COPY

# In the Matter Of:

FRED HEIDARPOUR V. CENTRAL PAYMENT

4:15-cv-139(CDL)

## ANDREW HEIDARPOUR

*September 28, 2016*

ESQUIRE SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION

-------------------------------X

FRED HEIDARPOUR, individually
and on behalf of a class of all
persons and entities similarly
situated,

Plaintiffs,

V. Case No. 4:15-cv-139(CDL)

CENTRAL PAYMENT CO., LLC,

Defendant.

-------------------------------X

VIDEO DEPOSITION OF ANDREW W. HEIDARPOUR

JACKSON & CAMPBELL, PC
One Lafayette Centre, South Tower
1120 20th Street NW
Washington, DC 20036
September 28, 2016 9:47 a.m.

Denise D. Vickery, CRR/RMR JOB NO. J0439420A

A P P E A R A N C E S

Attorneys for Plaintiff Fred Heidarpour and the Witness:

BRODERICK LAW, PC

99 High Street, Suite 304

Boston, MA 02110

508.221.1510

BY: EDWARD A. BRODERICK, ESQ.

ted@broderick-law.com

Attorneys for Defendant:

PAGE, SCRANTOM, SPROUSE, TUCKER & FORD, PC

1111 Bay Avenue, Third Floor

P.O. Box 1199

Columbus, GA 31902

706.324.0251

BY: THOMAS F. GRISTINA, ESQ.

tfg@psstf.com.com

Also Present:

Noojan Ettehad, Videographer

I N D E X

EXAMINATION OF


| ANDREW W. HEIDARPOUR | PAGE |
|---|---|
| BY MR. GRISTINA | 5 |
| BY MR. BRODERICK | 201 |
| BY MR. GRISTINA | 204 |


E X H I B I T S


| ANDREW H | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 59 |
| Exhibit 2 | Letter dated September 14, 2016 Broderick & Paronich to Gristina | 62 |
| Exhibit 3 | McDowell Mountain Justice Court Fred Heidarpour v. Freedom Auto Glass | 106 |
| Exhibit 4 | McDowell Mountain Justice Court Fred Heidarpour v. Arizona Energy Pros (Aepros) | 157 |
| Exhibit 5 | McDowell Mountain Justice Court Fred Heidarpour v. Mortgage Pro USA LLC | 183 |
| Exhibit 6 | HEIDARPOUR1041 - 1051 Phone Nur List | 193 |


(Exhibits attached to transcript.)

P R O C E E D I N G S

- - -

THE VIDEOGRAPHER: Good morning. This is the video -- video deposition of Andrew Heidarpour in the matter of Fred Heidarpour versus Central Payment Co., LLC. This deposition is being taken in Washington, DC on September 28, 2016 at 9:47 a.m. My name is a Noojan Ettehad. The video -- the court reporter today is Denise Vickery.

Will the counsel please introduce themselves.

MR. GRISTINA: Thomas Gristina and I'm here for Central Payment.

MR. BRODERICK: Edward Broderick here on behalf of Fred Heidarpour.

THE VIDEOGRAPHER: Thank you. The court reporter can swear the witness now.

- - -

ANDREW W. HEIDARPOUR

called for examination, and, after having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. GRISTINA:

Q. Good morning, Mr. Heidarpour.

A. Good morning.

Q. We met for the first time today.

A. Uh-huh.

Q. My name is Thomas Gristina and I'm an attorney with Page Scrantom in Columbus, Georgia, and we represent Central Payment in this lawsuit that's been filed by your father.

This is a deposition here today.

A. Yeah.

Q. I understand you've gone to law school, but I want to talk to you about the deposition process.

Have you ever had your deposition taken before?

A. No.

Q. Okay. So this is, I'll be asking a series of questions. Hopefully not be here too long, but try to get the information that we're looking for. And if you don't understand my

question, please let me know. I'll repeat it. If you do answer the question, I'll take it that you understood it, and you're answering it truthfully as you sit here today.

A. Okay.

Q. Is that okay?

A. Uh-huh.

Q. All right. So one thing as well is that I sometimes speak too fast. I might talk over you. You might talk over me. We got to not do that so that she can take down the answers and the questions accurately, okay?

A. Okay.

Q. And then also answers need to be verbal. So uh-huh or huh-uh, she can't take that down. So try to make sure everything is verbal, and if it's not, I'll point that out to you to try to get you to do it that way. Is that okay?

A. Yeah.

Q. Okay. So, again, also this deposition today is being taken in a federal lawsuit that your father has filed against Central Payment. That

lawsuit is pending in Federal Court in Columbus, Georgia. This deposition is being taken for purposes of that lawsuit. It is as if you were testifying in Federal Court today.

Do you understand that?

A. Uh-huh. Yes.

Q. Okay. And you're here under penalties of perjury. You understand that?

A. Yes.

Q. Okay. All right. Could you please state your full name and date of birth?

A. Andrew William Heidarpour. August 14, 1990.

Q. And so you've never -- but you've never had your deposition taken before?

A. No.

Q. Okay. Where were you born?

A. California.

Q. Where in California?

A. Oakland.

Q. Okay. Where did you go to school? And you can start with high school.

A. High school Edmond, Oklahoma, Edmond North and I went to University of Central Oklahoma for my undergrad, and I went to Arizona Summit for law school.
Q. When did you graduate law school?
A. 2014. May of 2014.
Q. And have you sat for the bar?
A. Yeah, I just sat for the one in July.
Q. Was that the first bar that you sat for?
A. No, I believe it was my second or third.
Q. What other bar exams have you sat for?
A. Virginia.
Q. And right after law school you sat for Virginia?
A. Yes.
Q. And were you unsuccessful in --
A. Yeah.
Q. -- your efforts?
Sorry, sorry about that --
A. Thanks. (Laugh).

Q. -- as well.
So how many -- it's not my purpose here to embarrass you.
A. Uh-huh.
Q. But I'm going to ask you some questions that might -- might make you feel bad. I apologize for that.
A. Uh-huh.
Q. How many times did you not pass the Virginia bar exam?
A. Twice.
Q. Okay. And then now you've taken the DC bar?
A. DC bar, yeah.
Q. And your results will be coming in a couple weeks?
A. Any -- anytime now, yeah.
Q. Well, good luck to you.
A. Thanks.
Q. All right. Where do you live now?
A. In Arlington.
Q. And where do you work?

A. Neifeld IP Law.
Q. Say it a little slower for me.
A. Neifeld IP Law.
Q. And when did you first start to work for that law firm?
A. About a year ago.
Q. What does that law firm specialize in?
A. Intellectual property.
Q. Maybe we'll go back a little bit further. So before when you were -- did you work while you were in college?
A. I worked for -- I worked for Abante Plumbing as well part time, and I started working for them in 2008.
Q. How old would you have been in 2008?
A. 18.
Q. And how -- do you still work for Abante part time?
A. Yeah.
Q. And that's a company that's owned by your father?
A. Well, he's the president. It's a

business. It's a corporation.

Q. He's the president.

Do you know who's -- who's the owner of the company?

A. Well, it's a corporation. So he would be the CEO.

Q. Is he a shareholder as well?

A. Yes. So yeah.

Q. Okay. Do you know anybody else who may have owned shares in Abante?

A. No.

Q. And you I understand -- is your cell phone that you have here today, is that phone an Abante Rooter cell phone?

A. Yes, it is.

Q. And that bill is paid by Abante Rooter, is it not?

A. Yes.

Q. And how long have you had that number for?

A. That this specific number?

Q. Yes.

A. I don't know. Four, five years.
Q. And has it always --
A. I'm not sure.
Q. -- has it always been an Abante cell phone?
A. Yeah, because I had an Abante number before and then I changed it.
Q. Okay. Other than working at Abante, leading up to where you are now, have you worked for any other companies?
A. Have I worked? Yeah. I mean, how far do you want me to go? There's -- (laugh).
Q. Well, moving -- why don't we -- you were 18. So I'm interested from when you were 18.
How old are you now?
A. 26.
Q. So from --
A. No, I'm sorry. Yeah, 26. I'm sorry.
Q. That's okay. So after -- after you started working at Abante and up to now and you mentioned the law firm that you worked for.
A. Yeah.

Q. Who else have you worked for?
A. Because I've also interned at law firms while I was in law school. There's Davis Miles McGuire. There's John Gall PC. I worked for a few law firms.
Q. And were those in Arizona?
A. John Gall was in Oklahoma. Davis Miles McGuire was in Arizona.
Q. And were any of those law firms specializing in TCPA cases?
A. No.
Q. And you understand we're here today on a Telephone Consumer Protection Act case. Do you understand that?
A. Yes.
Q. And I've seen some documents. I believe you have some familiarity with the TCPA?
A. Uh-huh.
Q. Is that accurate?
A. Yeah.
Q. All right. How did you get familiar with the Telephone Consumer Protection Act?

A. My dad wanted me to find a way to stop getting calls from telemarketers. So I did some research on it.
Q. And when was that?
A. Last year, maybe year before. I mean, I don't really know.
Q. And were you working at a law firm at that time?
A. You know, I don't know. Because I don't exactly remember when. I don't remember the exact timing he asked me to find out.
Q. Well, when you -- when you were assisting your father with that, were you doing it while you were employed by a law firm or were you doing it simply on your own?
A. I wasn't employed by -- I don't think I was employed by a law firm at the time.
Q. Okay. And, again, I'll ask you: In any of the law firms that you've worked at, did any of those firms specialize in TCPA cases?
A. That I worked at?
Q. Or were an intern with. Or maybe I'll

break it out.

A. I mean, Neifeld I don't think did TCPA. I don't think John Gall did TCPA.

Q. Do you know if any of the firms that you've ever interned at or worked for did TCPA cases?

A. There was a business that I helped start that was doing TCPA cases, but I don't know if at the time, and I think this was even before then.

Q. Okay. So tell me about what was that business?

A. It was LAFV, Legal Advocacy For Victims, and I worked there about two months, three months.

Q. Where was that business located?

A. DC.

Q. Who else worked there?

A. Richard Ashbaugh and I think Thomas something. I can't remember his last name. He's in Nevada.

Q. Were they lawyers?

A. Richard was.

Q. And did you help -- you said you helped start that company?

A. Yeah.

Q. That business?

A. Yeah.

Q. When was that?

A. I don't -- I don't recall. Maybe a year and a half, two years ago.

Q. What exactly did Legal Advocacy For Victims do?

A. It was for TCPA claims.

Q. And how did it -- how did it acquire clients?

A. Well, at that time because Richard was an attorney and Thomas -- that was more of Thomas's area. He would get us clients. I don't really -- that wasn't my area.

Q. What was Thomas's last name again?

A. I don't remember.

Q. Okay. Is it -- does it still exist?

A. I believe so. It should.

Q. What was your area with Legal Advocacy

For Victims?

A. I was helping with drafts and anything that Richard needed from me. I was like his clerk. So anything he needed.

Q. Drafts of what?

A. Of -- of anything. Anything he wanted me to do.

Q. Legal documents?

A. Legal documents, personal. I mean, whatever he asked me to do, I would do it.

Q. Did -- did Legal Advocacy For Victims file TCPA claims?

A. Yes.

Q. It actually filed the lawsuits themselves?

A. While I was there, I don't know if we filed any.

Q. Did you study the TCPA when you were in law school?

A. No.

Q. Were you working -- were you still in law school when you worked with Legal Advocacy For

Victims?

A. No.

Q. So this is something you did after law school?

A. Yeah.

Q. And when did you stop working there?

A. A few months ago, or I shouldn't say a few months ago. I stopped working after working a few months of working there, but that was probably, I want to say, around two years ago, close to two years ago.

Q. Why did you stop working there?

A. Didn't agree with the billing practices.

Q. What in particular concerned you?

A. When we were doing -- we had a contingency basis on our claims, and I just didn't feel comfortable with the percentage that was being made.

Q. What was the percentage?

A. Anywhere from 45, 55 percent.

Q. Did you have any ownership interest in

Legal Advocacy For Victims?
A. Yes.
Q. Do you still have that?
A. Yes, because I haven't been bought out yet.
Q. Have you asked to be bought out?
A. Yeah.
Q. Did they refuse?
A. They didn't give me what I wanted, so yeah. (Laugh).
Q. And how much did you ask for?
A. Well, it was more of getting compensated for the cases we had been working on. We had a disagreement on what cases those were or the date that it had been.
Q. So was there a specific amount you asked for they said no?
A. No, it's just because some of these cases take time. So it was a fact that I wanted to get compensated based on cases up to a certain date, and their date was different than my date.
Q. What was your -- did Legal Advocacy For

Victims handle any claims for your father?

A. I think they handled a couple, yeah.

Q. When were those?

A. Again, I don't know. Those were years ago.

Q. Do you know how many TCPA claims your father has made?

A. No.

Q. Do you have any rough estimate of that?

A. Don't have a clue.

Q. Is it more than a dozen?

A. I mean, I don't know.

Q. How many TCPA claims of your father's have you been involved with?

A. I mean, I don't know. I don't really keep track of how many I work on.

Q. Is it because there's too many for you to keep track of?

A. No, it's because it's, you know, it's not something I'm focused on. If he asked me to help him with something, I help him.

Q. Do you know what a professional

plaintiff is?

MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. Do you know what a professional plaintiff is?

MR. BRODERICK: Objection.

THE WITNESS: Am I to answer?

MR. BRODERICK: You can answer.

THE WITNESS: (Laugh). No.

BY MR. GRISTINA:

Q. Have you ever heard that term before?

A. No.

Q. Have you ever heard your father described as a professional plaintiff?

MR. BRODERICK: Objection.

THE WITNESS: Asked him described as a professional plaintiff?

BY MR. GRISTINA:

Q. Have you ever heard him described as?

A. I don't know what that term means, no.

Q. But you never heard of your father described as that?

A. No.

Q. Let me go back to the claims that you've been involved with your father.

So it's your testimony here today that you do not know how many he's been involved in?

A. No.

Q. That's -- oh, that's a bad question.

Do you know how many TCPA claims your father has been involved in?

MR. BRODERICK: Objection.

THE WITNESS: No.

BY MR. GRISTINA:

Q. And is it more than a dozen?

MR. BRODERICK: Objection.

THE WITNESS: I don't know. You'd have to ask him.

BY MR. GRISTINA:

Q. Okay. And you don't know how many TCPA claims that you've assisted him with?

A. No.

Q. Did you assist him with the claim we're here for today?

A. For Central Payment?
Q. Yes.
A. No.
Q. What states have you assisted -- what -- in what states has your father made TCPA claims where you have assisted him?
A. I don't -- (laugh). I don't know.
Q. You don't know?
A. No, because, I mean, some of these companies are all -- I mean, I don't know where he's filed or where he -- I mean, I don't know.
Q. You don't know what states he's filed lawsuits in?
A. No.
Q. When did you first start to study the TCPA?
A. I think it was around two years ago.
Q. And so you've been involved in a business that assisted people with TCPA claims. You've assisted your father with TCPA claims.
Do you consider yourself familiar with the TCPA?

A. I mean, I know some about it. It depends what you define as "familiar."

Q. Well, do you know what the elements of a TCPA claim are?

A. I would say it depends.

Q. What is your understanding of the TCPA claim your father has filed against Central Payment?

MR. BRODERICK: Objection.

THE WITNESS: This was a residential line; correct?

BY MR. GRISTINA:

Q. I'm asking you what your understanding of it was.

A. Well, I think -- I believe it was a residential line. It was a prerecorded message.

Q. Okay. We're going to talk about that line.

And so what -- what -- is that the extent of your understanding of the claim?

A. Yeah.

Q. Where do you currently live?

A. At 2121 North Westmoreland, Arlington,

Virginia.

Q. Where did you live when you were in law school in Arizona?

A. Phoenix in downtown.

Q. What was the address of that?

A. 310 South 4th Street.

Q. Who owned that apartment? Was it an apartment?

A. My dad. Yeah.

Q. And your father owned it?

A. Yeah.

Q. And at that time -- well, are you familiar with the house that your parents have in Scottsdale, Arizona?

A. Yes.

Q. Were they living in that house when -- when you were in law school?

A. You know, yes and no. I believe they bought that house after the apartment, but I know they travel a lot. So I don't -- I mean, I'm sure they were living there. They were living in multiple places. I don't know.

Q. How long did you live in the apartment in Phoenix?

A. Around three years. A little less than three years.

Q. And prior to that, where did you live?

A. I was in Oklahoma.

Q. In Edmond, Oklahoma?

A. Yes.

Q. What address did you live in there?

A. 756 Legacy Drive.

Q. And that was your parents' house?

A. Yes.

Q. All right. Have you ever been charged with a crime?

A. No.

Q. Are you married?

A. No. (Laugh).

Q. No children then?

A. No. (Laugh).

MR. BRODERICK: Don't say it like that.

THE WITNESS: (Laugh).

BY MR. GRISTINA:

Q. Is your -- is your full name Andrew Heidarpour?

A. Andrew William Heidarpour.

Q. Have you ever used any other names during your lifetime?

A. No.

Q. Have you ever used the last name Pour, P-o-u-r?

A. No. I'm sure I've said Andrew Pour before, but generally not.

Q. Why would you say Andrew Pour?

A. Well, I don't want to say I never have because, God forbid, if you find something I said Andrew Pour. I mean, I don't remember me ever using Andrew Pour.

Q. Well, have you ever represented to anybody that your name was Andrew Pour?

A. I don't think so, no.

Q. How about have you ever used the last name Ramelan?

A. Uh?

Q. Have you ever used the last name Ramelan, R-a-m-e-l-a-n?

A. No.

Q. Have you ever heard your parents -- let me be more specific.

Have you ever heard your mother hold her last name out as Pour, P-o-u-r?

A. Yeah.

Q. And in what context was that?

A. I know a lot of times, especially when she used to work in the medical field, it was hard for people to understand her name or her last name. So she would say Pour and she even spelled it a different way a few times. That's usually how she would use it.

Q. Have you ever seen your mother use the last name Pour on legal documents?

MR. BRODERICK: Objection.

THE WITNESS: No, I don't know. You have to ask her.

BY MR. GRISTINA:

Q. Have you ever heard your father use the

first name Ramezan, R-a-m-e-z-a-n?

A. Oh, Ramezan?

Q. Yeah. Thank you.

A. (Laugh). I mean, I believe that was his name before he came here.

Q. When he lived in Iran?

A. Yeah.

Q. And how do you -- did he tell you that was his name before he came here? How do you know that?

A. You know, I really don't know how I found out. I remember -- I know -- I think sometimes as his middle name it's Fred Ramezan Heidarpour. I mean, I don't remember when. I just know.

Q. All right. Have you ever known him to use or know of times where he's used the name Ramezan on legal documents?

A. I don't know.

Q. And then so I'll ask you again about Ramelan. Have you ever --

A. I've never heard of that.

Q. Never heard of that before?
A. Yeah.
Q. What state do you have your driver's license from?
A. Arizona.
Q. And when was that issued; do you know?
A. Two years ago. Around two years ago.
Q. Before that, was it -- what state was your license issued in?
A. Oklahoma.
Q. Was it to the Legacy Drive address?
A. Yes, I believe so.
Q. And what address -- when you were in law school, did you pay income taxes?
A. Did I pay income taxes?
Q. Yeah.
A. Oh, yeah.
Q. What address did you use for your income taxes?
A. What what?
Q. What address did you use for your income taxes?

A. I have to ask my CPA. They take care of all that.

Q. And who is your CPA?

A. You have to ask my dad. (Laugh).

Q. Is it the same CPA he uses?

A. I believe it should be. I think we used to have one in California. I think we have one in Texas that we use now.

Q. The last name Devoto sound familiar?

A. Devoto?

Q. Yes.

A. Devoto you mean?

Q. Devoto yes?

A. Yeah.

Q. And do you know -- how do you know that name?

A. He was the California CPA.

Q. Okay. And you believe he does your taxes as well?

A. I don't think he does it anymore because whoever my dad uses is who I'm going to be using.

Q. And why is that?

A. Because he's the one who helps me handle it all.

Q. Okay. What -- what is your role -- you said you worked part time with Abante starting in 2008.

What have you done for Abante in that capacity?

A. Mostly accounts receivable, invoices, making sure we get paid.

Q. And where is Abante headquartered?

A. California.

Q. Do you know the address?

A. It should be Admiral Drive.

Q. Is there an actual office on Admiral Drive?

A. I don't know.

Q. Have you ever been there?

A. There's an apartment there, yeah.

Q. Have you been to that apartment?

A. Yeah.

Q. Is there -- is there a sign that says

"Abante Rooter" at that apartment?

A. I mean, I don't know. I haven't been there in years.

Q. Do you know, is there a place where -- where Abante stores plumbing equipment in California?

A. I don't have. You'd have to ask him.

Q. Where -- is your father -- is he in charge of running Abante?

A. Yes.

Q. Where does he run Abante from?

A. Wherever he's at.

Q. So wherever he's located at the time is where Abante is run from?

MR. BRODERICK: Objection.

THE WITNESS: Well, you got to realize, he travels a lot. He works out of state. So if he's getting a phone call, the phone call gets sent to him. So he answers the call.

BY MR. GRISTINA:

Q. And what number does he use for Abante?

A. He has multiple numbers.

Q. Are they cell phone numbers?
A. Yes.
Q. But what -- what cell phone -- what cell phone number do you call him, your father on?
A. Well, it's not that easy because him and my mom, they always share phones. So I call both of them and get one of them.
Q. What number is that?
A. There's a 510-385-7447. There's a 209 number.
Q. What's that number?
A. I don't know it's 20938 something. And then there's another number that my mom and dad share. I think it's a -- it could be a 510 number. Another 510 one.
Q. Is there a 510 number that ends in 6407 that your father has?
A. I don't -- I don't know.
Q. What number -- if you were to call him right now, what number would you pick?
A. Him personally if I tried to get ahold of him?

Q. Yes.
A. It would probably be the 7447, but it may be my mom picks up.
Q. So I want to go back to something what you said. You said that your father runs Abante from wherever he's at at the time.
A. Uh-huh.
Q. Is that true?
MR. BRODERICK: Objection.
THE WITNESS: Well, again, he answers phone calls. So if he gets a call and he's in Virginia, what is he supposed to do?
BY MR. GRISTINA:
Q. What --
A. Not answer the call?
Q. Is he -- is that -- so he would run the company from there at that time?
A. Well, he --
MR. BRODERICK: Objection.
THE WITNESS: He would answer the call. I mean, that's -- that's -- I don't know how else you want me to say it. He gets a call. He

picks it up.

BY MR. GRISTINA:

Q. And I want to go back again and talk about Abante's headquarters, whatever that may be, but the apartment that you described on Admiral Drive.

A. Uh-huh.

Q. What does that apartment look like?

A. I mean, like I said, I haven't been there for years.

Q. When you were there, what did it look like? Is it in an apartment building?

A. Yeah, it's an apartment, had a desk, had a computer, a table.

Q. Is it in a residential apartment building?

A. I believe so. I think.

Q. Are there beds in that apartment?

A. Yeah.

Q. And does it have a kitchen?

A. Yeah.

Q. Do people live in that apartment?

A. I don't know.
Q. Have you ever stayed in that apartment?
A. Yeah, years ago.
Q. For how long?
A. Maybe a week or two at a time.
Q. And why would you have had stayed there?
A. Because I'd visit California.
Q. Who else works for Abante besides you and your father?
A. I believe my brother does. I don't know if my mom does. I think she does, too. I think we all work for him.
Q. Anybody else?
A. Yes, plumbers.
Q. What are their names?
A. There's Moyses, there's Francisco, there's Aldo, there's Martinez. I think there's a few of them.
Q. Do the plumbers that work for Abante, do they have trucks that they drive?
A. I mean, I would assume so.

Q. Have you ever seen an Abante Rooter truck?

A. Yeah. I don't know if it was owned by Abante or not. I saw a sign that said "Abante Rooter" on it.

Q. Where did you see that sign?

A. It was on the truck.

Q. Okay. That's what I'm -- that's what I'm asking.

So when these plumbers that work for Abante go on a service call, do they go there in a truck that has "Abante" on it on the side of it?

A. Yeah, but I don't know if they own the truck or we do. I would assume they go there with an Abante sign. I would hope they do.

Q. What does your brother do for Abante?

A. That's a good question. I don't know.

Q. We've all had plumbers come to various places we lived in. They come in with wrenches and different things and do whatever it is they do.

A. Uh-huh.

Q. But my question is with Abante: Does

Abante have a place where it stores plumbing equipment?

A. I mean, again, I don't -- I don't know. That's something you'd have to ask Fred.

Q. Do you pay invoices for spaces other than the apartment on Admiral -- Admiral Drive?

A. No. The invoices I look at are for customers.

Q. Do you look at any of the invoices related to the overhead for Abante?

A. No.

Q. Who does that?

A. I assume it's my dad. I don't know.

Q. Is there a building anywhere on earth that you know of where someone could walk off the street into an Abante office and talk to somebody who works for Abante?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I don't know. Again, that's something you'd have to ask Fred.

BY MR. GRISTINA:

Q. Well, you've worked for Abante for eight years now?

A. Uh-huh.

Q. Is that yes?

A. Yeah.

Q. And have you ever walked into a building where the front door on it says "Abante Rooter"?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I don't -- I don't know. That's not something I really focus on.

BY MR. GRISTINA:

Q. Is there a receptionist that works for Abante Rooter who fields calls?

A. Again, that's something you'd have to ask Fred. I'm not involved in that. I don't know.

Q. How many customers does Abante Rooter service in any given year? Do you know that?

A. I don't but, I mean, it's a good amount.

Q. And where does Abante Rooter operate? What cities and what states?

A. I believe it's just in California and what cities I'm not sure. I know it's in multiple cities. I hear my dad say Bay Area a lot. I know it's a big area.

Q. Does it operate in Arizona?

A. No. It's a plumbing company in California.

Q. Do you know if it's ever done business in Arizona?

A. I don't know. You'd have to ask Fred.

Q. You're represented here today by Ted Broderick; is that correct?

A. Correct.

Q. When did you hire Mr. Broderick to represent you?

A. A month, month and a half ago, I think.

Q. Was that in response to the subpoena that we served for your deposition?

A. Yes.

Q. Before that time -- well, let me do this.

What discussions have you had with your

father regarding this lawsuit?
A. About this?
Q. This lawsuit, yes.
A. None besides the deposition and they added in that one.
Q. Before the subpoena, which I believe we served back in late August, maybe early September, had you had any discussions with your father about the Central Payment lawsuit?
A. Besides trying to know if it was a landline or, you know, what was the call details, no, not really.
Q. What discussions about whether or not it was a landline did you have?
A. Oh, I was just asking him what the call was. He said landline prerecorded, and that's it.
Q. Any other discussions about the landline?
A. I mean, I don't -- I don't -- I don't think so. I don't know.
Q. Do you know what number he claims was called?

A. I think it was a 480 or 408.
Q. Do you know where that number is located?
A. Well, it should be Arizona.
Q. Do you know where in Arizona it's located?
A. The house, I assume.
Q. Do you know one way or the other?
A. I mean, I don't know the number for the home. I just know it's a 480 number.
Q. And you don't -- and when you say "the home," do you mean the Scottsdale house that your parents own?
A. Yes.
Q. And you don't know whether or not -- you do not know the landline number for that house?
A. No.
Q. Have you ever tried to call a landline number that you believed was that house?
A. No.
Q. When you were -- I assume you've spent time in the Scottsdale house, have you not?

A. Yes, I have.

Q. All right. Do you know where -- hang on one second. Do you know what that noise is?

A. It sounds like it's coming from behind you.

MR. GRISTINA: Can we go off the record for a second.

THE VIDEOGRAPHER: No. We're all right. It did that before.

MR. GRISTINA: Okay.

THE VIDEOGRAPHER: You want to go off the record?

MR. GRISTINA: No, I mean, I guess we'll keep coming. But is it interfering with --

THE VIDEOGRAPHER: It will stop.

BY MR. GRISTINA:

Q. Okay. All right. So when I talk about the Scottsdale house, I want to be clear that we have the address right.

So what is your understanding of the Scottsdale house's address? Do you know that address?

A. 38560 North 101st Street.

Q. Right. Okay. And about how much -- how much time have you spent in that house?

A. I mean, really not much. Even when I was in law school, I'd prefer my apartment.

Q. I assume you went out and had dinner with your parents?

A. Yeah.

Q. And now in that house, are there -- do you know where the landlines are located in that house?

A. No.

MR. GRISTINA: All right. All right. Let's go off the record.

THE VIDEOGRAPHER: Going off the record at 10:20.

(Recess - 10:20 a.m. - 10:24 a.m.)

THE VIDEOGRAPHER: Going back on record at 10:24.

BY MR. GRISTINA:

Q. All right. Mr. Heidarpour, we were discussing the Scottsdale address and you gave me

the street address. So for purposes of the deposition, I'm just going to call it the Scottsdale house.

A. Okay.

Q. And with that, can we agree that that Scottsdale house is the house located at 38560 North 101 Street?

A. Yeah.

Q. Okay. All right. Now, and we were discussing the fact that you would go out to the Scottsdale house from time to time and have dinner with your parents?

A. Uh-huh.

Q. All right. Is that -- that's true?

A. Yeah.

Q. All right. And my understanding is you have a close family.

A. Uh-huh.

Q. So I assume you spend a fair amount of time with your parents in that house?

A. I mean, like I said, I would always prefer my apartment. Their house is kind of far

from where I like to be. So -- (laugh). I'd have dinner. Sometimes stay, sometimes leave, or we'd go out to eat somewhere.

Q. All right. And specifically you can't tell me where the landline phones are located in that house?

A. No, I don't know.

Q. When you were there, did you ever hear a landline phone ring in that house?

A. I mean, I don't know. I'm sure at some point I have.

Q. And when I say "landline phones," do you remember whether or not your parents had cordless phones in that house that were tied to a landline?

A. I don't -- I don't know.

Q. You don't know if -- you can't recall anywhere in the house where you saw what you would have believed to be a landline phone?

A. I mean, I don't -- I don't know.

Q. Okay. How about a fax machine? Did you ever see a fax machine in the house?

A. Yeah, because we have a printer. I'm pretty sure it's a fax as well.

Q. Did you ever use that fax machine?

A. I'm sure I printed things off of it.

Q. What sort of things would you print on it?

A. I don't know. Maybe files or reports. I mean, I don't -- I'm just -- again, I don't want to say never. So, you know, I'm not sure.

Q. Would you have used that fax machine and printer for Abante Rooter business?

MR. BRODERICK: Objection.

THE WITNESS: I don't think I've ever used it for that, no, because that's -- I wouldn't need to use it for that.

BY MR. GRISTINA:

Q. You said files or reports.

A. Uh-huh.

Q. What did you mean by that?

A. I meant for school or something I was working on.

Q. Does your father have an office in that

house?

A. I believe so, yes.

Q. Is that where the fax machine is located?

A. I don't know.

Q. You don't know if that's --

A. I mean, I haven't been there. We -- we have a couple printers. Again, we have printers and faxes are like combined. So then we have a few of those. We have a few printers. So I don't know if he has one there right now or not.

Q. Is there a telephone near the printers that you described?

A. I wouldn't think so, no.

Q. And if you were to try to call your parents, if you knew they were in that house at the time -- you're all in Arizona. You're at your apartment and you want to try to reach your parents, and you knew they were in the Scottsdale house. How would you try to call them?

A. Either my dad's cell or mom's.

Q. And you don't know the landline

number --
A. No.
Q. -- for that house?
A. No.
Q. You understand that if a call is placed to a business landline by an autodialer that it's not a TCPA violation?
MR. BRODERICK: Objection.
THE WITNESS: Okay.
BY MR. GRISTINA:
Q. Do you agree with that?
A. If that's what you say, all right. Yeah.
Q. But, I mean, your experience as somebody who studied the TCPA and assisted your father and have a business --
A. Uh-huh.
Q. -- that is involved in TCPA claims, do you believe that to be an accurate statement?
MR. BRODERICK: Objection.
THE WITNESS: For landlines? I know more about wireless. I don't know much about

landline but, I mean, it sounds right, yeah.
BY MR. GRISTINA:
Q. Did you assist your father in gathering information to file this Central Payment lawsuit?
MR. BRODERICK: Objection.
THE WITNESS: No.
BY MR. GRISTINA:
Q. Have you assisted your father in filing lawsuits in Arizona?
MR. BRODERICK: Objection.
THE WITNESS: I believe he's asked me about some. Depends what you consider assisting.
BY MR. GRISTINA:
Q. Have you drafted documents for him for those?
A. No.
Q. Have you corresponded with companies that your father later sued in Arizona for TCPA violations?
A. No.
MR. BRODERICK: Objection.
THE WITNESS: I don't know because

I don't always know where these companies are. I don't know.

BY MR. GRISTINA:

Q. About how often while you were living in Arizona did you visit the Scottsdale house?

A. I want to say maybe once or twice a month, but I'm not sure.

Q. And that's --

A. Because they traveled a lot. So most of the time they would come to me.

Q. Are you aware of your father conducting Abante Rooter business out of the Scottsdale house?

MR. BRODERICK: Objection.

THE WITNESS: Well, like I say, he gets a phone call. So I'm sure if he gets a phone call and he's in the Scottsdale home, he's going to answer his home.

BY MR. GRISTINA:

Q. And in your opinion, would that be conducting business out of the Scottsdale house?

MR. BRODERICK: Objection.

THE WITNESS: You know, I don't

know. It would depend.
BY MR. GRISTINA:
Q. And your mom also works for Abante?
A. I believe so, yes.
Q. Does she pretty much travel with him wherever he goes?
A. Yeah.
I'm sorry if I'm coughing.
Q. That's all right.
MR. BRODERICK: At least you don't have the Trump sniffle.
THE WITNESS: (Laugh).
BY MR. GRISTINA:
Q. All right. So the number -- do you know -- I'll ask you again. I think you already answered this.
But do you know the number on which the Central Payment lawsuit is based, the telephone number?
A. I assume it's the residential line. It's the 480.
Q. And why do you say you assume it's the

residential line?

A. Because this is my dad's Scottsdale. I believe that is the number for Scottsdale is 480.

Q. Okay.

A. Or 408, one of those.

Q. Well, that's what I was asking you earlier. You said you didn't know the number for the Scottsdale house.

A. I don't. I just know it's -- you actually asked me multiple times. I said I know it's a 480 or 408, but besides that, I don't know what it is.

Q. But you've never called that number to reach them?

A. I don't, no. No.

Q. All right. So let's -- let's call it the 480 number for the deposition, okay?

A. All right.

Q. Is that fair?

A. Yeah.

Q. All right. To whom is the 480 number registered?

MR. BRODERICK: Objection.
THE WITNESS: I don't know.
BY MR. GRISTINA:
Q. Have you ever filed any lawsuits -- assisted your father in filing lawsuits based on the 480 number?
A. I don't believe so, no.
Q. Do you know when the 480 number was obtained?
A. Again, no.
Q. Do you know who obtained the 480 number?
A. I assume my mom or dad. I mean, I don't know.
Q. Do you know how that number was selected?
A. No.
Q. Is the 480 number a cellular number?
A. Say it again.
Q. Is it a cellular number?
A. The 480?
Q. Yes.

A. Wow. How can it be? It's a landline.
Q. So you can't -- a number can't be a cellular number and a landline number at the same time, can it?
A. At the same time?
Q. Right.
A. No.
Q. Okay.
A. Not that I know of.
Q. Do you know if there are any -- we talked about the 480 number, but do you know if there are any other landline telephone numbers registered to the Scottsdale house?
A. I don't know.
Q. When you were in the house -- I think I asked you this, but -- but do you know if there are multiple ring tones that would come to the landline in that house?
A. I don't know.
Q. Because sometimes you could have a landline -- are you aware that sometimes you can have a landline phone that could have different ring

tones for different calls that were coming in?
A. Actually that I didn't know.
Q. You didn't know that?
A. No. I know cell phones can do that because I can program it. I didn't know landlines can do that.
Q. But -- well, let me ask it this way.
Are you aware that you could have a landline that would receive calls from two different numbers?
A. A landline that would receive calls. What do you mean?
Q. It could mean you could have two different numbers that come to the same phone where they would have different ring tones. Are you aware of something like that?
MR. BRODERICK: Objection.
THE WITNESS: Can you rephrase that? I'm --
BY MR. GRISTINA:
Q. That's all right.
A. Too -- (laugh).

Q. Yeah. So -- so you have a landline phone in a house --

A. Uh-huh.

Q. -- and there's actually two numbers that could be registered to that house. And when you call one of them, it rings one way, and when you call the other one, it rings a different way. So that the person hearing the rings would be able to discern which number is being called.

Are you aware of that process?

A. And you would only have one phone for that?

Q. Yes.

A. Oh, no, I didn't know that.

Q. Okay. All right. Do you know who pays the bills for the 480 telephone number?

A. Again, I assume Fred and Farideh, but I don't know.

Q. When you say "Fred and Farideh," you're referring to your parents?

A. Yeah.

MR. GRISTINA: Are you doing A or

1?

THE REPORTER: 1.

(Document marked for identification purposes as Andrew H Exhibit 1.)

BY MR. GRISTINA:

Q. All right. Mr. Heidarpour, I've put in front of you what we've marked as Andrew H Exhibit 1, and we did Andrew H to save space on there.

A. Right. I understand.

Q. It's a subpoena that was served on your attorneys for you to be here today.

A. Uh-huh.

MR. BRODERICK: That is an extra copy.

BY MR. GRISTINA:

Q. Have you ever seen that document before?

A. (Reviewing document).

I believe so, yes.

Q. When did you first see it?

A. I want to say maybe around a month ago or maybe a few weeks ago. I don't -- I don't

recall. Never had got it.
Q. Okay. And in the subpoena that you have in front of you, if you'll look, there is an Exhibit A attached to that subpoena.
A. Okay.
Q. Do you see that?
A. Uh-huh.
Q. And in Exhibit A there are on the second page on page 2, there are document requests. Do you see that?
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. All right.
A. Sorry.
Q. Did you -- have you reviewed those document requests?
A. Yes.
Q. And in response to these document requests -- and there's a number of them -- did you do anything to locate documents?
A. I mean, whatever it asked me, I should

have given. So, yeah.
Q. Did you -- did you gather documents --
MR. BRODERICK: Objection.
BY MR. GRISTINA:
Q. -- related to these requests?
A. Let's see. What do you mean did I gather documents?
Q. Well, did you gather any documents and give them to your attorney in response to these document requests?
A. I forwarded him some things, yes.
Q. And what sort of documents did you forward to your attorney?
A. I believe most of it is actually information with other attorneys.
Q. Pardon?
A. Information with other attorneys.
Q. I don't understand that.
You forwarded information with other attorneys to Mr. Broderick?
A. Yeah. Conversations I would have.
Q. With -- with other lawyers?

A. Yeah. I would get documents sent to me. I would get an e-mail sent to me and I would send it to him.
Q. And was that in response to these document requests?
MR. BRODERICK: I'm going to register an objection that we served a Rule 45 objection saying that our response is limited to documents related to this lawsuit and that he did not have any of those documents.
MR. GRISTINA: Mark this as Exhibit 2.
(Document marked for identification purposes as Andrew H Exhibit 2.)
BY MR. GRISTINA:
Q. All right. Do you see that we've marked as Exhibit 2, Mr. Heidarpour?
A. Yes.
Q. And that's a letter from Mr. Broderick to me.
A. Uh-huh.
Q. Is this today the first time you've

seen that?
A. I believe so, yes.
Q. Okay. All right. And so we can kind of stay focused on this here, do you have any documents that you've gathered that are related to this lawsuit?
A. That are not privileged?
Q. Well, do you have --
A. No.
Q. -- any documents that are related to this lawsuit?
A. That aren't privileged? No.
Q. And you maintain that you have some documents that you believe are privileged?
A. I mean, it says right here "other than privileged communications with his counsel."
Q. So other than --
A. Am I reading that right? Yeah.
Q. All right. You're reading what your attorney said to me. What I'm asking you is what you understand.
Are there documents that you have

related to this lawsuit that you have not produced?

A. Well, my attorney would understand better than me. So besides it being privileged, no.

Q. Right. My question is: Are there documents that you have related to this lawsuit that you have in your possession that you have not produced?

A. And I said --

MR. BRODERICK: Objection.

THE WITNESS: -- other than it being privileged, no.

BY MR. GRISTINA:

Q. So you have documents that you believe are privileged that you -- have you given those to your lawyer?

A. Yes.

Q. Okay. And are those documents correspondence with your lawyers?

A. Yes.

Q. Are those -- are any of those documents correspondence with your father?

A. No.

Q. Okay. Other than correspondence with your lawyers, are there any other documents that you have related to this case?

A. No.

Q. Okay. And when -- when were those correspondence with your lawyers?

A. I think when it was filed.

Q. All right. When what was filed?

A. When the -- when the case was filed. I mean, I don't remember. I think it was when it was filed last time.

Q. When the lawsuit was filed?

A. Yeah.

Q. So you had correspondence with which lawyers?

A. I believe it was Anthony.

Q. All right. And those are documents that -- so you had correspondence with Anthony Paronich when this Central Payment lawsuit was filed?

A. Yes.

Q. And you understand you're not a party

to this lawsuit?
A. Uh-huh.
Q. Is that true?
A. Yes.
Q. Do you believe Mr. Paronich to be your attorney?
A. That's a tough question to answer.
I believe Ted is my attorney, but I think it all falls under the same purview.
Q. All right. You testified earlier that you hired Mr. Broderick after the subpoena was served on you in this case --
A. Uh-huh.
Q. -- just a month or so ago; correct?
A. Uh-huh.
Q. Is that correct?
A. Yes.
MR. BRODERICK: Objection.
BY MR. GRISTINA:
Q. This lawsuit was filed in August of 2015. You're aware of that, are you not?
A. Uh-huh. Yes.

Q. Yes? And did you have a lawyer at that time?
A. Well, Anthony was handling the case.
Q. Okay.
A. So...
Q. And he's your father's lawyer; correct?
A. I believe so, yeah.
Q. I mean, and my question is: Did he represent you as well?
A. Directly? I mean, I'm not sure. I don't think so. I don't know.
MR. BRODERICK: Objection.
MR. GRISTINA: What sort of -- well, Ted, is he going to produce those documents? Do you guys maintain those as privileged?
MR. BRODERICK: Yes, we do.
MR. GRISTINA: Okay. What's the predicate for that?
MR. BRODERICK: We were representing him and his father at the time of filing the lawsuit.
MR. GRISTINA: He's not a party.

MR. BRODERICK: We have clients who aren't parties.

BY MR. GRISTINA:

Q. What -- without telling me the substance of these communications, I understand your attorney is going to -- Ted, are you going to assert the attorney-client privilege over the substance of the communications?

MR. BRODERICK: Yes.

BY MR. GRISTINA:

Q. What -- what -- were these e-mail communications?

A. Yes.

Q. And were they documents related to the 480 number?

MR. BRODERICK: Objection. I'm going to instruct the witness not to answer.

BY MR. GRISTINA:

Q. Were any telephone bills provided to Mr. Paronich?

MR. BRODERICK: Objection and -- well, I'm going to instruct him not to answer about

his communications with Mr. Paronich.

MR. GRISTINA: In any way? I'm asking about a specific document and whether or not telephone records were produced.

MR. BRODERICK: If you can remember.

THE WITNESS: Yeah. I don't know.

BY MR. GRISTINA:

Q. So were you assisting your father in gathering information regarding this lawsuit?

A. This one? No.

Q. All right. That's confusing because you corresponded with Mr. Paronich regarding the lawsuit.

A. Uh-huh.

Q. So what was your capacity in corresponding with Mr. Paronich regarding this lawsuit? What were you doing?

MR. BRODERICK: I'm going to instruct the witness not to answer. These are questions about communications with his lawyer.

BY MR. GRISTINA:

Q. But you were not assisting your father in filing a lawsuit?
A. No.
Q. Is it your testimony today that you don't have any communications that in any way reference or relate to the telephone number 480-595-5903?
A. Yeah.
Q. Have you looked for communications related to that?
A. Yes.
Q. Where did you look?
A. In my e-mail.
Q. And it's your testimony that you don't have any e-mails with your father or your mother regarding the 480 number?
A. I mean, I don't believe so, no.
Q. When did you look?
A. A few weeks ago.
Q. And how far back did you look?
A. A year and a half, two years ago.
Q. And what is your e-mail address?

A. AndrewHeidarpour@gmail.com.
Q. Do you have another e-mail address?
A. Stockhead07@gmail.com.
Q. How about another one referencing TCPA?
A. There's AndrewHeidarpourTCPA@Gmail.
Q. And they're all Gmail accounts?
A. Yeah.
Q. Do you have any other e-mail accounts?
A. One at Neifeld. I think I have a Hotmail account from years ago.
Q. Did you check all of those e-mail accounts for communications regarding the 480 number?
A. I checked with TCPA and the Andrew Heidarpour.
Q. Did you check any of the others?
A. No.
Q. And those e-mails for the TCPA e-mail address and the other one that you mentioned, they -- you checked them back a couple of years?
A. Which one are you talking about?
Q. Well, tell me -- tell me the ones you

checked back a couple years.

A. TCPA. AndrewHeidarpourTCPA and Andrew Heidarpour@Gmail.

Q. Is it your testimony that you don't have any documents related to communications between you and your father that in any way reference the 480 number?

MR. BRODERICK: Objection. Asked and answered.

BY MR. GRISTINA:

Q. Is that your testimony?

A. Yeah.

Q. How about communications between you and your mother in any way regarding the 480 number?

A. No.

Q. You don't have any e-mails between you and your mother regarding the number?

A. No.

Q. How about communications between you and Abante Rooter regarding the 480 number?

A. No.

Q. Have you checked for -- well, let me

ask you this. Looking at these, there are 14 document requests.

Is it your testimony that you reviewed all of these and searched for documents related to them?

A. Yes.

Q. And is it your testimony that you don't have any documents related to any of these document requests?

MR. BRODERICK: Objection. Notice.

BY MR. GRISTINA:

Q. That you're not asserting are privileged?

A. Yes.

MR. BRODERICK: Or our relevance objection as set forth in our letter.

BY MR. GRISTINA:

Q. Are you withholding documents based on relevance?

A. Excuse me?

Q. Are you withholding documents from

production in this case based on relevance?
A. I mean, you asked me for 48 -- for documents pertaining to 480; right?
Q. Yes.
A. I don't have anything regarding 480.
Oh, is this? This is the number.
Q. That's the number.
A. That's the number. All right.
Q. 480-595-5903.
A. Okay.
Q. And it's your testimony you don't have any non-privileged documents related to this number?
A. No.
Q. Do you know how many lawsuits your father has filed based on this 480 number?
A. No.
Q. And you don't -- I asked you this before.
You don't know how many lawsuits you've assisted him with respect to this number?
A. No.
Q. But do you understand that you have

assisted him with lawsuits related to this number?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I'm not -- I mean, I'm sure -- I don't know. If he asks me for help, I help him, but I don't know what number it's regarding all the time.

BY MR. GRISTINA:

Q. Are you aware of calls being forwarded from the 480 number to your father's cell phone?

MR. BRODERICK: Objection.

THE WITNESS: No, but it wouldn't surprise me.

BY MR. GRISTINA:

Q. Why wouldn't it surprise you?

A. Because he travels a lot.

Q. And do you know of any other -- any numbers where calls are forwarded to your father's cell phone?

A. You'd have to ask him.

Q. Okay. And you understand your father's cell phone is registered to Abante Rooter, do you not?

A. Correct.
Q. Do you know where the bills from that cell phone are sent?
A. No. You'd have to ask him.
Q. And those are the same bills for your cell phone as well; correct?
A. Yes, because it's an Abante phone.
Q. Do you receive any calls on your Abante phone that are forwarded from the 480 number?
A. I mean, if I have, I wouldn't know because I've never been told that any number was forwarded to me.
Q. Do you receive calls on your cell phone from Abante customers?
A. Customers?
Q. Yes.
A. No.
Q. Have you ever heard of the company DNA Pool Perfectors?
A. I mean, it sounds familiar. I don't -- no, I don't know.
Q. Have you ever received any calls from

DNA Pool Perfectors?
A. Me?
Q. Yes.
A. No.
Q. Have you ever received any calls where people were trying to reach DNA Pool Perfectors?
A. I don't see how I would. I have a 510 number.
Q. Do you know that the 480 number was previously assigned to DNA Pool Perfectors?
A. If -- okay.
Q. You do know that one way or the other?
A. No. Okay. I mean, I don't -- I don't know. If that's what you're saying, then that's what it is.
Q. All right. I'm -- yeah, I don't -- in this -- in this instance, I'm just trying to know if you are aware of that fact that the 480 number had been previously assigned to DNA Pool Perfectors.
A. I mean, I assumed it was assigned to somewhere because you're getting a phone number.
Q. But you're not specifically aware that

it is assigned?

A. Yeah, I'm not -- I'm not sure. I don't know.

Q. We're talking over each other and I apologize.

A. Oh, sorry.

Q. But, no. I mean, you're not aware that it was previously assigned to DNA Pool Perfectors?

A. No.

Q. Okay. Are you aware that the 480 number is still publicly listed as being associated with DNA Pool Perfectors?

A. I didn't know that. I don't know.

Q. Have you discussed that with your father?

A. No.

Q. Are you aware that the 480 number is still publicly listed in the Cave Springs, Arizona telephone directory as associated with DNA Pool Perfectors?

A. I don't know.

I didn't even know the number.

(Laugh).

Q. Were you in any way involved with the company A.B.C. Billing?

A. No.

Q. And I know it's a sensitive topic, and we're going to maybe talk about it a little bit, but your mother had some trouble related to A.B.C. Billing.

Did you have anything at all to do with that business?

MR. BRODERICK: Objection.

THE WITNESS: I would mail envelopes. That was it.

BY MR. GRISTINA:

Q. For A.B.C. Billing?

A. It was -- I don't know if it was for A.B.C. Billing. I just know I mailed envelopes. That's really all I did.

Q. Were you ever interviewed by criminal investigators related to A.B.C. Billing?

A. No.

Q. Do you know if your father was

interviewed by criminal investigators?
A. I don't know.
Q. All right. Other than this lawsuit that we're here for today, can you tell me the names of any other lawsuits that your father has filed with respect to 480 number?
A. No.
Q. So you don't know any of the other companies that your --
A. I don't --
Q. -- your father sued?
A. I don't -- a lot of these companies have similar names. I mean, I don't remember the name.
Q. So you can't remember a single name other than -- than -- well, I don't if you remember Central Payment.
But other than Central Payment --
A. Uh-huh.
Q. -- can you remember a single name of another company that your father has sued based on the 480 number?

A. No.
Q. Have you ever been involved in any bankruptcies?
A. No.
Q. And I'm going to ask only specifically with respect to your father and mother.
Do you know how many demand letters that you may have sent making claims for TCPA violations on their behalf?
A. That I sent?
Q. Yes.
A. No.
Q. Have you ever received any of the revenues from settlements that your father has obtained in TCPA claims?
A. No.
Q. Do you get a share of any of those revenues?
A. No.
Q. So if your father settles a case for 500 bucks, does he ever give you any of that money?
A. No. I'm an employee of Abante. I get

paid hourly.

Q. So you get paid hourly by Abante?

A. Yeah.

Q. But does that have anything to do with the TCPA claims your father files?

A. I mean, if I review a draft, I mean, I guess. He just pays me hourly. If he asks me to do something for Abante, I don't really question it.

Q. So when -- when you review potential TCPA claims for your father, do you bill that time to Abante?

MR. BRODERICK: Objection.

THE WITNESS: Yes and no. He kind of pays me minimum hours per pay period, and if I go over, I'll tell him, but I usually don't.

BY MR. GRISTINA:

Q. So my question is a little different than that.

But do you receive -- when you work on helping your father on a TCPA claim --

A. Uh-huh.

Q. -- do you bill that time to Abante?

A. No.
Q. Are you paid by Abante for that time?
A. I'm paid for hours.
Q. By Abante?
A. Yeah.
Q. And those might be hours that were associated with your working on TCPA claims?
A. Probably, yeah.
Q. Specifically with respect to this Central Payment claim --
A. Uh-huh.
Q. -- were you paid by Abante for your time working on this claim?
A. No, I never -- I don't know anything about this claim.
Q. Well, you've corresponded with Mr. Broderick and Mr. Paronich and your attorney has asserted privilege --
A. Uh-huh.
Q. -- based on that related to this lawsuit.
A. Uh-huh.

Q. So were those correspondence that you're claiming privilege on related to this Central Payment lawsuit?

A. No, not --

MR. BRODERICK: Objection. I think you're asking him about the substance of communications with his counsel.

MR. GRISTINA: Well, the problem is that he says he doesn't know anything about this case and, yet, you're asserting an attorney-client privilege based on this case and so that's -- that's confusing to me.

Now, if these are communications that he had regarding other lawsuits that you're claiming a privilege on, that's what I'm trying to figure out. So I don't -- if he knows nothing about the case, then how can it be a privilege between you and him related to the case?

MR. BRODERICK: If as he sits here today, he knows nothing about the case, that's -- that's the state of his knowledge, but you're not going to ask him about any communications he's had

with his lawyers.

MR. GRISTINA: But I think that I can ask him about communications, if he's had communications. My question is not the specifics, but I'm asking if he's had communications with you all regarding this lawsuit that he claims are privileged.

He doesn't have to tell me what the communications are, but I'm trying to get the realm to understand whether or not there is a privilege.

And then -- and then there's going to be a follow-up question, but -- but I'm specifically wondering if he had had communications with you all regarding this lawsuit.

MR. BRODERICK: Well, we met yesterday --

MR. GRISTINA: All right.

MR. BRODERICK: -- preparing for his subpoena.

BY MR. GRISTINA:

Q. We talked about the time surrounding

the filing of the complaint when you said that you had correspondence with Paronich -- with Mr. Paronich. Okay. Do you recall that?

A. Uh-huh.

Q. Is that yes?

A. Yes.

Q. All right. Did you bill Abante for that time?

A. No.

Q. Was that not -- you didn't keep track of those hours --

A. No.

Q. -- in association with the other work that you were doing for Abante on TCPA claims?

A. Yeah, no.

Q. Why not?

A. Because I didn't really do anything. (Laugh).

Q. Specifically with respect to the 480 number, have you billed Abante for time --

A. No.

Q. -- on TCPA claims?

I got to finish.

MR. BRODERICK: Let him finish.

THE WITNESS: Sorry.

BY MR. GRISTINA:

Q. Yeah. Working on with the 4 -- we're talking about the 480 number.

A. Uh-huh.

Q. Have you billed Abante time for claims related to the 480 number that you assisted your father with?

A. No.

Q. What number did you -- what number was at issue in the Abante -- in the claims for which you billed Abante for?

A. Whatever the Abante numbers are.

Q. And those are cell phone numbers?

A. Yeah.

Q. And, again, are you aware of the 480 number calls being forwarded to Abante cell phones?

MR. BRODERICK: Objection.

THE WITNESS: I mean, like I said, it wouldn't surprise me if he did that because he

travels.
BY MR. GRISTINA:
Q. Has Abante ever made a claim on a TCPA violation for calls that were placed to the 480 number and later forwarded to an Abante cell phone?
MR. BRODERICK: Objection.
THE WITNESS: I don't know.
BY MR. GRISTINA:
Q. Do you know how many TCPA lawsuits Abante has filed?
A. No.
Q. Are you assisting Abante with those now?
A. Some, yeah.
Q. And where are those lawsuits pending?
A. Oh, no. I'm sorry. The lawsuits I don't know, but in case in terms of TCPA, yeah, I help some.
Q. And how do you help your father with those Abante cases?
A. Review drafts.
Q. Of what?

A. Like he'll have correspondence or e-mail. He'll write it. He'll call me. Say, can you review the draft? I'll edit the wording or change something. And I'll say, okay, read the draft. And then sometimes he'll add. Sometimes he'll send it. I mean, whatever he does from there is him.

Q. Did you do any of that type of work with respect to the Central Payment claim?

A. No.

Q. Are you aware of any recordings of telephone calls between either of your parents and Central Payment Wisconsin?

A. No.

Q. Do your parents, to your knowledge, record calls with telemarketers that they are gathering information on to file suit against?

A. I don't know.

Q. Are you aware of your parents lying to telemarketers during such calls when they're trying to gather information?

MR. BRODERICK: Objection.

THE WITNESS: What do you -- what do you mean "lying"?

BY MR. GRISTINA:

Q. Misrepresenting who they are when they're talking to the telemarketers.

MR. BRODERICK: Objection.

THE WITNESS: I mean, I don't --

MR. BRODERICK: Just know what you know.

THE WITNESS: I don't know. You'd have ask them. (Laugh).

BY MR. GRISTINA:

Q. Have your parents ever told you that they -- that they would do whatever it takes to gather information on these companies so they can file suit?

MR. BRODERICK: Objection.

THE WITNESS: No.

BY MR. GRISTINA:

Q. Do you think it would be acceptable for someone to lie to a telemarketer so that they could gather information about the telemarketer to file

suit against them?

MR. BRODERICK: Objection.

THE WITNESS: Was an illegal call already made?

BY MR. GRISTINA:

Q. I'm asking you: If a call -- if a telemarketer calls, do you think it would be acceptable --

A. It depends.

Q. -- for someone to lie to them to gather information so that they could file a TCPA claim?

MR. BRODERICK: Objection.

THE WITNESS: It depends.

BY MR. GRISTINA:

Q. It depends on what?

A. If it was an illegal call.

Q. And if it's an illegal call, do you believe it's acceptable -- do you believe it's acceptable to lie to a telemarketer to gather information?

MR. BRODERICK: Objection.

THE WITNESS: To gather

information for them? Yeah.

BY MR. GRISTINA:

Q. You think it's okay to lie to them?

MR. BRODERICK: Objection.

THE WITNESS: I mean, you need to understand. In order to have a claim against a telemarketer, you need to gather information from them. Hanging up the phone on them isn't going to get you anywhere. You're not going to have anything. Half these people probably call from a fake number. So to gather information, yeah, you need to gather information. Otherwise they just hang up on you.

BY MR. GRISTINA:

Q. And even if to gather that information you misrepresent who you are at the time?

MR. BRODERICK: Objection.

THE WITNESS: I don't see it as black and white like that. It depends. Again, it depends.

BY MR. GRISTINA:

Q. But would it be okay to lie to one of

the telemarketers and tell them that you have a business and give them the name of the business so that they will provide information as to who they are? Would that be acceptable?

MR. BRODERICK: Objection.

THE WITNESS: If an illegal call was made?

BY MR. GRISTINA:

Q. Yes.

A. I mean, again, it depends.

Q. It depends on what?

MR. BRODERICK: Objection. He's not a TCPA ethicist. I mean, he's here as a fact --

MR. GRISTINA: Ted, you and I get along great, but that's a speaking objection and it's inappropriate.

MR. BRODERICK: I'm registering an objection on a third-party witness.

MR. GRISTINA: I'm fine with it but not a speaking objection, Ted.

MR. BRODERICK: I tell you, I'm going to put my objection on the record.

MR. GRISTINA: I'm fine with that.
MR. BRODERICK: Ask you not to ask him opinion questions.
BY MR. GRISTINA:
Q. I'm asking you if it's okay to lie to a telemarketer to gather information to file a TCPA claim.
MR. BRODERICK: Objection. That's the third time you've asked him that.
BY MR. GRISTINA:
Q. What's your answer?
A. Am I answering?
MR. BRODERICK: Yes, about if it continues, we might have to ask to take a break.
THE WITNESS: You know, like I said, as far as I know, you need to gather information on these telemarketers in order to sue them. Am I -- am I correct?
BY MR. GRISTINA:
Q. I'm asking you.
A. Well, I mean, if you need to get information, they made an illegal call, again, I'd

say it depends. If the call was, in fact, illegal, to get information to sue them, probably.

Q. Are you aware that your mother testified that she would do whatever it takes to get the information to file the claims?

A. Okay.

Q. Were you aware of that before I just said it?

A. No, but --

Q. Have you ever heard her say something like that?

A. No, but I've told her, you need to get this information in order to have a claim.

I don't know if you've ever gotten a call from a telemarketer, but they're not really prone on questions.

Q. Have you ever held yourself out as an attorney to companies from which your -- excuse me. Let me start again.

Have you ever heard held yourself out as an attorney to companies on which you're gathering information to file a TCPA claim?

A. No.
Q. Have you ever told --
A. And I don't gather the information.
Q. Have you ever told companies that you've handled hundreds of TCPA claims?
A. Sure. My dad has and my mom has.
Q. Have you done that?
A. I mean, I don't remember. Maybe, maybe not.
Q. Have you, in fact, been involved with hundreds of TCPA claims?
A. I mean, it could be hundreds. I don't know.
Q. Have you ever been accused of harassing companies?
A. (Laugh).
MR. BRODERICK: Objection.
THE WITNESS: Have I ever been accused of harassing? Have I personally?
BY MR. GRISTINA:
Q. Yes.
A. No.

Q. Do you know if your father has?

A. I mean, the minute you ask them a question, you're harassing them. So probably. I mean, I don't know. You have to ask him.

Q. Did you check to see if you had any text messages with your father regarding the 480 number?

A. Yeah.

Q. And did you have any?

A. No.

Q. Have you had text messages with anybody about the 480 number?

A. No.

Q. How about this lawsuit? Have you had text messages with anybody about that, other than your attorneys?

A. No.

Q. Do you know how much money your father has received in settlements related to TCPA claims?

A. No. You have to ask him.

Q. Do you know how much money Abante has received in settlements related to TCPA claims?

A. No.
Q. And I think I asked this before, but do you know of any recordings that your parents have kept related to TCPA claims?
A. No.
MR. BRODERICK: Objection.
BY MR. GRISTINA:
Q. Do you know of a spreadsheet that your parents maintain related to TCPA claims?
A. Yes.
Q. What do you know about that spreadsheet?
A. I believe it has the caller details for the call.
Q. What computer does that spreadsheet stay on?
A. I don't know.
Q. Do you know who maintains the spreadsheet?
A. I assume my parents.
Q. Have you ever inputted data to the spreadsheet?

A. No.
Q. Do you know about a paper notebook that they keep with them to record calls that they receive from telemarketers that they want to pursue TCPA claims against?
A. Yes.
Q. What do you know about that notebook?
A. Just that they write the information in it.
Q. Do you know where that notebook is?
A. I assume it's wherever they are. I mean, I don't know.
Q. Do you have --
MR. BRODERICK: He doesn't want you to assume. He wants to know what you know.
THE WITNESS: Yeah, no. I don't know.
BY MR. GRISTINA:
Q. You don't have that notebook, do you?
A. No.
Q. Did you tell them to keep that notebook?

A. No.

Q. All right. I'm going to ask you about some other telephone numbers.

Are you familiar with -- and I want to know if you're familiar. We'll go through them and see if you're familiar with them and see if we can identify whose numbers they are.

A. Uh-huh.

Q. 304-520-0902?

A. I don't know.

Q. 480-575-6052?

A. No.

Q. 925-253-7997?

A. It might be Ali's because I know his is a 925 number.

Q. That's your brother, Ali?

A. Yeah.

Q. And I don't have an area code on this one. 253-0787?

A. I don't -- that number sounds familiar. Is that -- is that an Abante number?

Q. I'm trying to get you to help me

identify it if you know.

A. I mean, I don't -- it sounds familiar.

Q. If you don't know, it's okay.

A. Yeah, it sounds familiar.

Q. All right. How about -- again, I don't have an area code but 340-7447?

A. That is -- that should be Legacy Drive. Yeah.

MR. BRODERICK: In Oklahoma?

THE WITNESS: I mean, I think so. I don't -- that's what it was --

MR. BRODERICK: That's -- that's where that is?

THE WITNESS: Yeah, that's one -- one weird. I don't know if he has it or if he canceled it and converted it to a wireless line. I mean, I don't know.

BY MR. GRISTINA:

Q. In the -- how long ago was it as best you can recall you went to the Admiral Drive address in California?

A. Five, six years.

Q. Okay.
A. It's been a while.
Q. At that time, were there Abante business records stored there?
A. I don't know.
Q. Are there filing cabinets there; do you remember?
A. I don't -- I don't know.
Q. Have you ever been involved in any of -- any medical practices that your mother was involved in?
A. Besides mailing the envelopes, no.
Q. Are you aware of any -- other than Abante, are you aware of any other business entities that your father is involved with?
A. I mean, I know he has some.
Q. Do you know what they are?
A. No, because I don't know if he's involved in them or my mom is involved in them. I mean, I don't know.
Q. Is there -- do you know the names of them?

A. There's A.B.C. Billing. Alliance Consulting. They have Abante Plumbing. I'm sure there's maybe one or two more.
Q. You can't recall the names --
A. Yeah.
Q. -- as you sit here today?
A. Yeah.
Q. Have you ever heard of a company Avante, A-v-a-n-t-e?
A. Avante?
Q. Yes.
A. With a V?
Q. Yes.
A. Sounds like -- sounds like Abante. Is it another company?
Q. Well, I'll just tell you. It's on the cell phone bills --
A. Uh-huh.
Q. -- for Abante Rooter.
A. Then they probably misspelled it.
Q. It appears to have a number associated with a cell phone named Avante that are forwarded to

Abante cell phone numbers.
Do you have any knowledge of that?
A. The number -- there's a number on the account associated? Yeah, I don't know.
Q. If you don't know, you don't know.
A. Yeah.
MR. GRISTINA: All right. Why don't we take a break. We'll come back in and we'll go through some documents.
MR. BRODERICK: All right.
THE VIDEOGRAPHER: Going off the record at 11:12.
(Recess - 11:12 a.m. - 11:17 a.m.)
THE VIDEOGRAPHER: Going back on record at 11:17.
BY MR. GRISTINA:
Q. Mr. Heidarpour, have you ever helped your father prepare phone bills for TCPA claims related to the 480 number?
A. No.
Q. Have you ever helped your mother prepare those?

A. No.
Q. Are you aware of how your father collects those bills to submit to courts in association with his TCPA claims?
A. No.
Q. All right. Are you aware of multiple lawsuits your father filed in the Arizona small claims court for TCPA violations?
A. I'm sure he has.
Q. Are you aware of the specifics of any of those?
A. I know there's one he had to refile.
Q. Have you helped him with those?
A. In making them, no.
Q. When you say -- is there some other way that you helped him with them?
A. I think I'd say, yeah, you need to file in California or you need to file in Arizona.
Q. Do you correspond with the companies that he was targeting?
A. You know, I don't know.
MR. GRISTINA: All right. Mark

this as 3.

(Document marked for identification purposes as Andrew H Exhibit 3.)

MR. GRISTINA: I'm going to try to not to get them out of order like I did last time.

MR. BRODERICK: You're not going to make me carry too much paper back, are you?

BY MR. GRISTINA:

Q. All right. Take a look at that document that has been marked as A Heidarpour Exhibit 3.

Mr. Heidarpour, have you ever seen that before?

A. This?

Q. Yes.

A. No.

Q. All right. This is -- this is a compilation of documents related to a lawsuit that your father filed against Freedom Auto Glass in McDowell Mountain Justice Court in Phoenix, Arizona?

A. Okay.

Q. Do you see that on the first page?

A. Yes.

Q. All right. And the date in the upper left-hand corner of the first page says "Filed on September 30, 2015."

Do you see that?

A. Uh-huh.

Q. And you're aware that's just two weeks after the lawsuit was filed against Central Payment? Are you aware of that?

A. No.

Q. All right. Did you assist your father in any way with this lawsuit?

A. (Reviewing document).

You know, I don't remember because I've seen -- the only one that I believe I've helped him with he had to refile. I don't know if this was the one or not.

Q. Okay. We'll go through the documents and see -- see how that works.

A. Okay.

Q. But look at the fifth page in this lawsuit or these documents and you'll see the top of

it has got Maricopa County Justice Courts Arizona on it. Do you see that?
A. Uh-huh.
Q. All right. In the upper left-hand corner, it has your father's name Fred Heidarpour.
Do you see that?
A. Uh-huh.
Q. And then it lists the Scottsdale address.
Do you see that?
A. Yes.
Q. And then it has the plaintiff's name, address, and phone. Above that it says the phone number 510-459-6147.
Do you see that?
A. Say that again.
Q. The phone number below your father's name and address.
A. Oh, okay. Okay.
Q. Do you see that?
A. Uh-huh.
Q. 5 --

A. 459-6147.

Q. Yeah. 510-459-6147.

A. Uh-huh.

Q. What number is that?

A. I mean, I don't know.

Q. Is it your father's cell phone number with Abante?

A. I don't know.

Q. Did you prepare this document -- this page of this document that we're looking at?

A. No, I didn't.

Q. There is a signature down about the middle of that page.

A. Uh-huh.

Q. It says "By the named plaintiff."

Do you see that?

A. Uh-huh.

Q. Do you recognize that signature?

A. (Noise.) Sorry. So I have to turn it back off?

Q. Yeah. If it's going to keep vibrating, if you can just turn it off, it would be great.

A. (Witness complying.)
My mom or dad's.
Q. Okay. But as you sit here today, you don't recognize it as either one?
A. I mean --
Q. It could be either one?
A. It could be my dad's because my mom usually doesn't. I mean --
(Ali Heidarpour entered.)
MR. GRISTINA: This is.
THE WITNESS: -- I think it's my dad's.
MR. BRODERICK: Oh, this is Ali.
MR. GRISTINA: Yeah.
MR. BRODERICK: Can we take a quick break?
MR. GRISTINA: Yeah. We'll take a quick break.
THE VIDEOGRAPHER: Going off the record at 11:22.
(Recess - 11:22 a.m. - 11:23 a.m.)
THE VIDEOGRAPHER: Going back on

record at 11:23.

BY MR. GRISTINA:

Q. All right. We kind of got sidetracked a little bit there, but my question wasn't really clear.

Looking at it now, do you recognize that as your father's signature?

A. I believe it is, yeah.

Q. Okay. But you didn't sign this document, did you?

A. No.

Q. All right. Keep -- if you could keep going through to -- go forward one, two, three more pages there's another document where it's headlined Maricopa County Justice Courts Arizona.

A. Uh-huh.

Q. Do you see that?

A. Uh-huh.

Q. And it, again, in the upper left-hand corner lists your father's name.

A. Uh-huh.

Q. And then it has another number there.

510-385-5405?

A. Uh-huh.

Q. Do you recognize that number?

A. That's my number.

Q. Do you know why your number was listed there?

A. No. My dad probably wanted them to call me if they had any issues. I mean, I don't know.

Q. Do you know why the 480 number is not there?

A. No, I don't know.

Q. All right. So, again, but this is your number below your father's name, but you don't know why it was put there?

A. Yeah.

Q. Okay. Down in the -- further down on the page there in the middle, again, is another signature. Do you recognize that signature?

A. No.

Q. If you go back to the other page that had a signature on it --

A. Uh-huh.

Q. -- that we were looking at that's three pages prior to try to identify for the record. So we have signatures on the two pages. Both say Maricopa County Justice Courts. One of them has the 510-459-6147.

A. Uh-huh.

Q. The other one has 510-385-5405.

A. Uh-huh.

Q. But looking at both signatures, does it refresh your recollection or knowledge as to whose signatures those are?

A. No. I mean, they can both be my dad's or both be my mom's. I mean, I don't know.

Q. Do they appear to be different signatures?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I guess but, you know, I know they sign in different ways. That's -- I know I do. I don't see --

BY MR. GRISTINA:

Q. But they look different, do they not?

A. Yeah.

Q. Okay. All right. Back to the one that has your number on it.

A. Uh-huh.

Q. Advance one more page in this stack of documents.

A. Uh-huh.

Q. And, again, the heading is Maricopa County Justice Courts Arizona.

Do you -- looking at this now, look at the defendant's answer down there at the bottom of that page and read that, and tell me if this reading that refreshes your recollection of any involvement you may have had in this case.

A. (Reviewing document).

Yeah, I don't know. I don't know if this was the one he had to refile or not. I mean, I don't know.

Q. Okay. And so for the record, I'm going to -- I'm going to read the second paragraph in the defendant's answer, and it says that:

In addition, Mr. Heid -- they

misspelled it, but I'll start again.

A. Uh-huh.

Q. "In addition, Mr. Heidarfours' son has sent over a dozen e-mails to our company including multiple threats if we did not comply and turn over a sum of $1500."

A. Uh-huh.

Q. "Mr. Heidarfours himself has never contacted our company despite our request to speak to him and attempt to resolve this issue.
Mr. Heidarfours' son represents himself as an attorney and the number of e-mails is becoming close to harassment."

A. Uh-huh.

Q. "This case has no merit and we ask that it is dismissed."

A. Uh-huh.

Q. Reading that today, does that refresh your recollection of this case at all?

A. No, it doesn't.

Q. Okay. And do you recall any communications from this company accusing you of

becoming close to harassment?
A. No, because most companies say it's harassment.
Q. Okay. But you --
A. They try to act like the victim.
Q. You can't recall this company specifically?
A. No.
Q. And is it -- do you disagree with their assertion that you represented yourself as an attorney?
A. Yeah. I never represented myself as an attorney, if I even had communication with them.
Q. That's something you would never do?
A. Yeah.
Q. Correct?
A. Yeah.
Q. You understand that would not be appropriate?
A. Yeah, I do know.
Q. All right. Going further into this document. So we're going to -- we're going to flip

this page over. Go one, two, three, four more, and I'm going to show you what mine looks like so we're on the same page.

A. All right.

Q. Are we all there?

A. Uh-huh.

Q. These aren't Bates stamped and I apologize.

MR. BRODERICK: There is handwriting.

MR. GRISTINA: Yeah.

BY MR. GRISTINA:

Q. All right. So this page is, so we can identify it for the record, it's again Maricopa County Justice Courts Arizona, and it has your father's name and then your telephone number in the upper left-hand corner.

A. Uh-huh.

Q. And in the middle it says "Motion to Request" and then a box below it says "Oral Argument Requested" so we can identify this page.

Do you recall your father requesting a

continuance in this case?

A. No. I know he's asked for a continuance, but I don't know for which cases.

Q. Okay. And then down there's a signature on this page.

Do you recognize that signature?

A. I mean, like I said, my mom or my dad. I don't know.

Q. All right. Go two pages beyond that and there you are.

Okay. So this -- this page for the record is also Maricopa County Justice Courts. In the upper right-hand corner, it's actually part of a fax, it says number 6758 page 1.

A. Uh-huh.

Q. So that will help us identify it, and this is a disclosure statement. That's the caption of this document.

A. Uh-huh.

Q. Do you see that in the middle?

A. Uh-huh.

Q. Do you? Is that yes?

A. Yes.
Q. Do you recall ever helping your father put together a disclosure statement?
A. No.
Q. And if you go down the -- you understand, do you not, that if this document was -- do you know if this was filed in a court of law?
A. I don't know. I see it's stamped.
Q. Okay.
A. McDowell Mountain.
Q. And do you see down by the number 1, it says:
"The following facts support my side of this case."
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. All right. And above that it says "I am" and there's a box checked "Plaintiff"?
A. Yes.
Q. Okay. And then it lists Exhibits 1 through 4 which are "My telephone bill," which is

Exhibit 1. Exhibit 2, "Letter to the -- to them" it looks like.

A. Uh-huh.

Q. And then "Demand" and then Exhibit 3 "E-mails," Exhibit 4 "Law for TCPA."

A. Uh-huh.

Q. Do you see those exhibits or those -- that -- that identification --

A. Yes.

Q. -- on this document?

And does that refresh your recollection about this document at all any involvement you may have had?

A. No.

Q. Is this your handwriting --

A. No.

Q. -- on this page?

Do you recognize the handwriting?

A. It could be my mom's because I don't think my dad writes that neat. I think it's my mom's.

Q. And then if you'll go through advance

one, two, three, three more pages, there's a phone bill from Cox it looks like.
Do you see that?
A. Uh-huh.
Q. And that's marked as Exhibit 1?
A. Yes.
Q. Do you recognize that?
A. Yes.
Q. Have you ever seen this phone bill before we sit here today?
A. No.
Q. Did you prepare this exhibit for this Arizona lawsuit?
A. No.
Q. And if you look through this phone -- this Exhibit 1.
A. Uh-huh.
Q. Look at the whole exhibit and you'll see where it stops because Exhibit 2 starts and there's your name on top of the page. Why don't take you a look at the whole exhibit.
A. Okay.

Q. All right.

A. We're on Exhibit 2?

Q. No. We're still on Exhibit 1.

A. We're still on Exhibit 1?

Q. Yeah. I just wanted you to look at the whole thing.

A. So just look at it all? Okay.

Q. Yeah, and specifically do you see where it goes -- the page numbers are up in the upper right-hand column? It says page 2 of 6 and then 3 of 6?

A. Uh-huh.

Q. And then 4 of 6?

A. Uh-huh.

Q. And then -- and then there's another page that doesn't have it in the upper right-hand column.

A. Okay.

Q. Do you know -- do you know why pages 5 and 6 were not included with this?

A. No, I don't know.

Q. All right. In looking at the document

that you've got open right there --

A. Uh-huh.

Q. -- that's a redacted document.

A. Uh-huh.

Q. Is that a fair description of this as a redacted document?

A. Oh.

Q. If you know?

A. I mean, I don't know.

Q. Have you ever seen this page before?

A. No.

Q. All right. In the upper left-hand column, it says phone number 480-595-5903.

A. Uh-huh.

Q. You see that?

A. Yes.

Q. And it says "Period last 120 days, call type all calls."

A. Uh-huh.

Q. Do you know based on your experience in assisting your father with TCPA claims if this is part of the Cox bill that is included with?

A. I mean, I don't -- I don't know. I've never seen the bill. So I don't -- I don't know.

Q. Have you ever seen a document that looked like this before that had a phone number period and call type in the upper left-hand column?

A. No, I don't -- that's not something I look at.

Q. Have you ever discussed with your mother her preparation of documents like this?

A. I've told her she needs to get a phone bill, but besides that, no.

Q. And are you aware that this document was filed in a court of law?

A. Okay.

Q. All right. If you looked at this, as you sit here today, would it appear to you that this redacted document is intended to be held out as part of the Cox bill?

MR. BRODERICK: Objection.

THE WITNESS: I don't know. It could be part of Cox. It could be something -- I mean, I don't know.

BY MR. GRISTINA:
Q. Do you -- do you maintain on your computer any call logs for the 480 number?
A. No.
Q. Did you assist your parents in preparing responses to document requests in our case, in the Central Payment case?
A. Maybe. I mean, I can't recall. I'm sure he's asked me a question.
Q. Can you recall any specific questions?
A. No. No.
Q. These -- this -- this document you're looking at was not produced in our lawsuit. This is something that I obtained --
A. Okay.
Q. -- outside -- outside on my own.
Do you recall ever discussing with your parents a decision whether or not to produce these documents to us in this lawsuit?
A. No.
Q. All right. Flip one more page to Exhibit 2. Do you see that?

A. Uh-huh.

Q. All right. And this, is this a document you've seen before?

A. No.

Q. Is that your name at the top of the page Andrew Heidarpour?

A. Yeah.

Q. And then is that your phone number below that?

A. Yes, it is.

Q. And then it has Andrew HeidarpourTCPA@Gmail.com; is that correct?

A. Uh-huh.

Q. And then got -- we need verbal.

A. Oh, sorry. Yes.

Q. And then at the signature area, it says "Very truly yours" and it has a slash S slash Andrew Heidarpour.

Do you see that?

A. Uh-huh. Yes.

Q. And did you put that electronic S on this document?

A. No, but I probably -- because I create a draft for my parents that they could change and put in the call details. So that's probably just on all of them.

Q. This document was sent by e-mail or appears to have been sent by e-mail to Freedom Auto Glass.

A. Uh-huh.

Q. Do you see that in the upper left-hand column?

A. Yes.

Q. Do you think that looking at this document --

A. Uh-huh.

Q. -- if someone were looking at this that they would believe that this is a letter from you?

A. Yeah, probably.

Q. And is it your testimony here today that this is not a letter from you?

A. No, because the -- this TCPA account was first made for the claims so the claims would come to one e-mail. I don't -- I create a draft of

this, but my parents just fill it in. So you're probably going to find most of these that are the same on the top and the bottom and then the middle is going to be different.

Q. And is this something that you maintain on your personal computer?

A. No.

Q. Did you -- do you recall assisting your parents with respect to this particular document?

A. No. I don't -- I don't draft these.

Q. Okay. And in the paragraph, the first paragraph, it says --

A. Uh huh.

Q. "My name is Andrew Heidarpour and I write to bring your attention a telemarketing concern of mine."

A. Uh-huh.

Q. "On multiple occasions in May of 2015 my father received an unsolicited telemarketing call to his telephone number 480-5959-5903 from your company or some company on your behalf from number 602-638-0422."

A. Uh-huh.
Q. Is that correct?
A. Yeah.
Q. So if somebody received this, they would believe that you were notifying them regarding a call made to the 480 number; correct?
A. Yeah.
Q. In the bottom of that second paragraph, it says:

"Also, by sending this letter, you, as well as any third parties that you worked with related to the telephone campaign at issue, are hereby notified of your obligation to preserve all electronic and nonelectronic files regarding this claim. This includes, but is not limited to, all e-mail communications and records reflecting telephone calls."

A. Uh-huh.
Q. Is that -- did I read that right?
A. Yeah.
Q. And am I correct that the same obligation applied to your father with respect to

documents related to this claim?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I don't know. That looks like a boilerplate clause to me.

BY MR. GRISTINA:

Q. But is that something that you believed to be true, that sentence in a letter that you wrote?

MR. BRODERICK: Objection.

THE WITNESS: Yeah, I don't know. I don't think so.

BY MR. GRISTINA:

Q. Do you believe that your father had an obligation to preserve all documents he had related to this particular TCPA lawsuit that we're talking about here in Arizona?

A. I don't think so.

MR. BRODERICK: Objection.

THE WITNESS: But I don't know.

BY MR. GRISTINA:

Q. Did you ever discuss with him --

A. No.

Q. -- the need to preserve all records he had related to the TCPA claims he was making?

A. No.

Q. Is this something that you're familiar with, the obligation to preserve records in a lawsuit?

A. No. I put it in there because it's -- I thought it was a good clause and I know a lot of companies say they didn't make the call, they didn't make the call.

Q. And this was written August 4, 2015. It's after you graduated law school, but before you -- well, you were not licensed --

A. Uh-huh.

Q. -- at the time?

A. Correct.

MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. All right. If you go to the next page. It says "Demand Letter Violation of the TCPA" and it's dated August 24, 2015.

A. Uh-huh.

Q. Have you ever seen this -- this demand letter before?
A. No. I mean, I don't know.
Q. Who was -- well, reviewing it, who was this demand letter sent on behalf of?
A. Well, it says "Abante Rooter" on the left side.
Q. And so that's who the demand was made on behalf of, correct, Abante Rooter?
MR. BRODERICK: Objection.
THE WITNESS: I mean, that's what it says. It says "Abante Rooter." I don't -- besides that, I don't know anything else.
BY MR. GRISTINA:
Q. And then just below that, it says "Time and date of call."
A. Uh-huh.
Q. "My telephone number."
A. Uh-huh.
Q. You see that, that inlay in the document?
A. Yeah.

Q. And then next to "my telephone number" it lists the 480 number, does it not?
A. Uh-huh. And this -- and this might have been the one that was refiled because he did have to separate a claim from Abante and his personal.
Q. Someone --
A. I believe he refiled this.
(Reviewing document).
Yeah, he -- yeah, I think he refiled this. Because the Cox bill, Cox is for personal.
Yeah, he refiled this one.
Q. Are you still on the same page with the demand letter?
A. Yeah.
Q. So this demand letter was sent to Freedom Auto Glass, was it not?
A. Uh-huh.
Q. Is that correct?
A. Yes.
Q. And in reviewing this, it is sent on behalf of Abante Rooter with respect to the 480

number; correct?
MR. BRODERICK: Objection.
THE WITNESS: I mean, I don't know. If it is, it's a mistake.
BY MR. GRISTINA:
Q. But somebody looking at this, wouldn't it be reasonable for them to read this to mean that the Abante Rooter & Plumbing number was the 480 number alleged just below Abante Rooter and that that was the number that the claim was being made on behalf of?
MR. BRODERICK: Objection.
THE WITNESS: I mean, maybe. That would be why it was refiled that way maybe.
BY MR. GRISTINA:
Q. I'm asking you.
A. Well --
Q. If that's what --
A. Well, I believe this one was refiled and they were separated.
Q. Looking at this demand letter, can you tell me anywhere -- well, did you -- did you prepare

this form demand letter for your parents?

A. I created a template that's similar, but they've changed it a little bit.

Q. Take a look at this demand letter and tell me anywhere in there where it references the fact that the 480 number may or may not be a residential landline.

MR. BRODERICK: Objection.

THE WITNESS: You want me to read this whole document?

BY MR. GRISTINA:

Q. Yeah, take a look at it. See if you -- if you see anywhere where it references or makes a demand based on the fact that the 480 number is allegedly a residential landline.

A. (Reviewing document).

MR. BRODERICK: Objection.

THE VIDEOGRAPHER: I have to change the DVD in 10 minutes. Is this a good time to do it while he's doing that?

MR. GRISTINA: Yeah. Go ahead.

THE VIDEOGRAPHER: Going off the

record at 11:44. This marks the end of DVD No. 1.

(Recess - 11:44 a.m. - 11:48 a.m.)

THE VIDEOGRAPHER: Going back on record at 11:48. This marks the beginning of DVD No. 2.

(The reporter read the record on page 135 lines 12-15.)

THE WITNESS: No, I mean, I don't think so. I see landline on here, but I don't know that it references it. I don't think so.

BY MR. GRISTINA:

Q. Okay. And, in fact, on the first page, it says "These are the following violations" and the first bullet point below that lists a Statute 47 USC 227 (b)(1)(A)(iii).

A. Uh-huh.

Q. It says:

"Prohibits calling to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service or other radio common carrier service, or any service for which the call parties charged for the

call."

Correct?

A. Uh-huh.

Q. Did I read that right?

A. Yes.

Q. And of these three bullets there, not one of them lists calls to residential landlines; correct?

A. No, but I believe one or two of them will apply.

Q. Okay. And which would those be?

A. I think it's the second one and the third. I don't think it matters if it's a wireless number for those.

Q. Are you aware of the basis for your parents' claim in this case?

A. I think it was a prerecorded message for a landline.

Q. Okay. And based on the fact that an autodialer was allegedly used to call an allegedly residential landline, are you aware whether or not your father has made a claim based on either of the

two statutes listed in those second and third bullet points?

A. You know, I don't know.

MR. BRODERICK: Objection.

THE WITNESS: Because, I mean, when I -- I gave him the list of statutes. I don't know.

BY MR. GRISTINA:

Q. And then --

A. I don't know. They're both listed. Call types is auto dialer or prerecorded message.

Q. Do either one of those list to a residential landline?

A. No, but it doesn't say it's a wireless line either.

Q. If somebody -- is it your testimony that if somebody read this, they would believe that Abante Rooter was a suiting -- asserting a claim based on a call to an allegedly residential landline?

MR. BRODERICK: Objection.

THE WITNESS: I don't know.

BY MR. GRISTINA:

Q. And on the second page of this demand letter, it's down at the bottom of the left-hand column, you see that it says "Abante Rooter & Plumbing"?

A. Uh-huh.

Q. Is that correct?

A. Yes.

Q. And it lists the Admiral Drive address?

A. Yes.

Q. It does not list the Scottsdale house, does it?

A. That's correct.

I think they messed up on it.

Q. How do you think they messed up?

A. Because it's a 480. That's why I said he had to separate the claims. Because I think he might have had -- I think he had a claim against them for his business as well. I don't remember. But I know he had to separate his personal from his business.

Q. And because you can't -- a line can't

be both a residential landline and a business cell phone, can it?

A. Oh, sorry.

Can you repeat the question?

Q. A telephone line can't be both a residential landline and a business cell phone; correct?

A. Correct.

Q. Is it your testimony -- isn't it correct that your father was making this demand based on a purportedly cellular telephone call?

A. You know, I don't --

MR. BRODERICK: Objection.

THE WITNESS: I don't know. Yeah, I don't know. He may have put in the wrong number. He may have -- I mean, I don't know what he did with this.

BY MR. GRISTINA:

Q. Go to Exhibit 3 if you would, please.

THE VIDEOGRAPHER: Push it in. Yeah.

THE WITNESS: All right. Uh-huh.

BY MR. GRISTINA:

Q. All right. And do you see these? This is a compilation of e-mails. Do you see that?

A. Uh-huh.

Q. All right. Now, these are your -- these are e-mails from you, are they not? Many of these?

A. Not necessarily. It was probably my dad or my mom, and I read a draft and then they sent it.

Q. And so is it true that your father then sent e-mails and these e-mails reflected here are purporting to be you, Andrew Heidarpour?

MR. BRODERICK: Objection.

THE WITNESS: You know, I don't know because I probably reviewed most of these.

(Reviewing document).

Yeah, I don't know. I may have reviewed them.

BY MR. GRISTINA:

Q. This is your e-mail address, is it not, AndrewHeidarpourTCPA.Gmail.com?

A. I just made -- I don't even have a -- I don't even if we use it anymore, but yeah. But I don't really use it.

Q. And if we just look at the top right -- Exhibit 3 at the top right-hand corner the date August 13, 2015 at 8 a.m. and then looks like we got e-mails in here from August 5, 2015, August 4, 2015.

That's within the two-year period that you talked about that you searched for e-mails, isn't it?

A. I mean, I guess so. Like I said, I think it was two years. I don't know.

Q. Is it your testimony that you didn't see these e-mails when you did that search?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I don't -- I don't know.

BY MR. GRISTINA:

Q. I guess, were these e-mails provided by you to your attorney?

MR. BRODERICK: Objection. We made a Rule 45 objection.

BY MR. GRISTINA:

Q. Did you provide these to your attorney?

A. I mean, I -- (reviewing document).

I don't know.

Q. Do you recall seeing this e-mail after you received the subpoena in this case but before today?

A. Do you know how many e-mails I -- I don't know, sir. I don't know.

Q. And is it your testimony that you didn't write these e-mails in here that say from Andrew Heidarpour?

A. You know, like I said, I may have written some, but I know we were all using the account. And my dad was usually the one sending them or my mom, and I was reviewing them. So I don't -- we all had access to it.

Q. Does your father -- does he currently have access to this Gmail account, Andrew Heidarpour TCPA?

A. He should if we use it anymore.

Q. And is it -- again, did you

specifically search this Gmail account --

A. Yeah.

Q. -- to response to the subpoena?

A. Yeah.

Q. In the first page of Exhibit 3, there's an e-mail from you -- well, from Andrew Heidarpour dated Wednesday, August 5, 2015 at 6:46 p.m. and it's sent to Caris at FreedomAutoGlass.com.

A. Uh-huh.

Q. In the second paragraph, it says:

"You are liable for their actions and have violated the TCPA. I have handled hundreds of these claims, and everyone seems to think if they can get someone else to market or call on their behalf, then they can avoid liability. This can't be farther from the truth."

Do you see that?

A. Yes.

(Noise). It is under that paper. There is -- no?

MR. GRISTINA: We're hoping to find the source of the beep.

THE VIDEOGRAPHER: Go off the record?

MR. GRISTINA: No, I don't think so. Because it will stop. It takes forever to go back on.

(Noise).

MR. GRISTINA: I'm going to touch your mic here to see if it's under there.

THE VIDEOGRAPHER: It's not that.

MR. GRISTINA: No. All right. Let's go off.

THE VIDEOGRAPHER: Going off the record at 11:56.

(Recess - 11:56 a.m. - 11:58 a.m.)

THE VIDEOGRAPHER: Going back on record at 11:58.

BY MR. GRISTINA:

Q. Mr. Heidarpour, do you recall writing that paragraph?

A. No. I may have. I mean, I don't know.

Q. Is it --

A. There's a lot of drafts I check. I

don't know.

Q. Do you believe that's an accurate statement?

A. I can't seem to find the paragraph. This was the second paragraph?

Q. It was -- yeah. It has the sentence "I have handled hundreds of these claims."

A. Uh-huh. I mean, I don't know. Maybe. I don't know.

Q. And when it says "handled hundreds of these claims," what does that mean "handled"?

A. Like I said, I don't know. I don't know if I drafted this or not.

Q. Do you think if somebody read this that they might interpret that to mean that the person sending it was an attorney?

MR. BRODERICK: Objection.

THE WITNESS: I don't know. I feel like that's kind of a far reach, actually.

BY MR. GRISTINA:

Q. Okay. But you don't -- you don't know what is meant by the word "handled" there?

MR. BRODERICK: Objection.
THE WITNESS: I mean, no.
BY MR. GRISTINA:
Q. The subject of this e-mail is "Pre-Suit Notification of Federal Telemarketing Law Violation." Did I get that right?
A. Uh-huh. Yes.
Q. And at the bottom it says Andrew Heidarpour.
A. Uh-huh.
Q. But you don't -- it's your testimony this may have been sent by your parents using your name?
A. Yeah. Like I said, I read drafts. So it wouldn't surprise me if my name is on the bottom or Fred's name is on the bottom, or I send it or they send it. Most -- most of the time, I mean, they're the ones sending it.
Q. If you look at page -- in the upper right-hand column of Exhibit -- corner of Exhibit 3, it has page -- pages 1 of 5.
A. Uh-huh.

Q. 2 of 5. 3 of 5. Go to page 4 of 5.
A. Uh-huh.
Q. You see that?
A. Yeah.
Q. All right. In the middle of that page, there's a Monday, August 24, 2015 at 7:38 p.m. e-mail. Do you see that?
A. Yes.
Q. And that's from AndrewHeidarpourTCPA@Gmail.com --
A. Uh-huh.
Q. -- to Caris@FreedomAutoGlass.com. Do you see that?
A. Yes.
Q. And it appears to be an attachment?
A. Uh-huh.
Q. And it says "Abante Demand Freedom Auto Glass.PDF." Do you see that?
A. Yes.
Q. Do you believe that that's the demand letter that we were just looking at?
A. I mean, I don't --

MR. BRODERICK: Objection.
THE WITNESS: -- have any way of knowing that.
BY MR. GRISTINA:
Q. And going further down on the -- well, look at the e-mail Wednesday, September 9, 2015 at 10:17 a.m.
A. Uh-huh.
Q. It's from the same Andrew Heidarpour TCPA Gmail. It says:
"This is the last time that I am going to communicate with you. I will send this to an attorney and you will end up paying attorney's fees."
Do you see that?
A. Uh-huh. Yeah.
Q. Do you recall writing that?
A. No.
Q. And then further down the next e-mail at 11:05 e-mail, it's addressed to the same Andrew Heidarpour TCPA Gmail account from Caris@FreedomAutoGlass.com and she writes or the

e-mail reads:

"Again, the original offer stands. Otherwise please do not send additional e-mails. At this point you are attempting to threaten or bully us."

Reading this, do you recall -- does that refresh your recollection as to whether or not --

A. No.

Q. -- you had this e-mail exchange?

A. No.

Q. Do you think that whoever was sending these e-mails to Freedom Auto Glass was threatening or bullying them?

MR. BRODERICK: Objection.

THE WITNESS: What I can tell you is every telemarketer thinks they're being harassed or threatened or bullied, when they're the ones who act as the victim. That's what I can tell you. So it wouldn't surprise me if that shows up a thousand times, 10 times, 20 times. I don't know.

BY MR. GRISTINA:

Q. Do you know what your father's motivation is for filing so many TCPA lawsuits?
A. Oh, yeah. (Laugh).
Q. Why is that?
A. He wants them to stop. He's tired of getting the calls.
Q. To him personally?
A. It's more so actually I think his business, but personally, too.
Q. Have you ever discussed with him getting rid of the 480 number?
A. No, but I believe he put that on a DNC and it's unlisted, I think.
Q. But have you ever talked to him about getting rid of the number if he wanted to stop getting calls on it?
A. No.
Q. All right. The last page in this document, Exhibit -- what Exhibit is this?
THE REPORTER: 3.
THE WITNESS: I see Exhibit 4.
BY MR. GRISTINA:

Q. The last page.

A. This?

Q. No. Keep going.

A. Like the last last page?

Q. Yeah. Literally the last page. You got it right there.

A. Uh-huh.

Q. All right. This is dated November 30, 2015. It says "Settlement Agreement." Do you see that?

A. Yes.

Q. Do you recall seeing this document before today?

A. I mean, I am sure I have seen it because I usually review the settlement agreements.

Q. Okay. In fact, this is a settlement agreement between Fred Heidarpour, his spouse, and his heirs, successors and/or assigns --

A. And this is 480 number.

Q. -- and defendant Freedom Auto Glass.

Do you see that?

A. Yes.

Q. All right. So this is the settlement agreement that was filed in this lawsuit in Arizona that we've been talking about for the last half hour or so.

A. Uh-huh.

Q. Do you see in the first "Whereas" clause:

"Plaintiff alleges violations of the Telephone Consumer Protection Act 47 USC 227 at sequential TCPA to plaintiff's cellular telephone line on May 15, 2015."

Do you see that?

A. Yes.

Q. So I'm correct, am I not, that your father was settling a claim with Freedom Auto Glass based on the 480 number and the claim related to that being a cellular telephone number?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I think it was a 480. I don't see the number here. So I don't know which one it was related to. You have to ask him.

BY MR. GRISTINA:

Q. Does it reference anywhere in here residential landline in this settlement agreement, this one-page agreement?

A. I don't think so, no.

Q. And then in the third "Whereas" clause, your father had the check sent to 465 Miner Road, Orinda, California?

A. Uh-huh.

Q. Do you see that?

A. Yes.

Q. Do you know why he used that address?

A. Well, I know because I always ask him what address they want in there. Wherever they are is where they want the check sent to because they travel a lot.

Q. So you always ask them. What, is that for other --

A. Because I --

Q. -- TCPA claims?

A. No, because when I said a lot of times I'll review these agreements and I'll say, you know,

what address are you wanting it to?

Q. And do you have these agreements like this on your computer related to the 480 number?

A. No.

Q. How do you review them if they're not on your computer?

A. He'll save it as a draft. Because these are usually e-mailed. These are all e-mailed.

Q. So does he e-mail them to you?

A. No. I'll go in the account. Because I don't know which e-mail this was sent to, but usually I'll just go in the account and review it and then I'll tell him. I'll call him and say it's reviewed.

Q. What account?

A. Like I say, I don't know if we used a TCPA one, but Abante Plumbing and Fred Pour.

Q. You have access to both of those?

A. Yes.

Q. Could this -- did you look in the Abante account in response to the subpoena we sent to you in this case?

A. No.

MR. BRODERICK: Objection.

THE WITNESS: Because it's not my account.

BY MR. GRISTINA:

Q. Do you have access to it?

A. Yeah.

Q. And have you reviewed documents that are in that account?

A. No.

Q. Do you know if this settlement agreement from November 30, 2015 was in the Abante e-mail account?

MR. BRODERICK: Objection.

THE WITNESS: No, I don't know.

Are we done with this one?

BY MR. GRISTINA:

Q. Yeah, keep it there.

(Document marked for identification purposes as Andrew H Exhibit 4.)

BY MR. GRISTINA:

Q. All right. What's been marked as

Exhibit 5 is --

A. I see 4.

THE REPORTER: 4.

MR. GRISTINA: It's 4? Good. I'm wrong on the other one then.

THE VIDEOGRAPHER: I'm getting a cell phone interruption. Is that you again? Oh, yeah, that's it.

THE WITNESS: iPhones.

MR. GRISTINA: Are we okay?

THE VIDEOGRAPHER: Yeah, you're okay.

BY MR. GRISTINA:

Q. Okay. What's been marked as Exhibit 4 is another compilation of documents related to another Arizona lawsuit.

A. Uh-huh.

Q. And this one has the caption Fred Heidarpour versus Arizona Energy Pros (Aepros).

Do you see that?

A. Yes.

Q. It's on the first page.

A. Yeah.
Q. Filed on September 30, 2015.
A. Uh-huh.
Q. Do you see that?
A. Yes.
Q. Are you familiar with this lawsuit?
A. (Reviewing document).
No, I don't know. Maybe this was the one that had the mistake because these were both filed on the same day.
Yeah, no.
Q. All right. We're going to go through this lawsuit, but if you look at the -- go into page -- the fifth page in this document. It's a Maricopa County Justice Courts Arizona.
A. Yeah.
Q. And then it's got a stamp on it "Northeast Regional Justice Court Center." Then the left-hand column it's written McDowell Mountain.
A. Uh-huh.
Q. Then your dad's name is there and the Scottsdale address and then it has 510-459-6147

listed again.
A. Uh-huh.
Q. Do you see that?
A. Yes.
Q. Do you know, isn't that a cell phone that your father has with Abante?
A. I think so. I don't know.
Q. And if you go to the page right after that, there's -- in the defendant's answer, they write:
"Our company did not place this alleged illegal call. (See attachments). A copy of all the threatening e-mails were sent on September 28, 2015 to the Internet Crime Complaint Center of the FBI."
Do you see that?
A. Where are you?
Q. At the bottom of it.
A. Oh, okay. All right. Uh-huh.
Q. Do you see that?
A. Yes.
Q. Reading that -- me having read that to you, does it refresh your recollection as to whether

or not you were in any way involved in this?
A. No.
Q. Are you aware of your father discussing with you somebody reporting what they believe are threatening e-mails to the Crime Complaint Center of the FBI?
A. Anytime you send an e-mail to them it's a threatening e-mail, according to them again. So no, this wouldn't surprise me at all.
Q. But are you aware of somebody actually sending a complaint to the complaint center of the FBI?
A. No.
Q. If you turn to the next page, this is captioned "Small Claims Complaint Answer."
A. Uh-huh.
Q. You see that?
A. Yes.
Q. And the first, number 1 says:
"We did not place this call in question. We do not have an auto dialer. We did not auto dial this number."

And then down at number 4 it says:
"The below e-mail was sent to our salesperson, as well as other threatening e-mails with the same content, after a newspaper article appeared in the Arizona Republic newspaper."
Are you familiar with what newspaper article they're referring to?
A. No.
Q. And if you look down below that, there's what appears to be either a restatement or a copy of an e-mail from Fred Poor, P-o-o-r.
A. Uh-huh.
Q. But the e-mail address is FredPour60@Gmail.com.
A. Yes.
Q. Have you ever seen that e-mail before?
A. That's his, yeah. That's -- he uses Fred Pour 60 or Abante Plumbing now. Those are the two e-mails he generally uses.
Q. Do you recall reviewing this e-mail to a Mr. Gardner from your father?
A. No.

Q. Do you know of any connection between your parents and an address in Alderwoods -- Alderwood Circle Mesa, Arizona?
A. Where?
Q. Alderwood Circle in Mesa, Arizona?
A. No.
Q. All right. Going through these -- this document, go further in and you will see another copy of defendant's answer, and then right after that there's Exhibit 1, which is a CenturyLink bill.
A. Okay. You're on CenturyLink. Okay. Exhibit 1.
Q. That's the one.
A. All right.
Q. Exhibit 1 in the upper left-hand column and page 1 of 7. This is a -- have you ever seen this bill before?
A. No.
Q. And it says Fred Heidarpour, addressed to Fred Heidarpour, isn't it?
A. Yes.
Q. All right. And the account number for

this is 4805955903897; is that correct?

A. That's what it says, yeah.

Q. Do you believe this relates to the 480 number?

MR. BRODERICK: Objection.

THE WITNESS: Let me --

BY MR. GRISTINA:

Q. If you look on page 3 of 7, there's long distance -- bottom page long distance usage --

A. Well, it says --

Q. -- and it has the 480 number listed.

A. 480-595-5903 for local phone service.

Q. Yeah.

MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. Looking at this and reviewing this document, do you believe that it relates to the 480 number that we've been talking about?

A. Was that the same one? I don't -- see, again, I don't even remember the number now. Was it 5903? Was that the number?

Q. I'll represent to you that it was.

A. Okay. Then, yes.
Q. And if you look at this -- this document, it appears -- at the bottom center of each page it has page numbers. 1 of 7 all the way up to 7 of 7.
A. Uh-huh.
Q. If you look at pages 4 of 7, 5 of 7, and 6 of 7.
A. Uh-huh.
Q. Did you have any involvement in the redaction or preparation of these pages?
A. No.
Q. Do you know anything about that at all?
A. No.
Q. Do you know who redacted these documents before filing them?
MR. BRODERICK: Objection.
THE WITNESS: No.
BY MR. GRISTINA:
Q. Do you know -- have you discussed with your mother any way that she downloads material from the Internet and redacts it before producing it?

A. No, I don't think so.

Q. If you look at pages 5 of 7, do you see there's two -- two calls that are unredacted there?

A. Uh-huh.

Q. Do you -- do you know what it's intended to reflect by listing those two numbers there whether or not which phone called what?

A. No.

MR. BRODERICK: Objection.

THE WITNESS: I don't.

BY MR. GRISTINA:

Q. Have you ever seen an unredacted version of this CenturyLink bill dated April 1, 2015?

A. No.

Q. And did you have any role whatsoever in filing this Exhibit 1 in the Arizona court?

A. No.

Q. Can you explain to me in any way what these redactions are intended to signify?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I don't

know. You have to ask whoever did it. Ask my mom or dad.

BY MR. GRISTINA:

Q. But it's not going to be your intention in this case to testify about why these numbers are redacted or how this phone bill was prepared and filed?

A. I mean, I don't know.

MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. You don't have any knowledge of how it was --

A. No.

Q. -- prepared?

A. No.

Q. And you haven't discussed it with anybody?

A. No.

Q. All right. Go to Exhibit 3 in that -- in that stack.

A. Okay.

Q. And so it's -- these are more e-mails.

Do you see those e-mails?

A. Yes.

Q. All right. At the bottom of the first page dated March 18, 2015, 8:51 a.m.

A. Uh-huh.

Q. It looks like it's an e-mail from AliHeidarpour@Gmail.com to FredPour60@Gmail.com.

A. Yes.

Q. Do you recognize that e-mail address as your brother's e-mail address?

A. Yes.

Q. And do you know -- the con -- the text of the e-mail just says "CEO is Russell Gardner."

A. Uh-huh.

Q. And then it looks like there's -- on the next page there's an e-mail for him and an address. Do you see that?

A. Yes.

Q. Do you know why your brother would have been communicating with your father regarding this lawsuit?

A. No. You have to ask him.

Q. Does your brother work with you on other TCPA claims?

A. No. What he does, I don't know what he does.

Q. You don't have any idea as to why he was providing your father the -- the name of the CEO?

A. No.

Q. If you advance two more pages in, there's a Gmail page. Page 1 of 1 at the top right hand. It says "Contract one message David@Aepros.com" and it says "KJ."

Do you see that?

A. Yes.

Q. Do you know who KJ -- it says "KJ, here is a copy of our contract that you had requested. Thanks."

A. Uh-huh.

Q. Do you know who KJ is?

A. No.

Q. Do you know does your -- do you know if your father ever uses the name KJ?

A. No, I don't -- I don't know.
Q. Do you know if your father does business with Arizona Energy Pros?
A. He doesn't do business with any of these people.
Q. Have you -- do you know if your father requested a copy of a --
A. He doesn't --
Q. -- contract from them?
A. What was -- what was the contract?
Q. It's not attached --
A. I don't know.
Q. -- but it says --
A. I mean, I don't know. You have to ask -- you have to ask Fred. That was between him and David.
Q. Have you ever discussed with your parents the act of actually asking for documentation from telemarketers so they could obtain information to file claims against telemarketers?
A. Repeat that one more time.
Q. Have you discussed with your parents

the act of actually requesting document from the telemarketers so they could obtain information to later use in a claim against the telemarketers?

A. To request documentation. No, I told them to get information. I gave them a cheat sheet of questions they need to ask, but no.

Q. What is that? What did that cheat sheet say?

A. Name of the company, name you're speaking to, callback number, e-mail, and that's generally -- that's usually enough.

Q. Where is that cheat sheet --

A. And call notes.

Q. Where is that cheat sheet maintained?

A. My mom or dad has it.

Q. Is it kept on your computer?

A. No.

Q. You don't -- how did you communicate to them? Is it on a Microsoft Word document?

A. I believe so, yes.

Q. Did you save it on your computer?

A. I don't have it. My mom or dad does.

Q. Have you looked for it in this case?

A. No.

Q. Is it -- is your testimony that you can no longer access the cheat sheet that you're describing to me?

A. Yeah, I don't have it.

Q. Do you know when you first provided it to your parents?

A. Probably when they were wanting to do these calls. When they were wanting to report these people.

Q. Do you know how much money your father makes a year filing TCPA claims?

MR. BRODERICK: Objection.

THE WITNESS: No.

BY MR. GRISTINA:

Q. Have you ever discussed that with him?

A. No.

Q. If you'll go further along in this document, thumb through, you'll find a demand letter similar to the one that we were talking about in the last exhibit.

A. Uh-huh. Exhibit 4?
Q. Yeah.
A. Okay.
Q. Well, Exhibit 4. Stop there. That's good. And that's another -- that's -- Exhibit 4 has your name at the top of it.
A. Uh-huh.
Q. It's a similar document to the one that we were looking at with respect to the last Arizona lawsuit.
A. Yeah.
Q. Do you have any recollection of preparing this document?
A. No.
Q. And it's dated August 4, 2015, an e-mail to Arizona Energy Pros.
Do you see that?
A. Uh-huh.
Q. All right. And then it, again, just like the other one, it says:
"My father received an unsolicited telemarketing call on his telephone number

480-595-5903."

A. Uh-huh.

Q. Do you see that?

A. Yeah.

Q. And that would lead Arizona Energy Pros to believe and that's -- well, let me ask it a different way.

By -- your electronic signature is on this page, is it not?

A. Uh-huh.

MR. BRODERICK: Objection.

THE WITNESS: Yeah.

BY MR. GRISTINA:

Q. Do you think your father put that on there or did you put that on there?

A. Like I said, I made a template for them.

Q. Okay. So you --

A. So my signature is on there. So whatever they add, I mean, I made a template for them.

Q. This is a demand letter, is it not, on

behalf of the 480 number?

A. Demand letter, consent letter. Depends how you read it.

Q. All right. We'll go to the next page.

A. I don't view it exactly as a demand. I view it as a consent.

That says demand letter.

Q. The next page is a demand letter.

A. Yes.

Q. This is a demand letter sent on behalf of Abante Rooter & Plumbing related to the 480 number, is it not?

A. Yeah, I think you're getting confused on what are demands and what are consent. This is not a demand letter.

Q. Right. So the document that has the stamp in the upper right-hand corner that says "Exhibit 4" is not a demand letter, it's a consent letter?

A. I mean, I don't consider it demand. I consider it consent letter.

Q. Tell me what a consent letter is.

A. Well, it's a little -- what's the word? A little less aggressive. It's a softer tone to try and get information from the company. Because a lot of times if you just come out yelling, hey, you violated this, they won't respond to you or they just ignore you. So it's a way -- it's a way for them to explain why they did or didn't make a call or to give any information that they want.

Q. And why do you call it a consent letter? You use the word "consent"?

A. Because I don't see any demand for payment on here. That's why.

Q. Okay. Then looking at the next page, is that a demand letter?

A. It's labeled "Demand." Yes.

Q. And I'm correct, am I not, this is a demand letter sent on behalf of Abante Rooter & Plumbing related to the 480 number, is it not?

MR. BRODERICK: Objection.

THE WITNESS: Well, it says "Abante" and it says "480."

BY MR. GRISTINA:

Q. Is the answer to my question yes?

MR. BRODERICK: Objection.

THE WITNESS: Well, that's -- that's what it seems to show. It says "Abante" and "480."

BY MR. GRISTINA:

Q. So it's a demand letter sent on behalf of Abante?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I don't know. I guess. I don't know.

BY MR. GRISTINA:

Q. Could it be sent on behalf of somebody else?

MR. BRODERICK: Objection.

THE WITNESS: Well, again, I don't know. I didn't send it. So I don't know. It could have been sent on someone else's behalf. I don't know.

BY MR. GRISTINA:

Q. And it relates to the 480 number, does it not?

A. Correct.

Q. And on the bottom -- next page we -- this -- we don't need to read it through again unless you want to, but it's the same as the other one.

A. See, probably a template. Yeah.

Q. Abante Rooter & Plumbing?

A. Uh-huh.

Q. Correct?

A. Yes.

Q. And so it's a template, as you described it, is that what it is?

A. Yeah.

Q. So you provided your parents with a template that they use to make TCPA demands on behalf of Abante Rooter related to the 480 number?

A. Well, no, that they made a mistake on because they're supposed to put the right statutes that apply to it and obviously, yeah, you can't put the -- like this cell phone listed as a business is not exact.

Q. Yes.

A. That was all -- that's all part of the template.

Q. Right.

A. So basically they didn't -- they forgot to take it out or they didn't write it correctly.

Q. What should they have put in here instead?

A. Well, if they -- if it was 480, they could have just -- they should have put their own name and put the right statute. They messed up.

Q. So both these lawsuits that we looked at were mistakes?

A. Well, like I said, I believe one of them or maybe both of them were refiled to correct that, actually.

Q. Do you -- do you know that whether or not the calls in our case at issue here were actually fielded on your father's cell phone that's owned by Abante as opposed to the 480 number?

MR. BRODERICK: Objection.

THE WITNESS: What do you mean "fielded"?

BY MR. GRISTINA:
Q. Did he answer the calls when they came in, the nine calls that he's alleging in this case, that when he answered them, he was answering his cell phone and not a landline?
A. Yeah.
MR. BRODERICK: Objection.
THE WITNESS: I don't know.
BY MR. GRISTINA:
Q. Is that possible?
MR. BRODERICK: Objection.
THE WITNESS: I don't know. If he was traveling and the number was forwarded. I mean, I don't -- I don't know.
BY MR. GRISTINA:
Q. So if you receive a call that was forwarded from the 480 number on your cell phone --
A. Uh-huh.
Q. -- that's a call received on a cell phone, is it not?
A. No.
MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. It's not?

A. No, it is not.

Q. So what -- what phone are you receiving it off of?

A. That is -- that's --

MR. BRODERICK: Objection.

THE WITNESS: That's a landline number that's transferred to a cell phone. You're making it seem like it is then converted to a cell phone and it's not. It's still a landline number, but you're answering it on a cell phone.

BY MR. GRISTINA:

Q. So it's you're answering it on a cell phone, but it's not actually a call to a cell phone?

A. No.

MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. That's your testimony?

MR. BRODERICK: Objection.

THE WITNESS: It's a landline number, is it not? You just said yourself earlier,

it can't be a landline and it can't be a cell phone at the same time. You said that.

BY MR. GRISTINA:

Q. Yeah, I'm asking you.

A. So --

Q. So what phone are you answering it on?

A. So based on --

Q. When your father answers --

A. I mean, I don't know.

Q. -- his cell phone, is he not answering his cell phone?

MR. BRODERICK: Objection.

THE WITNESS: Yeah, but I don't know if this went on his cell phone or land -- I mean, I don't know.

BY MR. GRISTINA:

Q. Has your father filed a TCPA claim that he's alleged is a cellular call based on calls placed to the 480 number that he answered on his cellular telephone because the calls were forwarded there?

A. I don't know.

MR. BRODERICK: Objection.
BY MR. GRISTINA:
Q. Could he do that?
MR. BRODERICK: Objection.
THE WITNESS: I'm not a lawyer.
BY MR. GRISTINA:
Q. I mean, if a call was forwarded from the 480 number to his cell phone, could he file a TCPA claim alleging a call to his cellular phone?
MR. BRODERICK: Objection.
THE WITNESS: To his cellular phone?
BY MR. GRISTINA:
Q. Yes.
A. Can I answer this even though I'm not a lawyer?
MR. BRODERICK: No idea.
THE WITNESS: Yeah.
BY MR. GRISTINA:
Q. Do you know the answer to the question?
A. I don't know, I mean.
Q. If you don't know, you don't know.

A. If -- I don't know.

Q. Are you aware that the Abante cell phone that your father uses is billed to the Scottsdale address?

A. I don't know.

MR. BRODERICK: Objection.

THE REPORTER: Exhibit 5.

(Document marked for identification purposes as Andrew H Exhibit 5.)

BY MR. GRISTINA:

Q. All right. Exhibit 5, Mr. Heidarpour, is another Arizona small claims case dated September 30, 2015 that your father filed against Mortgage Pro USA.

Do you see that?

A. Yes.

Q. And I'm going to try to not repeat some of the same questions that we've gone through before.

So looking at -- into the document you'll see Exhibit 1 is a CenturyLink bill.

A. How far in?

Q. Yeah, it's about halfway through.
A. Okay.
Q. Maybe not halfway, maybe a third.
A. Okay.
Q. You see it? Exhibit 1, March 1, 2015 CenturyLink bill. Do you see that?
A. I'm trying to find a date to make sure for the record.
Q. In the upper right-hand column.
A. Yes. Yes. Yes. Yes.
Q. And look -- look at this document. Tell me if you've ever seen it before. It purports to be seven pages long.
A. No, I haven't.
Q. And if -- in your experience, if you were submitting a telephone bill related to a TCPA claim, wouldn't you want to submit it in the claim exactly as the bill comes to the customer?
MR. BRODERICK: Objection.
THE WITNESS: I don't know. I think it would depend on -- I mean, it would depend. I don't know.

BY MR. GRISTINA:
Q. Do you think it would be okay to remove pages from the bill and then insert new pages that you prepared on a computer modifying the original bill?
MR. BRODERICK: Objection.
THE WITNESS: I mean, I don't know. It's a pretty broad question. I don't know.
BY MR. GRISTINA:
Q. If you hold the bill out to somebody you're suing as the phone bill and that's not actually the phone bill as it was sent to you --
A. Uh-huh.
Q. -- would that be appropriate?
MR. BRODERICK: Objection.
THE WITNESS: I'd say it depends on the information.
BY MR. GRISTINA:
Q. Shouldn't you tell them that you've changed it in a certain way and so they can understand what it is you're providing to them?
MR. BRODERICK: Objection.

THE WITNESS: I mean, that's not my call to make. I don't know.

BY MR. GRISTINA:

Q. If you look at page 6 of 7 of this bill, February 17, 1:06 p.m., it has the number 510-459-6147.

A. Uh-huh.

Q. And then below that it has the number 928-851-3973.

A. Uh-huh.

Q. Do you understand that to mean that that is a phone call placed from the 928 number to the 510 number?

MR. BRODERICK: Objection.

THE WITNESS: No, I don't have a clue of what any of this means.

BY MR. GRISTINA:

Q. Does it mean that your father was making a claim based on a number that a call was forwarded to the 510 number from the 480 number?

MR. BRODERICK: Objection.

THE WITNESS: Like I say, I don't

know because I don't know how to interpret this. I don't know.

BY MR. GRISTINA:

Q. So you never saw this when your father submitted it to the court?

A. Yeah, no.

Q. But in your experience -- so you have no clue what these numbers are on here?

A. Yeah, I don't -- I don't review any of these phone bills. I don't know.

Q. Exhibit 2, which is right after that phone bill, there's correspondence between the first e-mail is from Marcello Byrd to FredPour60@Gmail.com. It says "Good afternoon, Debbie"?

A. Uh-huh.

MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. Do you know why the name Debbie is reflected there?

A. Probably they answered the phone and they probably didn't hear what their name was. I

mean, I don't know. It's not -- you have to ask. You have to ask Fred.

Q. Do you know if your mom in fielding calls would tell people that she was Debbie?

A. I don't know.

Q. And below that, there's an e-mail between your brother and your father.

Do you see that?

A. Yes.

Q. Do you have any knowledge of that e-mail?

A. No.

Q. All right. It looks like there's maybe -- well, there's one from your father to your brother and then your brother to your father. Your brother was, again, providing the president of the company. "President Jason Brackley."

A. Uh-huh.

Q. Now we've seen two of those. Does that refresh your recollection as to why your brother might have been corresponding with your father?

A. No.

Q. Then going to Exhibit 3 and then the demand letter that's right behind it. Do you see that?

A. Yes.

Q. All right. So we have what you were calling -- is that -- Exhibit 3, stamped Exhibit 3, is that a consent letter?

A. Yeah.

Q. Okay. And that's dated August 10 sent to MTG Pro Loan a/k/a Mortgage Pro USA.

Do you see that?

A. Yes.

Q. All right. Now, then the next page is a demand letter, and this is similar to the ones we've seen before. It's got Abante Rooter & Plumbing, who it is sent on behalf of, and then it lists the 480 number.

Do you see that?

A. Yes.

Q. And is it your testimony that this is a mistake as well?

A. (Reviewing document).

You know, I don't know because I don't see the number. This could be an Abante one. I don't see a phone number.

Q. It says "My telephone number 480-5959-5903."

A. Where?

Q. On the demand letter.

A. Oh, you're on the demand? Oh. Was that the number that was -- see, I'm looking at the consent letter. If that was the number called then, yeah, it was a mistake.

Q. And this letter is actually on the next page slightly different from the other two. In the bottom left-hand corner it actually is sent on behalf of your father --

A. Uh-huh.

Q. -- via Abante Rooter & Plumbing.

Do you see that?

A. Yes.

Q. So looking at this demand letter, this would appear to be a demand made on mortgage loans on behalf of Abante Rooter & Plumbing for the 480

number; correct?

MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. It's signed by your father?

A. Oh, no. Like I said, there was a mistake. It should be -- because it's -- it's not Abante.

Q. Looking at this document, if you received it, would you have any way to know that it wasn't sent on behalf of Abante?

MR. BRODERICK: Objection.

THE WITNESS: Well, I don't know what someone else thinks. So I don't know.

BY MR. GRISTINA:

Q. And clearly it's got your father's name on the bottom left-hand column, doesn't it?

A. Yes.

Q. Is this something you believe that he prepared?

A. Him or Farideh.

Q. There's no -- and this doesn't make any reference to a claim made on behalf of a residential

landline, does it?

MR. BRODERICK: Objection.

THE WITNESS: I mean, I haven't read it all. Do you want me to read it?

MR. BRODERICK: Objection.

BY MR. GRISTINA:

Q. It's the same as the others. You can take a look at it if you want.

A. (Reviewing document).

MR. BRODERICK: You can take your time. Read the whole thing.

THE WITNESS: (Reviewing document).

Yeah, I don't think it states it's either a wireless or residential. I don't know if it states either of them.

BY MR. GRISTINA:

Q. It references a violation of the statute and it describes a cellular.

A. Yeah, but those statutes -- because some of those statutes can apply to landline. So, again, they should have made it more organized, put

the right statutes.

Q. All right. So we've talked about these three Arizona lawsuits and there's a fourth Arizona lawsuit, I'll represent to you, that was filed against Nationwide CPAs.

A. Uh-huh.

Q. Is it your testimony here that you have no recollection of these lawsuits before I asked you about them here today?

A. The Nationwide sounds familiar because I think they had a claim against them twice. I remember there was one business. He had to file -- you know, I don't know because I keep thinking there was a case he had to file in both California and Arizona, or there were multiple cases. I don't know which ones they were. I don't know.

Q. But the e-mails that we've discussed today, you don't recall sending any of those e-mails?

A. I may have sent. I may have not. I don't know.

(Document marked for

identification purposes as Andrew H Exhibit 6.)

BY MR. GRISTINA:

Q. All right. Look at what we've marked as Exhibit 6. All right. This document is Bates stamped Heidarpour 1041 and I'll represent to you that it was recently produced to us by your attorneys.

A. Uh-huh.

Q. I'm not going to go through all the numbers in here, but have you ever seen this document before?

A. No.

Q. Do you know -- do you know what it is?

A. No. What is it?

Q. I'm asking you if you know.

A. (Laugh).

Q. I want to -- I want to ask your parents, but your attorneys won't let me. So that's one of the reasons why I'm trying to find out about it today.

A. I don't know.

Q. You've never seen anything like this

before?

A. No.

MR. GRISTINA: Okay. All right. All right. Just give me a minute. Go off for a second.

THE VIDEOGRAPHER: Going off the record at 12:39.

(Recess - 12:39 p.m. - 12:41 p.m.)

THE VIDEOGRAPHER: Back on record at 12:41.

BY MR. GRISTINA:

Q. Does -- do you have any -- other than your -- are you all right?

A. (Coughing). Yeah, I'm set.

Q. Other than your own -- that's all right.

Other than your ownership interest, do you have any other dealings with Legal Advisory For Victims?

A. No.

Q. Do they have any interest in the Central Payment case?

A. No.
Q. Do they have any involvement with this filing?
A. No.
Q. And where -- where are they? Where is their office located?
A. Last I checked it was in DC, but I think they moved.
Q. And other than your work for Abante now, which is part time, and waiting to hear on -- oh, and, well, are you currently -- where are you currently employed again?
A. Neifeld IP Law.
Q. And are you an associate there?
A. No. I'm a clerk.
Q. And do they -- do they file TCPA claims?
A. No.
Q. Other than for your father and what we've talked about, do you assist anybody else with TCPA claims?
A. No.

Q. Is he the only person that you assisted who's filed TCPA claims?
A. (Pause).
Q. Well, let me ask.
A. When I was with LAFV, I didn't assist anyone, no, because I was still -- even though I was owner, I was still just a clerk doing whatever Richard wanted me to. But besides that, no.
Q. Have you filed TCPA claims in your own name?
A. No.
Q. How about in your brother's name?
A. No.
Q. Have you ever filed in your mom's name?
A. No.
Q. Did you have any involvement in the litigation in Arizona involving Avondale Health Care?
A. No.
Q. Do you assist your father with the entities Heidarpour Family Limited Partnership II and III?

A. No.
Q. Do you know what they are?
A. I believe that's for the trust.
Q. What do you know about the trust?
A. That's all I know.
Q. You don't know any of the details of it?
A. No. You have to ask Fred.
Q. How about the Heidarpour Companies, Inc.? Do you assist with those?
A. No.
Q. Do you know the corporate addresses of any of those entities?
A. No.
Q. And we asked about David Devoto.
Are you aware that your parents provided information to CP Wisconsin to fill out a credit card processing application?
MR. BRODERICK: Objection.
THE WITNESS: No.
BY MR. GRISTINA:
Q. Do you know what Alliance Consulting

Services does?
A. No.
Q. That company, do you know how it's related to your family?
A. I think my mom used it. I don't know.
Q. Almost done.
All right. And did you assist your mom in preparing the Excel spreadsheet she uses to record calls from telemarketers?
A. No.
Q. In you work for Abante, are you involved with working with credit card processing companies?
A. No.
Q. Have you ever filled out a credit card processing application for Abante?
A. No. I know at one point my dad wanted me to help him find one, but besides that, no.
Q. Do you know why he wanted you to help him find one?
A. Well, he wanted to take credit cards.
Q. Okay. And so what did he -- what did

he want you to find?
A. Provide him with a low percentage.
Q. When was that?
A. Years ago. Long time ago.
Q. How did you end up doing that?
A. I think I found an app. I can't remember the name. It was some company at the time that was big. You plugged it into your phone and swept the card.
Q. So if -- your Abante is in the business of accepting credit cards, is it not?
A. It should be, yeah.
Q. Does the name Clover ring a bell?
A. No.
Q. We have a dispute amongst the attorneys related to document production issues.
A. Uh-huh.
Q. Subject to that dispute and whether or not we intend to recall you based on additional documents that may or may not be produced in this case, we reserve the right to do that, but subject to that, then I don't have anything further for you

today. I appreciate your time very much.

A. All right. Thank you.

MR. BRODERICK: I just have a couple of questions.

EXAMINATION

BY MR. BRODERICK:

Q. Can you turn to Exhibit 4?

A. On -- okay. All right.

Q. And on the third to last page.

MR. GRISTINA: Which lawsuit is that?

MR. BRODERICK: It's --

THE WITNESS: Arizona Energy Pros.

BY MR. BRODERICK:

Q. Yes.

A. Okay.

Q. And then the third to last page.

MR. GRISTINA: Show me what you got. Yeah.

BY MR. BRODERICK:

Q. Do you see the second paragraph under -- well, the paragraph under "Statement of Facts"

colon?
A. Yes.
Q. Could you read that to me?
A. "The facts of the case are as follows. A prerecorded call to my residential telephone was received on March 16, 2015 from 562-641-7934. This call was illegal under the purview of the TCPA. Prior express consent was not given prior to the call being initiated."
Q. And do you see where it says "Motion to Reconsider"?
A. Yes.
Q. Do you believe this is a corrected filing with respect to a call to the 480 Scottsdale number?
A. Yes.
Q. Could you turn to -- and a prerecorded call to a residence in your understanding is a violation of the TCPA; correct?
A. Correct.
Q. And then could you turn to Exhibit 5, and this one, Thomas, is Mortgage Pro.

A. On what page?
Q. The second to last page.
A. Okay.
Q. And do you see where it says "Motion to Reconsideration"?
A. Yes.
Q. And then do you see under "Statement of Facts" or it's misspelling, but it says:
"A per recorded call to my residential telephone was -- it says -- revised on February 17, 2015 --
A. (Laugh).
Q. -- from 928-851-3937. This call was illegal under the purview of the TCPA."
A. Correct.
Q. Do you -- again, do you believe that this is a correction of a filing regarding a call to the Scottsdale number?
A. Yes.
MR. GRISTINA: Object to the form. Leading.
MR. BRODERICK: No further

questions.

MR. GRISTINA: I have a couple more questions.

(Ali Heidarpour entered.)

MR. BRODERICK: Just one second. You can step out.

(Ali Heidarpour stepped out.)

FURTHER EXAMINATION

BY MR. GRISTINA:

Q. Go back to Exhibit 4, if you would, Mr. Heidarpour, the same page that your attorney showed you.

A. Okay. (Pause). All right.

Q. Right. Do you see the Bates -- the stamp right next to that, McDowell Mountain Justice Court?

A. Yes.

Q. Do you see the date that stamp is there?

A. Yes.

Q. And what date is that?

A. November 30th.

Q. Okay. 2015?
A. Correct.
Q. And that was three months after your father filed his lawsuit in this case, which is in September -- excuse me -- August.
No, I'm not talking this one. I'm talking the Central Payment case.
A. Oh. I mean, I guess. Okay.
Q. Are you aware that your father's cell phone records indicate this call that this lawsuit was based on?
A. No.
Q. Are you aware that it indicates that the call was answered on your father's cell phone?
MR. BRODERICK: Objection.
THE WITNESS: No, I don't know.
BY MR. GRISTINA:
Q. Okay. You don't know one way or the other?
A. No.
Q. If it did, would that change your opinion as to whether or not it was a residential

call or not?

MR. BRODERICK: Objection.

THE WITNESS: No, I don't know. It depends on what the law is.

BY MR. GRISTINA:

Q. And Exhibit 5, the same page your attorney was showing you.

A. Okay.

Q. That was filed on December 15, 2015, was it not? The Bates stamp is in the upper or the court stamp is in the upper right-hand column.

A. I see December 9th. Are we looking at the same one?

Q. Yeah, that's their own?

A. Okay.

Q. December 9, 2015. Do you see that?

A. Yes.

Q. All right. So, again, that was four -- four months after your father -- your father sued Central Payment; correct?

A. Okay. Yeah.

Q. And in either one of these documents --

A. Uh-huh.

Q. -- either one of these exhibits, before this page that Mr. Broderick brought to your attention, which was dated a couple of months or three months after the lawsuit was filed, was there any reference to that number being a residential landline?

MR. BRODERICK: Objection.

THE WITNESS: I don't know. I don't know.

BY MR. GRISTINA:

Q. Did they inform -- did your father inform either of the defendants in this case -- in these cases before November and December of 2015 that he was making a claim based on a residential landline?

MR. BRODERICK: Objection.

THE WITNESS: Well, you'd have to ask him. I don't know.

BY MR. GRISTINA:

Q. But certainly the demand letters don't indicate that, do they?

MR. BRODERICK: Objection.

THE WITNESS: I mean, again, I don't know what he intended to show. You'd have to ask Fred.

BY MR. GRISTINA:

Q. Could it have been that he believed since he answered the phones on his cell phone that he was, in fact, making a cellular claim under the TCPA?

MR. BRODERICK: Objection.

THE WITNESS: You'd have to ask him. I don't know. I don't know what he believes.

BY MR. GRISTINA:

Q. You never discussed that with him?

A. No.

Q. Have you ever assisted your father in filing a claim -- a TCPA claim where the call was placed to the 480 number but received on his cell phone?

A. No, and if I did, I wouldn't know. That's not something I ask. I don't know.

MR. GRISTINA: All right. I don't

have anything further.

MR. BRODERICK: Thank you.

MR. GRISTINA: Subject to my prior preservation of rights.

THE WITNESS: All right.

THE VIDEOGRAPHER: Going off the record at 12:53. This marks the end of DVD No. 2. This also marks the end of the deposition.

(Signature having been waived, the taking of the deposition concluded at 12:53 p.m.)

* * *

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA )

I, DENISE D. VICKERY, CRR/RMR and Notary Public, hereby certify the witness, ANDREW W. HEIDARPOUR, was by me first duly sworn to testify to the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and thereafter reduced to printing under my direction; that said deposition is a true record of the testimony given by said witness.

I certify the inspection, reading and signing of said deposition were waived by counsel for the respective parties and by the witness; and that I am not a relative or employee of any of the parties, or a relative or employee of either counsel, and I am in no way interested directly or indirectly in this action.

CERTIFIED TO THIS 4th DAY OF OCTOBER, 2016.

Denise D. Vickery, CRR/RMR

My Commission expires February 14, 2018