IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

FRED HEIDARPOUR, individually and on behalf of a class of all persons and entities similarly situated,

Plaintiffs,

vs.

CENTRAL PAYMENT CO., LLC,

Defendant.

Case No. 4:15-cv-00139-CDL

---

DEPOSITION OF MATTHEW HYMAN (INDIVIDUAL)
Larkspur, California
Tuesday, August 16, 2016

Reported by:
MONA M. RUSSO, CRR, RDR
CSR No. 8771

Job No. 2366825

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

FRED HEIDARPOUR, individually and on behalf of a class of all persons and entities similarly situated,

Plaintiffs,

vs.

CENTRAL PAYMENT CO., LLC,

Defendant.

Case No. 4:15-cv-00139-CDL

---

DEPOSITION of MATTHEW HYMAN, taken on behalf of Plaintiffs, at 2500 Larkspur Landing Circle, Larkspur, California, beginning at 9:01 a.m. and ending at 11:54 a.m., on Tuesday, August 16, 2016, before MONA M. RUSSO, Certified Shorthand Reporter No. 8771.

APPEARANCES OF COUNSEL

For Plaintiffs:

LAW OFFICE OF MATTHEW P. MCCUE
BY: MATTHEW P. MCCUE, ESQ.
1 South Avenue, Third Floor
Natick, Massachusetts 01760
508.655.1415
mmccue@massattorneys.net

For Defendant:

PAGE, SCRANTOM, SPROUSE, TUCKER & FORD
BY: THOMAS F. GRISTINA, ESQ.
ALAN G. SNIPES, ESQ.
Synovus Centre, 1111 Bay Avenue, Third Floor
Columbus, Georgia 31901
706.324.0251
tfg@psstf.com
ags@psstf.com

INDEX OF EXAMINATIONS

WITNESS: MATTHEW HYMAN

| EXAMINATION | PAGE |
|---|---|
| By Mr. McCue | 8 |

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Affidavit of Brian Ebersole | 16 |
| Exhibit 2 | Better Business Bureau Business Review | 54 |
| Exhibit 3 | Loan Agreement and Promissory Note (Bates CPAY000001 - 0004) | 63 |
| Exhibit 4 | E-mail chain, beginning with an e-mail dated July 23, 2012, to Matt Hyman from Nicholas Kortals (Bates CPAY047050 - 7061) | 77 |

INDEX OF EXHIBITS (Continued)



| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 5 | E-mail chain, beginning with an e-mail dated February 9, 2014, to Nicholas Korthals from Matthew Hyman (Bates CPAY000636 - 0637) | 85 |
| Exhibit 6 | E-mail dated February 24, 2014, to Matt Hyman from Nicholas Korthals (Bates CPAY000654) | 89 |
| Exhibit 7 | E-mail dated March 10, 2014, to Matt Hyman from Nicholas Korthals | 90 |
| Exhibit 8 | E-mail chain, beginning with an e-mail dated March 31, 2014, to Matt Hyman from Nicholas Korthals | 92 |
| Exhibit 9 | E-mail dated May 30, 2014, to Matthew Hyman from Nicholas Korthals | 97 |
| Exhibit 10 | E-mail chain, beginning with an e-mail dated January 26, 2015, to Nicholas Korthals from Matthew Hyman | 102 |

INDEX OF EXHIBITS (Continued)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | E-mail chain, beginning with an e-mail dated April 21, 2015, to Matt Hyman from Nicholas Korthals | 103 |
| Exhibit 12 | E-mail chain, beginning with an e-mail dated June 3, 2015, to Nicholas Korthals from Paul Dobson | 105 |
| Exhibit 13 | E-mail dated June 8, 2015, to Matthew Hyman from Nicholas Korthals (Bates CPAY046538 - 6539) | 107 |
| Exhibit 14 | E-mail dated June 24, 2015, to Matthew Hyman from Nicholas Korthals (Bates CPAY013639) | 110 |
| Exhibit 15 | E-mail chain, beginning with an e-mail dated August 31, 2015, to Matt Hyman from Nicholas Korthals (Bates CPAY046808 - 6811) | 112 |

INDEX OF EXHIBITS (Continued)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16 | Year 4 Business Plan for Central Payment Co., LLC, as of November 3, 2015 (Bates CPAY000040 - 0073) | 137 |

Larkspur, California; Tuesday, August 16, 2016

9:01 A.M.

MATTHEW HYMAN,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. MCCUE:

Q Good morning, Mr. Hyman. My name is Matthew McCue. We just met in the lobby. Thank you for your time today. Just some preliminaries.

Have you ever had your deposition taken before?

A Yes.

Q Okay. So you kind of understand the rules and how it works, but let me just review that quickly. If you have any -- most important, if I ask a question you don't understand, rather than have an unclear record, just tell me, and I'll try to rephrase or restate the question. If at any time you want to take a break, let us know. It's not meant to be an interrogation. It's meant to be a fact-gathering process.

The other kind of general rule is that because the court reporter is creating a record, that we both

wait for each other to finish asking a question or finish an answer and try not to talk over each other. And also, when you respond to a question, respond verbally so the court reporter can pick it up. Okay?

A Okay.

Q In the past, what kind of -- well, how many times have you been deposed in the past?

A I don't know.

Q More than ten?

A No.

Q What type of disputes?

A Landlord dispute in 2004 or 2003 --

Q Was that relating --

A -- is the last deposition I remember.

Q Okay. Was that relating to CPAY, or was that personal or something else?

A Related to a previous business.

Q Okay. All right. Summarize for me your educational background, beginning with high school.

A San Rafael High School, Santa Barbara City College for two years.

Q And then did you get an associate's degree or some type of degree?

A No.

Q What did you study in college? What type of

subjects in general?
A General.
Q Did you have a specialty?
A No.
Q Okay. Summarize for me your work experience once you left college.
A Self-employed.
Q Doing what type of stuff?
A 16 years in the credit card processing business.
Q Was it all for CPAY?
A I'm sorry?
Q All 16 years, were you working for CPAY?
A No.
Q Who were you working for during those 16 years?
A I just told you I was self-employed.
Q So were you essentially a salesperson selling somebody else's credit card processing services?
A We started our own credit card processing companies.
Q Okay. And "we" meaning you and --
A My brother.
Q And what were the names of those companies?
A CardPayment Solutions, in 2000.

Q And was that an incorporated business?
A It was an LLC, S Corp., yeah.
Q Okay. After that, what was the name of your company?
A Central Payment.
Q So when was Central Payment founded?
A Late 2005, early 2006.
Q And who are the owners of Central Payment?
A Currently or when we founded the business?
Q Why don't we do both.
A When we founded the business, it was myself, my brother Zach, and a third-party investor, a company called iPayment.
Q Okay. And currently?
A My brother and myself retain 25 percent ownership, and TSYS owns 75 percent.
Q Okay. And what is the full name of TSYS?
A Total Systems, I believe.
Q Okay. Where are they based out of?
A Columbus.
Q Columbus, Georgia?
A Yes.
Q Okay. What's your knowledge of this case, not derived from anything that your attorneys have told you, but just in general, what's your knowledge of this case?

A That we have this guy named Heidarpour, who is a professional litigator, basically baited one of our contractors, and is claiming that he wrongfully called his business or residence or whatever he's claiming, which is factually false. And that's it.

Q All right. Let me start with a few of those.

When you say "baited," what did Mr. Heidarpour do to bait Central Payment or Central Payment Wisconsin to call him?

MR. GRISTINA: Let me object to the form of the question. The "or" is what I'm objecting to.

THE WITNESS: He didn't bait Central Payment. Central Payment Wisconsin is a third-party contractor, so how they -- where and what they do with their business is their business.

But from my understanding, what happened is that they have this dialer that dialed his business, and Heidarpour or someone associated with Heidarpour baited them and gave them information, asked questions, and took that -- maybe not Korthals' but his employee's time, asking questions about the services and products, even went as far as to fill out an application.

And so I would -- in my professional opinion, if I am a resident and someone is calling me wrongfully, I wouldn't invest the time to falsely fill out an

application, right?

MR. MCCUE: Right.

THE WITNESS: Completely for the only sole purpose of filing a lawsuit, right? So he, you know -- my only knowledge is that Heidarpour is a professional litigator, and the baiting is someone that kind of puts out a hook and induces that phone call.

BY MR. MCCUE:

Q Okay. I just really want to understand your personal -- what's in your brain about this case.

A Sure.

Q Because you obviously think the case is frivolous, right? Yes or no?

A I think Heidarpour is frivolous.

Q Why? When you say he's a professional plaintiff, what does that mean?

A In my opinion, someone that files multiple lawsuits for the same exact reason.

Q So if someone is a consumer who gets a lot of illegal telemarketing calls at their home and fights back against that and files a lot of lawsuits, you think they're a professional plaintiff, and that's somehow a bad thing?

A Well, I disagree with your statement because that was not an illegal phone call.

Q Okay. So what did Mr. Heidarpour do to make Central Payment Wisconsin call him? Is that what you're saying? When you say "baited," did Mr. Heidarpour do anything that had Central Payment Wisconsin call him?

MR. GRISTINA: I'm going to object to the form of the question. But you can answer.

THE WITNESS: Ask it again.

BY MR. MCCUE:

Q You used the term "baited," right, which is a loaded term? You're making an allegation that Mr. Heidarpour did something wrong, something unethical, correct? Just be frank.

MR. GRISTINA: I object to the form of the question.

THE WITNESS: Yeah, I don't -- you know, I'm not here -- I don't want to talk about -- I don't know Heidarpour.

MR. MCCUE: I understand.

THE WITNESS: I don't know his -- I'm not sure of his level of integrity.

MR. MCCUE: Right.

THE WITNESS: I just know that he has a business -- this phone number that's in question that is being used for a business, and Nick Korthals, his business, contacted him to solicit payment processing

services, yet Heidarpour says that that line is a residential line, but it's not.

BY MR. MCCUE:

Q Well, how do you know? Why is it not? I mean, that's his residential number that's on the Do Not Call list. What factual basis do you have to say that that's a business line?

MR. GRISTINA: I object to the form. There's like four questions in there, so answer the best you can.

THE WITNESS: Ask one question, please.

BY MR. MCCUE:

Q You think that Mr. Heidarpour's phone line that he was called on in this case is a business line, correct?

A Yes.

Q Why?

A We have the facts -- I mean, have you not gone through the discovery process? Because I'm not the expert.

Q I understand.

A I really relied on my attorneys to --

Q Right. And I'm just interested in your personal factual understanding. Okay?

MR. GRISTINA: And not on communication that

you have had from me to you.

THE WITNESS: Sure. From my conversations with my counsel --

MR. GRISTINA: We don't want you to talk about our conversations. He doesn't want to ask about our conversations, and you don't have to talk about them. Answer the best you can based on your personal knowledge, not something that I have told you.

THE WITNESS: Yeah. From my personal knowledge, it's a business line.

BY MR. MCCUE:

Q Okay. Is it your -- is it because you think that business line was associated with a pool company?

A I don't know.

Q Does that ring any bells whatsoever?

A I don't know.

Q Okay. Have you ever seen -- let's mark this as the first exhibit.

(Exhibit 1 was marked for identification by the court reporter.)

BY MR. MCCUE:

Q Have you ever seen this Affidavit of Brian Ebersole?

A No.

Q No one has ever shown this to you? Your

attorneys never showed this to you?
A It's possible that this was sent to me to review, but I have not -- I did not --
Q Okay. Well, let me just -- well, I'm surprised you haven't seen this before.
But do you know where Mr. Korthals bought his data from? Do you know?
A No.
Q Did you ever ask him?
A No.
Q And you've never seen this affidavit before?
A No.
Q Are you aware that Mr. Korthals made 25 million telemarketing calls on behalf of CPAY?
A On behalf of -- I'm confused, "on behalf of CPAY." So Nick Korthals -- Korthals, LLC, it's his own enterprise.
Q I understand. Just for purposes of today, I appreciate that's your defense, so you don't have to go into that every time, just to let you know. I understand that CPAY Wisconsin made the calls, but it's my understanding that he was exclusively selling CPAY.
Is that correct?
A No.
Q He was not exclusively selling CPAY?

A No.

Q How do you know that?

A We don't -- he's in a nonexclusive agreement with Central Payment.

Q I understand that. I understand the contract is a nonexclusive contract.

But are you aware that he's already testified that the only thing he did was sell CPAY?

A No, I'm not aware. And I will go on record saying that I have a good feeling that Nick has sent business elsewhere and does business with third parties outside of what Central Payment has to offer. He is in a nonexclusive agreement. He has a right to do that.

Q Sure. What does Nick call his company?

A Korthals, LLC.

Q And what does he do business as?

A He does business as -- I don't know how many dbas he has. The only dba I know that he has that's relevant to my business is Central Payment Wisconsin.

Q Okay. Mr. Korthals has testified that all the telemarketing calls he made were made for CPAY. That's what he was selling. Okay? So I understand you want to dispute that, and we're not going to resolve that today. But for purposes of --

A But --

Q Yeah, go ahead.
A You're stating that I'm disputing it, and what I'm telling you is that it's none of -- I don't know -- it's none of my business what he does with his leads that come in and where he -- if he signs a contract, if it's on our paper, then that contract is obviously going to Central Payment.
Q Yeah.
A I know for a fact that he sent high-risk accounts, as an example, of businesses that we don't allow. I'll give you an example, like a cash-advance store or a tobacco store, or, you know, massage places. We don't tolerate that type of business, so he'll take those accounts in and submit those to a third party outside of Central Payment, and those leads were derived from whatever system he's running.
Q Okay. Have you reviewed his deposition from his testimony?
A No.
Q Have you asked to see that?
A No.
Q Have you seen the expert analysis that our experts did in this case about how many calls are estimated to have been made to -- how many telemarketing calls made by Nick Korthals went to residential lines?

MR. GRISTINA: I object to the form.
You can answer.
THE WITNESS: No.
BY MR. MCCUE:
Q So you don't know that our estimate is that over a million consumers were called by Nick Korthals at his home -- at their homes?
A You know, that's attorney-client privilege, so I would say, you know, if it's -- I know that from our counsel, but I don't know that outside of that.
Q You haven't seen the report of the expert?
A No.
Q Okay.
A And I will add to that no that I do know that million is highly questionable from -- I don't think we have gone -- I don't think your expert has gone through our cross-examination, I believe.
Q Sure, sure, I understand that.
A Have they or no?
Q We're not going to get into it, but obviously you guys have defenses and challenges to that report.
A Sure.
Q I just wanted to know what was your knowledge of the analysis. Okay?
A Okay.

Q Does that concern you at all that -- assuming that's correct, that a million people were called at their homes by Nick Korthals, does that concern you at all?

MR. GRISTINA: I object to the form.

You can answer.

THE WITNESS: What Korthals does in his operation, we have -- we don't control or condone it. If I knew he was calling residences, even though it's outside of my control, I would probably advise him to get third-party professional help and make sure that he's only calling businesses, but --

BY MR. MCCUE:

Q Did you ever ask Mr. Korthals who he was calling or where his data came from?

A No.

Q Did you ever ask him, are you sure this data is business data and not residences?

A We don't -- you know, he is a contractor, right?

Q Right.

A So we have over 1,500 contractors just like Korthals, LLC, so we don't get into second and third and fourth layers of how they're going out and acquiring their accounts because 99.9 percent of the time, their

accounts are not all going to Central Payment. It's a very competitive industry. Central Payment is not the -- we're not the only processor out in the street looking for business.

Q Right.

A And it's as equally as competitive to retain these relationships with guys like Korthals to get them to keep sending us paper, right? So we just look at it as number of accounts, so it -- you're asking questions to me in regards to his business practices, and, you know, in this business, it's none of my business because we're not getting all of his business.

Q Okay. Well, let's assume for purposes of discussion that he testified that all of his business is for you.

MR. GRISTINA: I object to the form.

BY MR. MCCUE:

Q Let's just assume for purposes of discussion.

Is it still your --

A Okay. So, hypothetically, I guess you're saying, if he testified that all of his business was going to Central Payment, which I highly -- I think it's unlikely, but there's a small chance that that's true. I do have a good relationship with Korthals.

Q Mh-hm.

A And so there's a small percentage of our 1,500 active sales partners that might actually send all of their business to CPAY. We don't know if he is or he is not. If he testified that he is, he is a man of his word, I believe, and I would say, okay, then he's sending all of his business to us.

Q Okay.

A But I -- there's no way for me to know that.

Q And your bottom line is as -- what is your title, managing partner?

A Managing director.

Q As a managing director of CPAY, you have no responsibility whatsoever to make sure that what Nick Korthals does when selling CPAY is compliant with telemarketing law?

MR. GRISTINA: I object to the form.

But go ahead and answer.

THE WITNESS: Okay. So, yes, we -- in our ISA agreement, in what we call our SRA, we do obviously want our contractors abiding by all state and federal law.

MR. MCCUE: Right.

THE WITNESS: And if they're not, we have the right to obviously terminate the relationship. We can actually do so without cause. But that's -- so that is covered. Although, I will go on record, even looking at

all these facts, I still don't -- specifically in respect to Heidarpour, I don't believe he broke any law.

BY MR. MCCUE:

Q How do you know? I mean, are you knowledgeable about the telemarketing laws yourself?

A No.

Q Did you take any measures whatsoever to do due diligence to make sure that what Korthals was doing was compliant with the telemarketing laws?

A We don't -- he is Korthals, LLC. That's like saying is someone monitoring what I'm doing. He is his own enterprise. He is his own business. I don't --

Q I understand that's your defense. I understand that.

A It's not my defense. It's a fact. He is running his own business. I never even saw his office, nobody from Central Payment. We don't know if we're getting 50 percent of his accounts or 100 percent of his accounts.

Q I understand.

A Yeah, so --

Q You call him Korthals, LLC, but he calls himself CPAY Wisconsin, right?

A Well, he does business as CPAY Wisconsin, but again, he could have ten dbas.

Q Does he?

A I don't know, and I'm sure if I had a conversation with him, he would tell me that it's only CPAY Wisconsin, and maybe it is. Maybe it is, but --

Q Well, I just want your personal knowledge.

Do you think he has other dbas?

A I would hope not. I would think that -- you know, I know there's other third-party -- I'll give you an example. We do a tremendous amount of business in the cash-advance business. It's a big revenue stream for Central Payment. I know that Korthals was sending all of his cash-advance business to another firm outside of Central Payment, and obviously I'm okay with that.

And so I don't know if he has another dba for that structure. I know that was a big revenue generator for his business. So I don't -- I can't say if he has different dbas or not. I honestly never asked.

Q Okay. Back to your statement about Mr. Heidarpour baiting Mr. Korthals, it seems that the factual predicate for that is based upon Mr. Heidarpour's follow-up and e-mails or questions trying to find out who was calling him.

Would you agree with that?

A You know, 50 percent I would agree. Yes, I think that's part of it, and I think the other part, he

went as far as to, you know, give bank account information, and he basically filled out an application.

So, you know, why he did that, maybe he wanted to get the application across via e-mail or fax so he could really see who he was talking to, if that's -- I mean, you know, that's --

Q So what's wrong with that?

A That's not the baiting that I'm referencing.

Q What's the baiting?

A He's a professional litigator.

Q You're mixing the terms. So a professional --

A No, because --

MR. GRISTINA: I object to the form. It's argumentative. Wait for him to finish his question.

THE WITNESS: All right.

BY MR. MCCUE:

Q Let's break it down, and I want to give you a fair opportunity to explain yourself.

A Yeah, yeah.

Q All right?

MR. GRISTINA: Hang on. The problem is that you guys are talking over each other some, so let him -- we're all friends here. We're going to get along fine, but let's make sure that we get the question out so that I can get my objection in, if necessary, and then you

can try to answer.

THE WITNESS: Sure.

BY MR. MCCUE:

Q The first term you used was "professional" litigant, right? So let's unpack that.

And I believe you testified earlier that your definition of a professional litigant is someone who files a lot of lawsuits, right?

A For the same exact reason.

Q Okay. All right. And then I asked a follow-up question. Assuming you got 50 illegal telemarketing calls at your home from 50 different companies and you filed 50 lawsuits because you wanted to fight back against illegal telemarketing and protect your privacy rights, what's wrong with that?

A If I had that phone number listed as a business number for business purposes, it's -- well, you tell -- I mean, that's wrong.

Q Okay. Let's unpack that, though.

A Okay.

Q Do you think Mr. Heidarpour listed his residential home number as a business line?

A I don't know if it's a residential business -- I don't even believe that the number is a residential line.

Q Why?

A But if it is, yes, I know it's listed in a public form as a business number.

Q Where? What public form?

A To the best of my knowledge, on-line.

Q Okay. On-line. All right.

If you had looked at Mr. Ebersole's affidavit, Mr. Ebersole is the owner of the data company, right, that Mr. Korthals used? Do you understand that?

A No.

Q Now you do.

A Right.

Q Okay. He's given us an affidavit that said that that number was assigned to a pool company when it was sold to Nick Korthals, a pool company, with no mention of Fred Heidarpour. Okay? And then because Mr. Korthals called on all data, in the interim, that number -- the pool company shut down, and that number was reassigned to Mr. Heidarpour.

Did you know that?

MR. GRISTINA: I object to the form.

THE WITNESS: For some reason, a pool company sounds familiar, and also a plumbing company sounds familiar. Regardless, he is -- he has this phone number knowingly that this number is out -- in my opinion, to

the best of my knowledge, in my opinion only, he has this number out in the Web purposely to trap companies, and the reason he wants to get as much information from whoever is calling him is so he could either, A, see if it's worth his time to file a lawsuit and/or, B, file a lawsuit. And if that's not frivolous, I don't know what is.

BY MR. MCCUE:

Q Okay. And I don't disagree with you, but what you keep saying though just leads me into more questions.

You say Mr. Heidarpour has put his number on the Internet to try to trap people? Is that what you think?

A In my humble opinion, and this is just in my opinion, in respects to this case only, not to every other phone number that Korthals might have dialed, but in respect of Heidarpour alone, yes, that's how I feel.

Q Why? What did Heidarpour do to trap telemarketers to call him?

A I'm just telling you how I feel. I cannot give you details on the case because I don't know. I'm just telling you how I feel.

Q Okay. But we're talking about the core merits of this case, right, and is this case substantive or

frivolous, right? So it matters; agree?
A Agree.
Q And you're saying you have a feeling it's frivolous, but you can't tell me a single fact that can show me why it's frivolous.
A Because that phone number is tied to his business that's on-line, and he uses that business number, per you, a residential line, for business purposes.
Q How do you know that?
A From -- to the best of my knowledge, and my attorneys could prove that in court, and I think we're prepared to do so. We'll prove that in court.
Q Okay. But you don't know? You're deferring to your attorney to --
MR. GRISTINA: Can you answer that question without referring to information I've given you?
THE WITNESS: I really can't.
MR. GRISTINA: Then I'll object based on attorney-client privilege.
BY MR. MCCUE:
Q All right. Do you have any understanding of the federal statute called the TCPA, the Telephone Consumer Protection Act?
A No.

Q Have you ever heard of that before this lawsuit was filed?
A No.
Q Have you ever heard of the Do Not Call Registry?
A Yes.
Q Is your residential phone line on the Do Not Call Registry?
A No.
Q Do you get telemarketing calls at home?
A Yes.
Q Do you find that annoying?
A No.
Q Do you like them?
A I know they're running their business.
Q Okay. Do you understand that a lot of people don't like them?
A Yes.
Q A lot of people find them invasive of their privacy?
A Yes.
Q Okay. Do you know that the Telephone Consumer Protection Act strictly regulates marketing by an auto dialer?
A No.

MR. GRISTINA: I object to the form.
Go ahead. You can answer.
THE WITNESS: No.
BY MR. MCCUE:
Q Do you know what an auto dialer is?
A Now I do, yes.
Q Do you know what prerecorded message telemarketing is?
A No.
Q Do you ever get one of those telemarketing calls at home where it's a computer, it's a message, and you have to press 1 for more information?
A No.
Q Okay. Take me through a chronology of your experience with Mr. Korthals, starting as far back as you can remember.
A I believe -- to the best of my knowledge, I think we first spoke on the phone maybe sometime in 2010.
Q All right. We took a few depositions yesterday, so we went over a lot of this stuff, so we can kind of move through it quickly.
A Okay.
Q My understanding is that he started at CPAY around 2009, and there was a first chunk of time,

roughly through 2012, where he worked as an independent agent for CPAY.

Is that consistent with your memory?

MR. GRISTINA: I object to the form.

You can answer.

THE WITNESS: No, but I -- I don't know exactly when he contracted with CPAY, but if it was 2009 and --

BY MR. MCCUE:

Q It's okay. What I'm more interested in is, it's my understanding that there were essentially two different periods of time where --

A Yes.

Q -- he worked for CPAY. And that's correct?

A Yes.

Q Worked with CPAY. And what I'm most interested in is the second period of time. All right?

A Sure.

Q When he first starts working for CPAY -- let's call it 2010 -- did he sign a contract?

A I would assume so, yes.

Q Okay. I'm going to give you what we have marked as Exhibit 1 to Mr. Neuhaus's deposition. And I will represent to you that that's the contract that's been produced by your counsel.

A Okay.
Q And I'll just ask you to look at it.
And the question -- the follow-up question is do you agree that this is the contract, the operative contract, with Mr. Korthals?
MR. GRISTINA: Look through the whole document.
(Brief pause.)
THE WITNESS: I would -- yes, it looks like his contract.
BY MR. MCCUE:
Q Okay. And it's my understanding that that's the contract he signed in roughly 2009, 2010. Maybe you can turn to the signature page and confirm the approximate date.
A July 2010.
Q Okay. And then at some point he left CPAY; is that correct?
A Yes.
Q And then he came back?
A Yes.
Q All right. And when he came back, it was roughly 2013, 2014?
A That sounds about right.
Q Okay. And we'll go through a lot of

documents.

A Yeah.

Q But it's my understanding that a new contract was not signed with Mr. Korthals, that essentially that contract was -- is still the operative contract.

Is that your understanding?

A I don't have knowledge to -- if he signed another contract or not.

Q Okay. All right. When Mr. Korthals left at some point, he left, and he's testified that during that period of time, he was incarcerated.

Were you aware of that?

A Not at the time, but after -- when he came back, yes, I was made aware.

Q Okay. When he signed up in 2009, he filled out a criminal background check form; is that correct?

A Most likely, yes.

Q Is that typical as part of the requirements for --

A Yes.

Q Okay. And did Central Payment in fact do a criminal background check on Mr. Korthals at that time?

A I would assume so, yes.

Q Okay. Does CPAY have rules about allowing people to become ISOs or ISAs if they have a criminal

record?

A It's up to our risk department, Dennis Taylor, to make that call.

Q Okay. So there's no like black-and-white rule?

A It depends on the circumstance.

Q Sure. I understand. So if someone had a DUI when they were in high school, that's a little different than something relating to fraud?

A Sure.

Q Okay. Were you aware of the substance of what Mr. Korthals had been charged with?

A From a high level, yes.

Q And what was that high level?

A That he got stuck in a very bad spot, lied, and ended up doing time for lying.

Q And he lied to whom?

A He lied to an investigator on a robbery or some type of theft that took place, to say that he was at a location or something like that, but he wasn't really at that location.

Q And was he under oath at that time?

A He was.

Q Okay. When he came back to CPAY, did he tell you about that? Say it's 2013 when he comes back.

A Yes.
Q He was upfront about that?
A Yes.
Q Did you do a second background check to make sure that what he was telling you was true?
A I don't recall.
Q Okay. Is that something you would have done?
If someone came back and said, look, I just spent some time in jail, would you typically say I've got to run a background check to make sure what you're telling me is true?
A He might have e-mailed me documentation supporting what happened. I don't recall.
Q Okay. But you don't recall doing a second background check?
A If someone is already active in our system, if they already have a profile built, it's not company policy to run a criminal background check again.
Q Sure.
A So this was kind of a different situation where Korthals left, came back, and was extremely transparent in what happened, and he spent some time giving me all the details and admitted what he got charged for and didn't deny it.
Q Right.

A So I'm not sure if he sent me documentation to support what he was saying, but he admitted to lying under oath, and that's why he ended up doing hard time.

I think he definitely paid the consequences for what he did. I'm sure he learned a valuable lesson. And at that time, I made a judgment call that, you know, we -- you know, we're in the business of changing lives and trying to give people second opportunities, and if he wanted to contract with CPAY, I felt like, you know, it was -- I mean, he didn't get charged with, you know, money laundering or theft. It was --

Q Right.

A It was a lie under oath. It was not right, what he did, but he definitely -- I feel in my heart that he served hard time for making a lie.

Q Sure. How do you know he doesn't have other criminal background? You basically trusted him and took him at his word, right?

A Well, we did -- I would assume that we did a criminal background check at the time of hiring him in 2010 or whenever. You know, someone with a criminal background that has something to hide typically doesn't call me out of the blue and is as transparent as Korthals.

Q Sure.

A I'm not sure if you've met Korthals. He's a good guy, and I wanted to, not give him a second chance. He already was active in our system, so it was more or less, you know, do I allow him to continue to send paper to CPAY? And at that time, my opinion was yes.
Q Okay. Who would definitively know if you guys did a second background check? Would that be risk?
A Yeah, probably Dennis Taylor. Maybe he would know.
Q Okay. Does TSYS have any rules about criminal records for ISOs?
A Well, we are TSYS, so --
Q So, in other words, it's a joint venture between Central Payment and TSYS, correct?
A Yes.
Q But TSYS is its own company, right?
A Yes.
Q Do you need to let TSYS know who you guys are hiring as ISOs or ISAs?
A No.
Q They don't have any oversight over --
A Yeah, it's not -- CPAY and TSYS is not just a joint venture. It's actually -- they own 75 percent of the business, so they're in full control. They have the board seats.

Q Right.
A You know, our business has certain policies and procedures in place. We have a sales management team of ten sales managers, and then they have 20 sales assistants under them, and so our job is to abide by the contract that these guys sign.
Q Okay. What I'm trying to get at is, the discretion to hire or fire ISOs or ISAs, does the buck stop with you and your brother, or does it go up any type of other chain?
A It typically stops with Dennis Taylor.
Q Who is the risk person?
A Yes.
Q Okay. The same issue of bringing on an ISO who has just had a period of incarceration: Was the final call made by Mr. Taylor, or was that made by you?
A I don't know. I think that was made by both myself and Dennis Taylor.
Q Is Dennis Taylor still with the company?
A Yes.
Q Is he your in-house counsel?
A No. He's VP of risk.
Q Do you guys have in-house counsel?
A Yes.
Q And who is that?

A John Hinkle.

Q Okay. So Mr. Korthals starts selling for CPAY, I believe, in the 2010 time frame. I'm going to take you through a bunch of documents, but what I want to first walk you through is just your memory of what he was doing.

Do you recall back in the 2009, 2010 time frame how he was marketing for CPAY or how he was marketing for his own business?

A No.

Q In other words, did you know that he was telemarketing?

A No.

Q You had no idea?

A To the best of my knowledge, I had no idea, yeah.

Q So you didn't know that he was using prerecorded message telemarketing back in 2010?

MR. GRISTINA: I object to the form.

THE WITNESS: To the best of my knowledge -- and I could be crossing my time line here, but I believe -- when you say "prerecorded message," are you speaking of a dialer?

BY MR. MCCUE:

Q Well, there are two different things on my

mind. That's a good question. A dialer is a machine that dials the numbers, and a prerecord is a message that actually plays, and Mr. Korthals was apparently doing both, using a dialer to send prerecords.

MR. GRISTINA: I object to the form.

You can answer.

THE WITNESS: You know, I don't know.

BY MR. MCCUE:

Q Let's focus on the time frame after he comes back, which is more recent in time.

A Okay.

Q It's my understanding that when he comes back in 2013, roughly, that he approaches you and he actually wants to open up an office; is that right?

A Yes.

Q And he asks CPAY for financial support, correct?

A Yes.

Q What type of financial -- what was he -- tell me about that approach to you.

What was his proposal?

A I don't recall the exact proposal, but I do remember there was a monthly allowance given to Korthals, LLC. As long as his business submitted, I want to say, 40 accounts a month, he would be given that

draw. And the reason we put the 40 accounts a month is so we are assured that the majority or some of the business is going to Central Payment and we don't loan Korthals $5,000 and then he submits his business to another business like Central Payment, and then we're stuck holding the bag.

Q Okay. But, initially, CPAY gave him $40,000, correct?

A I don't recall.

Q You don't recall giving him a chunk of money so he could open up an office, do a build-out, rent a dialer, buy leads? You don't recall that?

A I do not believe we gave him 40,000 upfront. I could be wrong.

Q Okay.

A We -- you know, our business -- just so you know, because I'm not trying -- I know 40,000 sounds like a tremendous amount of money, and I maybe should know, but we're in the business of -- we give business loans quite a bit. That's how this entire industry works. So our competitors will go out there and say, hey, we'll give you a hundred thousand dollars upfront to go out and market our paper.

Q Right.

A So I don't think we gave him 40,000 upfront.

I think we gave him 40,000 over a certain period of time, and maybe more than that, maybe a hundred thousand over a certain period of time. But I don't recall ever just -- I don't think -- that doesn't sound like something we would do, just deposit 40,000 into someone's account to start an office. It's typically done on a cash-flow-need basis.

Q Okay. If you had made that type of investment in Mr. Korthals' business, was it typical that you would say here's the money, but you need to use it to market CPAY?

A It's not an investment. It's a loan against their own residual income. So Korthals, back in 2009, built a portfolio. When I say "portfolio," he probably had 200 businesses processing credit cards through his profile, generating probably 2,500 or $4,000 a month of residual income.

Q Right.

A So when Central Payment loans -- not investment. It's far from investment. We just loan it -- we leverage that loan based off the residual income that he's making, so we know if we give Korthals, LLC, 40,000, and he starts submitting paper to Total Merchant Services down the street, we then hold his residual income, and we will get paid back over a

certain period of time.

Q Sure.

A So, you know, we kind of hold the -- we do hold the residuals as collateral. So Korthals is -- now that you have juggled my memory, he is an exception because he did have a portfolio. And so if he was brand-new in 2013, there's no way we would just loan him 40,000, because then we're completely naked on the transaction.

Q Okay.

A So we only loan money out based off someone's residual income. It's an advance.

Q And we'll go through some documents that might refresh your memory.

A Sure.

Q But after Mr. Korthals opens up CPAY Wisconsin, were you aware that he was using telemarketing as a method of finding new customers?

MR. GRISTINA: I'm going to object to the form.

THE WITNESS: His -- well, how do you define "telemarketing"?

BY MR. MCCUE:

Q Selling by telephone.

A Referencing a call dialer? Would that be --

Q Yeah, that's part of it, yeah.
A Okay. So the only knowledge I had of how he was going to solicit businesses was that he was going to use a dialer.
Q Right. Okay.
A He did tell me that he was planning on doing that.
Q Right.
A And, you know, again, it's -- it's great for Korthals to tell me that he's using a dialer. The only thing that Central Payment truly cares about is how many accounts are you going to submit per month, because at the end of the day, that dialer could be used for any other type of businesses he's running out of that office, right?
Q Right.
A And so, yes, I did know he was using a dialer, but to what extent, I don't know.
Q And just so we're clear, using a dialer to telemarket, correct? Using a dialer to sell, find new merchants who would be interested in CPAY?
A I don't -- there was never -- no, I don't know that.
Q Okay. Well, what does Mr. Korthals do? His job is to find new customers for CPAY, right?

A His -- Korthals, LLC, does -- I don't know who else he is contracted with in our space. I know it's not just Central Payment. So in respect to our relationship and his contract with CPAY, he's under a nonexclusive agreement. So the way I saw it was, as long as we're getting the 40 accounts a month you're agreeing to, Nick, then we're going to continue loaning you money.

Q You just said he -- I believe you said he had other contracts with other merchant service providers; is that correct?

A I'm not saying that factually, but I would assume that he does, yes.

Q But it might not be true.

A I would think it's true, but if it's not, I would be very surprised.

Q And you haven't looked at his deposition testimony, correct?

A No.

Q How many other ISOs call themselves Central Payment something? Like he calls himself Central Payment Wisconsin. Are there other ISOs that basically incorporate your trade name into their trade name?

A Well, he's representing Central Payment, so why he just didn't say Central Payment, that's, you

know -- because he's really -- he's representing Central Payment in this relationship.

Q Right.

A So I -- so what -- I'm sorry.

What's your question?

Q Are there other ISOs that do -- let's back up.

A Oh, okay, I see.

Q Let me just back up. Okay?

You have Central Payment, right? And it's your own stand-alone company with an incorporated -- it's a trademarked trade name, correct, Central Payment, right? And you have Nick Korthals, whose real company is called Korthals Enterprises, LLC, correct?

A Yes.

Q Okay. And then he starts doing business, calling him Central Payment Wisconsin, correct?

A Yes.

Q And my question to you is, are there other ISOs like Mr. Korthals who do business using a trade name that's very, very similar to Central Payment?

MR. GRISTINA: I object to the form.

But go ahead and answer.

THE WITNESS: I don't know.

BY MR. MCCUE:

Q Does that concern you at all that ISOs might

be out there saying they're Central Payment?

MR. GRISTINA: I object to the form.

THE WITNESS: So ISOs -- are you referencing an ISA or an ISO?

BY MR. MCCUE:

Q Either one.

A Okay. So, no, if someone is an independent contractor for Central Payment, they're representing Central Payment.

Q I understand that, but they're holding themselves out to the public and making it look to the public that they're the same thing.

A Well, but, no. On every business card that's out there, it clearly says in giant words an independent contractor for Central Payment, and businesses know -- I mean, I wouldn't say all, but most businesses know that these independent contractors will find them the best home for their business. So they know that, you know, Korthals might not just send them to CPAY. He might send them to TMS or Harbortouch or TSYS, right?

Q Right.

A There's different -- so it's not unusual for someone that's representing Central Payment to represent Central Payment.

Q All right. So you don't have any problem with

Mr. Korthals using the trade name Central Payment Wisconsin?
A No.
Q And you don't have any problem -- well, would you agree with me that Central Payment Wisconsin uses the same exact font and the same exact colors in the title as Central Payment?
A No.
Q Are you aware of that?
A Yes.
Q And you don't have a problem with that?
A Well, if he's representing Central Payment, he wants to -- you know, he wants to put out the -- you know, all the accolades and everything about Central Payment. Whether his logo is the same, I could -- you know, Visa/MasterCard rules and regs, if he went out and said he was Korthals, LLC and represented himself as Korthals, LLC to these businesses and then those businesses signed a Central Payment contract, that would be a big problem.
Q Why?
A Because that's a Visa/MasterCard rule, that you can't rep- -- I can't go out there and say this is Matt Hyman Processing, and then the contract that this business is signing is actually in fact Central Payment.

So what they call that -- if I wanted to do that, if Nick Korthals wanted to go out and market as Korthals, LLC, he would have to become registered with First National Bank of Omaha, which we've done maybe ten times in our history, where someone says, "Hey, I don't want to represent Central Payment. I want to represent my own brand." And there's a $10,000 fee, and they go through the process, and they get registered, and then they can do their own branding. So, yeah.

Q Just so I'm clear, so you're saying it's actually a requirement that when ISOs or ISAs go out and market, that they market -- that they represent that they are CPAY?

A Yes, not -- well, that they're an independent contractor for CPAY when selling -- when signing a Central Payment account. So what we don't want and what the -- and this is not our rule. This is, again, Visa/MasterCard rules.

Q Yeah.

A They can't go out and say they're representing Total Merchant Services and then in the ninth inning come in and give them a different contract. That would be a violation.

Q Sure.

A So they want -- you know, it's like an

insurance agent. You know, if I'm representing Aflac and at the end of the day I come in the ninth -- you know, the ninth hour and change my -- whoever that account is going to, they probably wouldn't like that. They don't have a governing body like Visa/MasterCard, but we do.

Q When someone like Nick Korthals markets or telemarkets to a new merchant, are they expected to say "Hi, this is CPAY" in the initial telemarketing call?

A In the initial --

Q Let me just back up. You said when the contract is signed, it has to be made clear that Nick Korthals is independent and he's selling CPAY, correct?

A No, I don't think I said that. What I said was that the business cards clearly say that they're independent contractors, but any -- most business owners know that these guys are -- in fact, they brag, and a lot of our marketing material talks about how these independent contractors are in business for themselves or local business owners and --

Q Right.

A Yet they -- you know, they represent Central Payment, of course, of course. And we have -- you know, I'm sure there's a percentage of our contractors that give us maybe 90 percent of their new business, which is

great. That means we're doing -- you know, we treat these contractors as a customer.

Q Right.

A So we try to impress our customers and make them happy so they continue sending us business and not our competitors.

Q Okay. So when Nick Korthals -- on his e-mails he lists most ethical company from 2010 through 2012 --

A Right.

Q -- and something about the top 500.

A Sure.

Q On his e-mails for Central Payment Wisconsin, that's okay for him to do, in your mind?

A Well, if he's sending out an e-mail and he's representing Central Payment, you know, he's bragging about the accomplishments and everything that CPAY and TSYS has to offer.

Q Yeah.

A And if those accounts are being submitted to CPAY and not to a competitor, which, you know, in regards to Korthals, I think, if I had to guess -- and this is just a guess -- I would say we probably got 80 percent of his new accounts, which is the majority.

Q Right.

A Yes, I think that's okay.

Q That's okay? Okay. And when he says on his own e-mails that he's an A+ BBB company, is he referring to CPAY or CPAY Wisconsin?

A Well, CPAY is, I believe, to the best of my knowledge, A+, and to the best of my knowledge, I believe Korthals has told me that he's A+ as well. I don't know, but I believe.

Q Let's mark this as the next exhibit.

THE REPORTER: This is Exhibit 2.

(Exhibit 2 was marked for identification by the court reporter.)

BY MR. MCCUE:

Q Mr. Hyman, I'm showing you what's marked as Exhibit 2. I will represent to you that this is a Better Business Bureau rating that I just printed off a couple days ago in regards to CPAY Wisconsin. It indicates that there is no -- that CPAY Wisconsin is not BBB accredited.

Do you see that?

A Yes.

Q Do you have any reason to believe that this is not accurate?

A No.

Q Have you ever asked Mr. Korthals does he have a BBB rating for his own company?

A No.
Q And do you think it's appropriate for Mr. Korthals to be saying on his e-mails, his Central Payment Wisconsin e-mails, that he's an A+ BBB-rated company?
A Well, if he's representing Central Payment and all of his customers that he is representing CPAY to are being boarded with Central Payment and we are the ones handling the customer service and tech support, et cetera, I would say yes.
Q Okay. So just wrapping up this area of testimony, in your mind, his website is okay, right?
His -- let me back up.
Have you seen his website before?
A Yes.
Q Have you looked at the content of the website?
A Briefly, yes.
Q All right. I want to show it to you just in case you need it.
A Yep.
Q And just for the record, what we're looking at is a currently accessible copy of Mr. Korthals' website.
For the record, the Web address is cpaywi.com, and I just asked Mr. Hyman just to acquaint himself with the website.

A And I will note that 20 percent of his website has to do with cash funding, of which we don't receive any of his business from.

Q Do you know if any of his telemarketing related to cash funding?

A I do not know.

Q So you don't know that he's already testified that a hundred percent of his telemarketing related to CPAY?

MR. GRISTINA: I object to the form.

THE WITNESS: No.

BY MR. MCCUE:

Q Okay. Have you had a chance to look at that website?

A Yes.

Q Would you agree with me that the trade name at the top is Central Payment Wisconsin?

A Yes.

Q Would you agree with me that's obviously very similar to the trade name of your company called Central Payment?

A Yes.

Q Would you agree with me that the colors that Central Payment shows for its company, meaning the "Central" is green and the "Payment" is white, is very

similar to the colors chosen by Mr. Korthals for Central Payment Wisconsin?

A Yes, but the website has a completely different feel. So although I agree with you, if Central Payment has green and white -- and I don't know if our -- I think our logo is all green.

Q Okay.

A So his logo is different, and his website is completely -- it's completely different. I would agree with you that the content and like this testimonial here is from our website, obviously, but the look and feel is totally different.

Q Okay. That's fair enough.

Is the font of Central Payment Wisconsin very similar to the font used in your logo?

A I would say it's similar.

Q Could you click on the About Us section of that? If you could just take a minute to go through the About Us section of the CPAY website.

My question is going to be are you familiar with that material?

A Yes.

Q Okay. Let me know when you're ready.

A I'm ready.

Q Okay. I'm going to show you what's been

marked as Exhibit 5 from Mr. Neuhaus's deposition. I'll just represent to you that I went through each of the pages on the About Us presentation, and he confirmed that that hard copy is essentially the same.

My question is do you recognize those materials?

A I'm sorry. The same as what?

Q This is a hard copy of the About Us section of the website. Okay?

A Okay, yeah.

Q My question is do you recognize those materials?

A Do I recognize the actual language, what this is saying?

Q The presentation itself.

A Oh. No.

Q Okay. Do you have any idea where Mr. Korthals got this information from?

A It could be from somewhere on our agent portal or some of our marketing. I'm not sure.

Q Okay. Is there anywhere -- in the materials that you're looking at, the hard copy, is there anywhere in those materials where he makes it clear that he's Korthals Enterprises, LLC?

A Let me look at this. How do you scroll down

on this thing?

Q And just for the record, I'll just note that you're looking at the -- you're back on the website.

A Yeah.

MR. GRISTINA: He's trying to scroll down.

MR. MCCUE: Yeah, that's fine.

THE WITNESS: On the website, yes, he does say CPAY Wisconsin is an ISO of Central Payment.

BY MR. MCCUE:

Q Where does it say that?

A Right here (indicating).

Q Oh, I see, the last part there, Central Payment. Okay.

A Yeah, in black and white. Now, you know, we do our best to make sure that, you know, they're abiding by, you know, what we feel is okay.

Q Yeah.

A And, yes, I would agree with you that this is content taken from either -- somewhere from Central Payment. I don't know where. But it's -- I think all the information, if he's representing Central Payment, is relevant, and it's relevant to -- potentially to customers that he's signing.

Q Okay. I just want to make sure. It sounds like it's A-OK with you, so that's fine with me, and we

can move on.

A Yeah. If it didn't say he's an ISO of Central Payment on the bottom of the website, I would probably say, you know, that's an adjustment he should make.

Q All right. So you're talking about the font at the very bottom of the website?

A Yes. These are critical -- you know, these are Visa/MasterCard rules right here. You have to state that. And then the last line is what we want, just for sense of total clarity.

Q Sure, sure.

A So if someone -- you know, if someone looks at this, they go, okay, he's an ISO of CPAY. And most -- again, I know I've said this before. Most business owners know that these independent contractors represent a whole slew of different organizations.

For example, I just got quoted on a whole-life insurance policy, and I got -- you know, he represents himself as working with this group, but I got bids from ten different insurance companies on the same product.

Q Yeah.

A And independent contractors in our space, they kind of play the same game where they will solicit a merchant account, and they will place you where they will make the biggest bang for their buck, not

necessarily for the merchant, but where they're going to get paid the most commission.

So it's -- you know, in respects to Korthals, I'll go back to the relationship really was 40 accounts a month, and we'll give you this money to start an office. And, you know, his marketing practices and his website, he might have e-mailed me the website, and I might have taken a look at it, you know, but --

Q It sounds like -- just to wrap it up, it sounds like you knew that he was using Central Payment Wisconsin as a trade name, and it was okay with you.

A I knew that he was representing Central Payment. I didn't -- I never really thought about Central Payment Wisconsin. So, no, I --

Q Okay. You knew his company was really called Korthals Enterprises, LLC, right?

A I did know it was Korthals, LLC, only because he asked me to make an adjustment within his profile, so that's the only reason why I know. You know, most of our independent contractors are just Nick Korthals.

Q Sure. And you understand there is no real company called Central Payment Wisconsin, right?

MR. GRISTINA: I object to the form.

THE WITNESS: Well, if that's how -- okay. It's --

BY MR. MCCUE:

Q It's a trade name for --

A It's a dba.

Q Right. A dba of Korthals Enterprises, LLC, correct?

A I don't know.

Q It's a dba for Nick Korthals?

A I don't know. I mean, I know he represents Central Payment, but how he registered Central Payment Wisconsin, I honestly don't know.

Q Okay. You're talking about if there's formal incorporation papers filed for Central Payment Wisconsin, you don't know.

A I have no idea.

Q All right. But you do know that Nick Korthals' business is called Korthals Enterprises, LLC, right?

A Yes.

Q And it's okay in your mind, as a managing director of CPAY, how he represents himself on his e-mails in terms of referring to awards that were given to CPAY? That's okay with you?

A If he's only -- if he's -- I'm sorry.

If he's representing Central Payment?

Q Right.

A Then, yes, I think it's okay.
Q It's on every e-mail he sends out, right?
MR. GRISTINA: I object to the form.
THE WITNESS: Well, I don't know how many different e-mail accounts he has.
BY MR. MCCUE:
Q Okay. On every CPAY Wisconsin account?
A Well, if it's a CPAY Wisconsin e-mail, then one would assume that he's representing Central Payment.
Q Right. So that's the point.
That's okay with you? That's all I'm trying to get at. That's okay with you?
A Yes, yes.
Q All right.
MR. GRISTINA: Why don't we take five minutes if you're at a good breaking point.
MR. MCCUE: Yeah, sure.
MR. GRISTINA: Thank you.
(Recess taken.)
MR. MCCUE: We'll go back on the record. I'll mark the next exhibit.
THE REPORTER: That's Number 3.
(Exhibit 3 was marked for identification by the court reporter.)

BY MR. MCCUE:
Q Mr. Hyman, I'm going to show you what we have marked as Exhibit 3 to your depo. And, admittedly, the quality on this is pretty poor, but it's my understanding that this is a copy of the loan agreement between CPAY and Mr. Korthals. I'll just give you a chance to kind of review that.
And my question is does it refresh your memory about an initial start-up loan from CPAY to Mr. Korthals in February of 2004 [sic]?
A I don't do the loan agreements. That's John Hinkle. But it does bring back your question in regards to the 40,000.
Q Yeah.
A That was a line of credit. That was not deposited into Korthals' checking account.
Q Oh, I understand. Okay.
MR. GRISTINA: Did you -- I think you said 2004 on the date.
MR. MCCUE: I'm sorry. It's 2014.
MR. GRISTINA: Yeah.
THE WITNESS: This is dated 2013, February 2013.
BY MR. MCCUE:
Q It was signed in February 2014, the last page.

A Oh. It took me a year to get it back. Maybe that's when we actually started --

Q Oh, you're right, you're right. So maybe it's a typo.

A Yeah.

Q Okay. But just so the record is clear, I'm showing you what's been marked as Exhibit 3.

And you recognize this as the loan that was made to Mr. Korthals, that Mr. Korthals signed for in February of 2014? Would you agree with that?

A Yes, I would agree with that.

Q And you have -- you have explained that it's a line of credit?

A It's -- TSYS wants to put a cap on certain loans that we give out based on the residual income.

Q Right.

A So at that time, he was approved up to 40,000 due to his total residual income, and I would guess his income at that time was probably close to 7- or $8,000 a month.

Q Okay.

A So we -- I believe that's how we came to the number of 40,000.

Q Okay.

A But that was -- again, that was a -- that

number to me is relatively insignificant because it was all based on Korthals writing a certain number of deals, and he would get the cash flow every month. I don't -- whether it was 5,000 or $8,000 a month.

Q Right.

A I don't remember the exact number. But it was basically like, hey, Korthals, we'll do -- we'll engage with you, and we'll give you up to 40,000 total, and we'll give you X amount of dollars per month based on certain performance criteria to get the loan, yeah.

Q I understand. Okay. Do you recall what he initially needed that money to do?

A I don't.

Q Do you recall that he was physically opening an office and had to do a build-out and had to rent computers and pay for a dialer? Do you recall that?

A I don't. I -- yes, I do remember a dialer.

Q Okay.

A I do. But I don't know anything about the office and computers, et cetera.

Q Okay.

MR. MCCUE: Tom, if you guys have a better copy of that, if you could just send it to me.

MR. GRISTINA: Yeah. I mean, I don't know if there is one.

MR. MCCUE: Not for today. I'm just saying in general.

BY MR. MCCUE:

Q All right. Let me show you what's been marked -- we marked this as Exhibit 6 to Mr. Neuhaus's deposition. I'll just ask you to take a look through that. And I will represent to you that Mr. Korthals has testified that this was the script that he used when speaking with merchants after they expressed an interest from a telemarketing call.

MR. GRISTINA: I object to the form.

THE WITNESS: I'm sorry. So what is this again?

BY MR. MCCUE:

Q This is a script that Mr. Korthals produced, so I wanted you to look at it just generally. I'm not going to ask you questions about every line.

My first question is have you ever seen this before?

A No.

Q Okay. Would you -- would you ever have asked Mr. Korthals to see the scripts that he uses when talking with merchants following a telemarketing call?

MR. GRISTINA: I object to the form.

Go ahead.

THE WITNESS: Possibly, yes.

BY MR. MCCUE:

Q Okay. Do you recall ever asking Mr. Korthals to send you his scripts?

A I would say I might have asked.

Q Okay.

A I might have asked, and I'm not sure the reason why I asked. But I want to --

Q And let me clarify.

A I do remember.

Q There is another document that I will show you where he sent you the script of a prerecorded message that he uses. That's a separate document.

A Okay.

Q I just want to be clear that this is a script that's used when a merchant has responded to the press 1 and is now talking to a live person at Central Payment Wisconsin. Okay?

A Yeah.

Q And my question is is this the type of script that you typically would have asked Mr. Korthals to show to you?

A I would probably be more interested in what is being said in that initial call.

Q Okay.

A But, you know, I -- it's really not our practice -- we have 1,500 contractors, and I might be in touch with 300 of them.

Q Okay.

A So we don't, you know -- in my daily conversations, I might talk to Nick maybe once a month, maybe every other month, but e-mail frequently. You know, in that two-minute conversation, it's not like, hey, by the way, I want to know what your, you know -- we have a sales management team, like Aaron Neuhaus.

Q Right.

A That was Nick's primary contact.

Q Okay. So it sounds like you don't -- you wouldn't get that deep into the weeds, so to speak, as to exactly what Mr. Korthals was doing?

A I wouldn't say I -- no. I sometimes do ask questions if interested, especially if a contractor has a very good month. I might want to see how they're marketing and make sure it's on the up and up.

Q Yeah.

A But, you know, no, it's not in our business practice to -- I just don't have the bandwidth to do it.

Q I understand.

A But in Korthals' case, I'm sure in one of our conversations, maybe at the President's Club -- now it's

coming back to me, and I apologize.

At the President's Club, he was bragging to a few -- we have, you know, our top 100 guys there, 120, and he was talking about this marketing ploy that he's doing where he's generating these results from, and a few of the top-tiered agents wanted to know what his script was, how was he getting traction.

And so if I recall, I might have asked him for that script so I could share it with his colleagues, but he was very -- I do remember he was a little standoffish, and I don't know if he ever actually sent me the script. He might have.

Q So would that have been the script for the prerecorded message, or would that have been the script --

A For the prerecorded message.

Q For the prerecorded message. All right.

So your memory is that -- so when he's talking about his trick at the President's meeting, you think he's referring to prerecorded message telemarketing?

MR. GRISTINA: I object to the form.

THE WITNESS: Say that again.

BY MR. MCCUE:

Q You just testified that at the President's Club, right -- which my understanding is a top dealer

meeting in Las Vegas every year; is that correct?
A Yes.
Q You hear Nick Korthals talking to other ISAs of CPAY, correct, other dealers?
A No. What I testified was that Korthals bragged about his marketing approach, and a few of those President's Club agents then inquired what his scripts were and how he was gaining the traction that he was gaining.
Q Right.
A And I believe that is why I might have asked him for a script, not because I wanted to audit it for compliance reasons.
Q Right.
A Because at that time and still to this day -- and it's to be determined -- I didn't believe that we were getting 100 percent of his business.
Q Sure.
A So it's not really -- you know, it's not proper form for me to say I want to see your scripts. He would say, okay, I disagree with you, and I'm going to start sending my business to your competitor down the street.
Q I understand. What he was bragging about was his prerecorded marketing that had been effective; is

that correct?
A I don't know if he was bragging, but I think he was sharing his thoughts and his business with his peers. I wouldn't call it bragging. I don't know. I wasn't there.
Q I just used the word because you had used it. I thought you had said that Nick was bragging to other President team members.
A Okay.
Q Let's move on from that.
But you observed him, Mr. Korthals, at a President's team meeting in Vegas, discussing with other President team members how he was getting more business using prerecorded marketing?
A After the President's Club meeting, I believe I might have gotten an inquiry from an agent, and thus possibly the reason why I might have asked Korthals for a script.
Q I understand.
A I don't know. I'm just giving you information to help you get to the answer.
Q Right. In your mind, you weren't saying, "Oh, my God, this is prerecorded marketing. I've got to be aware of the laws," because that -- you've testified that really wasn't your role given the relationship with

Korthals, correct?
A Yes.
Q Okay. And what you were thinking is here's information that another President team member might find useful, and you were essentially facilitating that information; is that correct?
A Yes.
Q Okay. In this script -- I'll call it a telemarketing script. And just so we're clear, I'll call the -- the prerecorded script, I'll call that the prerecorded script.
A Okay.
Q And why don't we call this the closer script, if that makes more sense. This is the script that Korthals was using when he was actually talking to a live person. Okay?
A Okay.
Q And we're referring to what is from Mr. Neuhaus's Deposition Exhibit 6.
On the second page of this closer script, it says, "Our company is Central Payment. We are a joint venture with TSYS. We are currently the largest processor in the world. We are A+ rated with the BBB," and it goes on from there.
Do you see that?

A Yes.
Q Is this the type of opportunity that you would have expected where Mr. Korthals would have said, "I'm CPAY Wisconsin. I'm an independent business, but I rep CPAY, and CPAY's the greatest"?
A I wouldn't expect him to say, "I'm CPAY Wisconsin," but I would expect him to say, you know, "We represent Central Payment, and Central Payment is a joint venture with TSYS." So I would expect that, yes.
Q Does he say that in this closing script?
A No.
Q He says that "Our company is Central Payment," correct?
A He's referencing -- when he says -- I think what he's saying is -- so he's representing Central Payment. He's an independent contractor for CPAY.
Q Right.
A So he's talking about, you know, our company. I don't think he's referencing Central Payment but our company, meaning Aflac, so like if an Aflac contractor talks to me, which I've talked to before, they say "our company" all day long, and because it's the company that they represent.
Q Okay.
A Now, would I prefer him to say we represent

Central Payment? Absolutely, I would prefer that. Only for sense of clarity, I would prefer that, yes.

Q Okay. So when a merchant is talking with CPAY Wisconsin in this context, press 1, they're talking, they get this closer script, how does the merchant know that they're actually talking to CPAY Wisconsin?

MR. GRISTINA: I object to the form.

BY MR. MCCUE:

Q Or how do they know they're talking to Korthals Enterprises?

A I don't know what that prerecorded message said and what company name was on there, but in my humble opinion, this is the script that I'm assuming Aaron Neuhaus provided. Whose script --

Q This script was produced by Mr. Korthals.

A Okay. Well, I question what other scripts he has and if he has another script for a different business that he's marketing with.

Q Okay. So my question to you is -- let's assume he's marketing Central Payment, right? Is this an appropriate script for him to use when he's talking to a merchant by saying, "Our company is Central Payment"? Do you have a problem with that?

A If this merchant -- a hundred percent, if this merchant said, "Okay. I'm good to go. I want to join

your company," and he boarded that account with Central Payment and not one of our competitors, I would say this is okay. It could use a few tweaks and adjustments, but I wouldn't say for any reason that this merchant is not doing business with who he's saying they're doing business with.

I will go on record, I think he should have said, "We represent Central Payment," and, you know, so there's that -- there's that cutoff. But, you know, he's out there writing paper on behalf of Central Payment, so I would say, yes, this script is okay. There could be maybe a small tweak in it.

Q All right. I'm going to take you through a bunch of documents. I'm going to try to be as efficient as I can. I want to give you an opportunity to review each one.

A Yeah.

Q But there shouldn't be any surprises.

A Okay.

Q For each of the documents, one of the things I need to do is to make sure it's an authentic document, right, and that it's your business record, and there's a long litany of questions that I can ask you about, you know, the technical foundation for each of these, but, basically, when I give you a document and I ask you is

it authentic, what I'm asking you is is this a true and accurate copy of the document that you produced, and is it a complete copy, to the best of your knowledge? You know, are we missing a page or missing an attachment?

Okay? And when I say to you is this a business record of CPAY, what I mean is kind of the common sense, if this is a document that was kept in the ordinary course of your business, and it wasn't created for this litigation or because of this litigation. It was just a document that was maintained in the ordinary course at CPAY and that you guys have produced it in the course of this litigation.

Is that fair?

A Yes.

Q So then I won't have to ask you 15 questions about every document if we're on the same page.

Let's mark this as the next exhibit.

THE REPORTER: Exhibit 4.

(Exhibit 4 was marked for identification by the court reporter.)

BY MR. MCCUE:

Q So, Mr. Hyman, I'm showing you what's been marked as Exhibit 4. At the bottom of the pages, if you see numbers on them, that's another way we keep track of documents. So the number for this document starts at

CPAY47050 and ends at 47061.

A Okay.

Q I'll just ask you to take a moment to go through this document just to become familiar with it, and then I'll ask you some questions about it afterward.

A Do these start backward or forward?

Q E-mails usually start backwards chronologically.

A Okay.

(Brief pause.)

THE WITNESS: Okay.

BY MR. MCCUE:

Q What I'll try to do is I'll try to summarize what I think the document shows, and then I'll just ask you to either agree, and if you don't agree, then I'll give you more time to go back through it. Okay?

A Yes.

Q So, chronologically, this document seems to be going back into 2012, and there's a number of e-mails between Mr. Korthals and Kris Atkinson at CPAY.

Do you see those?

A Yes.

Q Who is Mr. Atkinson?

A He was a previous sales director.

Q Okay. And would you agree with me that the

earlier e-mails talk about Mr. Korthals using a dialer or telemarketing system?

A Yes.

Q And he's talking about the costs of that; is that correct?

A Yes.

Q And later on in the e-mail -- turn to the first page -- you get involved in this e-mail string; is that correct?

MR. GRISTINA: I'll object to the form.

BY MR. MCCUE:

Q Do you get involved in this e-mail string?

MR. GRISTINA: Same objection.

BY MR. MCCUE:

Q If you look at the first page.

A Yes. Specifically, what are you asking?

Q I'm just asking you to look at the first page of the package.

A Okay.

Q Look at your name, your e-mail.

A Okay, yes. I see an e-mail where I said, "Ok, cool, keep me posted please."

Q Okay. All right. And the substance of this is Mr. Korthals now is talking to you about telemarketing by a prerecorded message, is that correct,

towards the bottom of the page?

A Yeah. He's updating me on the system that they're using to call.

Q Okay. The system they're using to telemarket, correct?

A I would assume so, yes.

Q Yeah, I'm not looking to trick you or anything.

A I know.

Q They're talking about the dialer, correct?

A Yes.

Q And the dialer, again, is a computer that helps Mr. Korthals engage in telemarketing, correct?

A I don't know. I don't believe that this -- I don't recall. This is -- you know, this is over four years ago.

Q Sure.

A And I just -- yeah, from the sound of it, it looks like he is running a very, very low end, low budget, total end cost of $1,000 for a dialer.

Q Okay.

A So I look forward to seeing the other e-mails that compound this e-mail to kind of give me the full story. Maybe that will juggle my memory.

Q Sure. All I want to show with this document

is that this is July 2012, and you're involved in communications with Mr. Korthals where he's talking about telemarketing by a dialer and telemarketing using a prerecord; is that correct?

A He doesn't say telemarketing, and he doesn't say that he's -- I don't know if he's -- if this is a script or if this is an auto dialer. I know he -- for the record, I know he used an auto dialer.

Q To do what?

A To automatically dial merchants --

Q For what purpose?

A -- with a prerecorded message that induced a merchant to press 1. If they pressed 1, then it would go to someone, one of his employees, and they would try to close the deal.

Q Okay.

A That's my, you know --

Q We're on the same page.

A Yeah.

Q But he's calling on new prospective customers, right? He's trying to find new customers for himself and for CPAY, correct?

A Correct.

Q In other words, he's not using a dialer to talk with existing customers about the latest, greatest

feature, right?

A Correct.

Q Okay. So when I say "telemarketing," what you just described is exactly what I'm talking about, right?

Mr. Korthals is using a dialer with a prerecorded message to make calls for new prospective merchants to sign them up for CPAY services. Okay?

A Okay.

Q And I understand you're going to --

A Yeah, I just think of telemarketing as, you know, Korthals dialing a phone number and calling you and closing you on the phone. I feel an auto dialer -- maybe this is just, you know, me, but I feel like an auto dialer -- I feel like they're not really telemarketing until that merchant presses 1, and then they get them on the phone and they try to close them on whatever they're trying to sell. But I guess if you're defining telemarketing as an auto dialer, then, yes, he's engaged in telemarketing.

Q Okay. So just for purposes -- so we're not -- so we're on the same page, when I say "telemarketing," I'm talking about the process from the beginning to the end. I'm not talking about the process after someone presses 1, right? What I'm talking about is he uses a dialer with a prerecorded message; dials out; somebody's

phone rings; someone might answer, someone might not; someone might press 1; someone might not.

That's all telemarketing. Okay?

A Okay.

Q And my general question, and I think we'll move on past this, is this is an e-mail from July 2012 where Mr. Korthals is talking about using a dialer to telemarket?

A Yes.

MR. GRISTINA: And my objection -- I'm not trying to interfere, but I'm going to object to this document as a string of e-mails because I don't think it is a complete string. I think there's different ones put in there. So, I mean, there is a July 23rd e-mail on top, but as you go further through, I'm not sure -- they were produced, I think, in sequence, but I'm not sure that they are sequential e-mails.

MR. MCCUE: Okay. I think that's a fair point, but I don't think it changes anything.

MR. GRISTINA: No, I don't think it does either. I just -- I don't want the record to reflect that I'm agreeing that this is one single e-mail string.

MR. MCCUE: No, I agree, I agree, because I'm looking at --

THE WITNESS: I mean, it starts on

November 26th, 2013. The last e-mail ends at July 23rd, 2012. So that's why it's just hard for me to --

MR. MCCUE: Okay.

THE WITNESS: This is one page out of a thousand, right? So I think as you continue showing me e-mails, it will come together.

BY MR. MCCUE:

Q Yeah. And just so we're -- my sole purpose in talking about this is just to refresh your memory about where chronologically in time you first were involved in discussions with Mr. Korthals that he was using a dialer to telemarket. Okay?

A So maybe this was the first time.

Q It might have been. I'm not sure.

But at least we're in July 2012, and you're talking with Mr. Korthals about using a dialer to telemarket, correct?

A I wouldn't say I'm talking with him. I would say he's talking to me.

Q Okay. You're corresponding with him on e-mail about his use of a dialer, correct?

A For the record, my response is five words long, and his e-mails to me are about 300, so --

Q Okay.

A You know, when you're saying that we're

talking about a dialer, no, I would say that Korthals is talking to me about a dialer, of which I get, and I will testify to this, over a thousand or 1,500 e-mails a day. So, you know, I --
Q I get it, yeah. So on page 1 -- this is Bates 47050 -- on July 23rd, 2012, the subject re line is, "Is the dialer up?" And that's from --
A Sure.
Q And you respond, "Ok, cool, keep me posted please," correct?
A Yes.
Q All right. We'll move on from that one.
A Okay.
Q I'll mark this as the next exhibit.
THE REPORTER: Exhibit 5.
(Exhibit 5 was marked for identification by the court reporter.)
THE WITNESS: And just for the record, too, that question of is the dialer up, that was in response to a previous e-mail.
BY MR. MCCUE:
Q Okay. That's fine.
A I just want to make sure that -- that wasn't like Matt Hyman reaching out to Korthals, questioning him.

Q I understand.
A Okay.
Q I'll ask you to take a look at this e-mail, two pages, Bates CPAY636 and 637.
A Okay.
Q Are you ready?
A Yes.
Q Okay. This looks like an e-mail. It's from February 9, 2014, between you and -- I'm sorry.
A Korthals.
Q Yeah. Let me just back up to the prior exhibit, Exhibit 4.
Would you agree with me that this is -- subject to the -- well, is Exhibit 4 these e-mails that were produced by Central Payment in the course of this litigation?
A Yes, although they're not in the order of which we sent them.
Q I understand. I understand.
A They're like -- they're a year and a half apart.
Q Okay. We can fix that.
A Okay.
Q Let's turn to Exhibit 5. This is a February 9, 2014, e-mail.

Do you agree with me that this is a business record of CPAY that was produced in this litigation?
A Yes.
Q Does it look to you like it's an authentic and complete copy of this e-mail?
A Yes.
Q And the substance of this e-mail -- correct me if I'm wrong, but it looks like Mr. Korthals is forwarding to you his website called cpaywi.com; is that correct?
A Correct.
Q And you had an opportunity to look at that website, correct?
A I might have.
Q And that was the website or the current version of the website that we looked at today in your deposition, correct?
A I don't know.
Q The current version of the website.
A This was sent in 2014.
Q I'm saying today we looked at the current version of the website on my computer, right?
A Yes, but I just don't know what changes he's made since --
Q I understand. I understand.

A Yeah.

Q In the text of this e-mail, he's talking about opening his office and getting furniture and desks delivered, correct?

A Yes.

Q And he's talking about how much it costs?

A Yes.

Q At the bottom of it, he says, "Sorry to bother you on a Sunday, but if I invested 15-20k into someone to open an office, I would like updates once in a while myself."

Do you see that?

A Yes.

Q Does that refresh your memory as to whether or not CPAY provided a loan or a line of credit to Mr. Korthals so he could open up his office?

A For the record, we just went over the promissory note, and I already told you I remembered the line of credit, which was done based off his residual income.

Q I understand. We talked about that. But earlier you said you didn't remember if he used the money to open his office or not.

A But post that question, I told you after seeing the promissory note --

Q Rather than argue with me, can you just tell me, does that refresh your memory?

MR. GRISTINA: He's not arguing with you.

THE WITNESS: I'm telling you that you're asking me a question, and you're leading into something that doesn't make any sense.

BY MR. MCCUE:

Q I'm asking you, did Mr. Korthals use money that he got from CPAY to open up his office? Yes or no?

A From the looks of it, yes.

Q Thank you. We'll mark this as the next exhibit.

THE REPORTER: Exhibit 6.

THE WITNESS: And I would also like to say that whether it's a physical office for Korthals or not, this loan was based off of his existing portfolio generating income that gave us collateral to loan him funds for whatever he sought after to do, which was to write business.

(Exhibit 6 was marked for identification by the court reporter.)

BY MR. MCCUE:

Q If you can look at the next exhibit, Exhibit 6. Let me know when you're ready.

A I'm ready.

Q In this e-mail, he's talking about getting his draw. And I believe you have testified what that would be. That was a monthly amount that CPAY provided to Mr. Korthals; is that correct?
A Yes.
Q And he's talking in this e-mail about funding the dialer for about three people.
Do you see that?
A Yes.
Q So then he was using -- the money he was getting, he was using the draw from CPAY to fund the dialer; is that correct?
A Yes.
Q We'll mark this as the next exhibit.
THE REPORTER: This is Number 7.
(Exhibit 7 was marked for identification by the court reporter.)
BY MR. MCCUE:
Q Let me know when you're ready.
A I'm ready.
Q If I could -- I apologize -- just go back to the prior one and just have you testify, is that a complete and authentic business record of CPAY?
A Yes.
Q Okay. So now we'll turn to Exhibit 6. I'll

ask you the same question.

Is Exhibit 6 a complete and authentic business record of CPAY?

A Yes, although there's no -- there's just one page. This is not the complete e-mail.

Q Okay.

A But, yes, I'm sure we supplied this one e-mail. This is not the whole e-mail chain.

Q I understand. And it refers to an attachment, which I don't have, which looks to be an Excel spreadsheet.

Would you agree with that?

A I have no idea.

Q Under attachments, what does it refer to? Are you on Exhibit 6?

MR. GRISTINA: 7.

BY MR. MCCUE:

Q I apologize.

A That's okay.

Q Exhibit 7: We're looking at an e-mail from March 10, 2014, from Mr. Korthals to you; is that correct?

A Yes.

Q And is this an authentic business record of CPAY?

A Yes.
Q And this is another e-mail -- would you agree with me this is another e-mail where Mr. Korthals is essentially talking about the ordinary course of his business, and he's talking about how many dialing days he has left, how many reps he's using, and how much it's going to cost to run the dialer?
A Yes.
THE REPORTER: Number 8.
(Exhibit 8 was marked for identification by the court reporter.)
BY MR. MCCUE:
Q A lot of these documents are going to be redundant, so I apologize for that. I just need to establish a record.
Exhibit 8 looks like an e-mail from March 31st, 2014. Again, it's from Mr. Korthals to you; is that correct?
A I'm sorry. Hold on. The first e-mail is March 31st.
Q 2014, right?
A Yes.
Q Okay. And it's from Mr. Korthals to you?
A Yes.
Q Is this a complete and authentic e-mail -- or

complete and authentic business record of CPAY?
A Yes.
Q In this Mr. Korthals is referring to -- it might be a typo; it might be not. It says, "I had a previous positive credit balance so in total I spent $8.001 on the dialer."
A What page are you on?
Q On the first page.
A On the first page. Okay.
Q My basic point is again he's referring to his use of a dialer and how much it costs; is that correct?
A Yes.
Q And you respond, "How much did we pay for the dialer for March," correct?
A Yes.
Q So you're acknowledging that CPAY itself is providing the draw that Mr. Korthals is using to pay for the dialer; is that correct?
A I'm sorry?
Q When you say "How much did we pay for the dialer for March," you're acknowledging that Mr. Korthals is using his draw from CPAY to pay for the dialer; is that correct?
A Amongst other things, yes.
Q And without that funding, Mr. Korthals could

not have run the dialer; is that correct?
A No, that's not true.
Q Why is that not true?
A Because a competitor would do the same thing I'm doing.
Q But a competitor didn't, right?
A No. We -- we treat Korthals, just like all of our independent contractors, like customers, and because of that relationship we have with Korthals, he gave us the opportunity to do business with him.
Q I understand.
A So he would still use the dialer, just with someone else.
Q All right. So to prevent Mr. Korthals from going to someone else, like a competitor of CPAY, to get funds to pay for the dialer, CPAY decided to pay for the dialer itself?
A No, we did not pay for the dialer itself.
Q You provided Mr. Korthals with a draw that he used to pay for the dialer?
A We provided Korthals with a draw that was collateralized against his residual income 100 percent. We were not at risk at all. He used those funds then to pay for the dialer.
Q If you hadn't provided him with his draw,

could he have run the dialer?
A No, but he would -- yes, he would.
Q How?
A Through another competitor.
Q He would have had to gone elsewhere, basically?
A Sure. That's what I'm trying to say.
Q I understand. So CPAY did that to keep Mr. Korthals under the CPAY tent, right?
A Not for the dialer, but we support --
Q Support his business.
A -- support that business, whatever that business might be, right?
Q Sure.
A In this case, it was a dialer, and I knew that he was using a dialer. I acknowledged that.
Q Right.
A But from the extent of how he was operating it, et cetera -- and also, just to let you know, these e-mails that he sends me once a month is because he's asking for a draw. Sometimes, you know, these guys will send me a quick business update and just kind of keep me posted: Hey, I'm doing great; I'm not doing great; I didn't get the 40 accounts, but here's why. So that's what this e-mail is in reference to.

Q I understand.
A Okay.
Q Just so you know, I'm not going to show you every single e-mail where he talks about using a draw for the dialer.
A Okay. Because every month, it's the same e-mail.
Q Okay. So let's try to expedite that.
Would you agree it was fairly common, probably almost every month, that Mr. Korthals would send you an e-mail saying, hey, Matt, can you send me my draw because I've got to run the dialer for an extra two weeks? Was that fairly common?
A Not for an extra two weeks, but he would send me an e-mail on a monthly basis requesting a draw amount for his operational cost of that business. In that operational cost, I knew that a portion or maybe even a big portion of that was for a -- this dialer that he was using.
Q I understand. And to avoid going through all the e-mails, he repeatedly referenced the dialer, saying that he needed the money because he needed to pay for certain numbers of dialing days, be it two weeks or three days or whatever.
Do you recall that?

A You know, it wasn't always for a dialer.
There was a few e-mails in respects to some direct mail campaigns. He tried to do other -- but, yes, I would say primarily every month I would get an e-mail with a draw request, and I would assume, without really diving into the Excel spreadsheet that he would send me, that a portion or probably a big portion of that monthly expense was for this dialer he was using.
Q Okay. Were you aware that Mr. Korthals himself was kind of on a shoestring, that he really needed CPAY's help to keep his business open?
MR. GRISTINA: I object to the form.
You can answer.
THE WITNESS: Yes, yeah. But I will add to that that if it wasn't CPAY supporting his business for growth, then someone else would step in.
MR. MCCUE: I understand.
THE WITNESS: Okay.
MR. MCCUE: Next exhibit.
THE REPORTER: Exhibit 9.
(Exhibit 9 was marked for identification by the court reporter.)
BY MR. MCCUE:
Q Just take a moment to look through that document.

A Okay.
Q I don't have -- this document refers to an attachment, which I don't have with me, but other than that, is this a complete and authentic copy of an e-mail from Mr. Korthals to you dated May 30, 2014?
A Yes.
Q Okay. And the substance of this is Mr. Korthals is talking about the Vegas trip.
Do you see that?
A Yes.
Q What is he referring to?
A I don't know. It may be my -- you know, I go to Vegas once in a while. Maybe I told him I was going to Las Vegas. Maybe this is the President's Club, although it's usually the first week in June. Maybe in 2014 it was May.
Q Okay. Let's assume it was the President's Club, which is what I think it was.
What I want to find out is, what is the President's Club? Tell me more about it.
A If you write over, you know, technically, 100 accounts in one year from the date of your first account, you're invited to a President's Club.
Q And Mr. Korthals was part of that President's Club?

A I don't know in 2014; I believe 2015.
Q Okay. And Mr. Neuhaus testified yesterday that he was also a member of the President's Club as of 2016?
A Yeah.
Q And the conference was just two months ago?
A Yeah.
Q So Mr. Korthals then is one of the top providers for CPAY; is that correct?
A No.
Q Okay. I thought -- I guess the cutoff is a hundred accounts?
A That's right.
Q A year?
A So 120, plus or minus, account executives we bring out, so he's part of the 120. Out of the 600 active reps that we have submitting business to us every month, and that fluctuates, he's in the top 120.
Q Okay. Do you know how close he is in that range? Is he 120th? Is he 1? Is he 2?
A He's probably, to the best of my knowledge, maybe 90th, 80th, 90th, you know.
Q And President's Club is kind of a bonus, kind of of a perk for ISOs or ISAs that are performing well?
A It's a two-day trip to Las Vegas where we have

our -- our vendors, Verifone, Hypercom, American Express, Discover, card-issuing brands come out, so we have all the, you know, cash-advance programs, check-cashing service -- you know, any third-party product that we have, it's a place for them to get further educated directly from the source, not from Central Payment. And, yeah, we have a big celebratory dinner and --

Q Sure. I understand.

And CPAY pays for the weekend, basically?

A We host the hotel rooms, and we pay for all the dinners, yeah.

Q Okay. Are there other kind of incentives or perks that are given to high-performing ISAs or ISOs?

A No.

Q Sales competitions I heard reference to yesterday.

A Oh, yeah, I mean, in just the normal course of business, you know, if someone writes -- first, second, and third place, so if someone writes -- you know, the top person writing the number -- the most number of new business with CPAY in one given month, they get a bonus, yeah, but that's like -- that's part of the comp.

Q I understand.

A Yeah.

Q Towards the second to the last paragraph here, Mr. Korthals says to you, "I have 2 reps that are starting in June and Aaron N is on board."

Do you know who he was referring to, Aaron N?

A I would assume Aaron Neuhaus.

Q All right. He says, "Aaron N is on board with helping me script train these guys."

Do you know what that means?

A No.

Q What type of script training would Mr. Neuhaus be involved with?

A I would assume that has to do with a closing script, so when that merchant presses 1 on the dialer, that -- Aaron is saying that he is going to support Nick in training his new employees on educating them what Central Payment is about, who we are, the history, and basic objectives.

You know, we -- again, Nick is a customer, and we want to try to support him. That's Aaron's job. I don't think Aaron Neuhaus was too pleased of helping him script train his employees because they're his employees, not ours, but he's a customer, and he's probably just trying to support that business.

Q Okay.

A But I don't know what script training he's

referring to. I have never heard that before.

MR. MCCUE: We're up to 10?

THE REPORTER: Number 10.

(Exhibit 10 was marked for identification by the court reporter.)

BY MR. MCCUE:

Q Just let me know when you're ready.

A I'm ready.

Q So this is an e-mail dated January 26th, 2015, again an e-mail from Mr. Hyman to yourself [sic].

Is this an authentic and complete copy of this e-mail?

A Yes.

Q And is this a business record of CPAY?

A Yes.

Q Okay. The substance of this, it looks like he is -- Mr. Korthals is asking for a $1,500 advance this month because leads have been rough and more expensive than usual. He says, "I really need the funds to run phones this last week hard and push sales."

Do you see that?

A Yes.

Q Is an advance different than a draw?

A The same.

Q The same?

A Yeah.
Q Okay. But again, he's saying he needs the advance in this case to -- because he needs funds to run the phones.
Do you see that?
A Yes.
Q Are you aware of the time frame for the telemarketing calls that relate to this case?
It's not a memory test.
A Yeah, I know. No, I don't.
Q Are you aware it's roughly February to August 2015?
A February 2015?
Q Right.
A Okay.
Q Okay. This e-mail we just looked at, Exhibit Number 10, this is from January 26th, 2015, correct?
A Yes.
Q All right. Next exhibit.
THE REPORTER: Number 11.
(Exhibit 11 was marked for identification by the court reporter.)
BY MR. MCCUE:
Q Mr. Hyman, this is an e-mail dated April 21st, 2015, e-mail from Mr. Korthals to yourself. Let me know

when you have had a chance to review it.
A I'm good.
Q Okay. Just going back to what we had talked about earlier, do you see on the bottom of the first page Mr. Korthals refers to himself as the Wisconsin national office? Do you see that?
A Yes.
Q Do you think he's referring to CPAY Wisconsin or to CPAY itself?
A I don't know.
Q Is CPAY Wisconsin a national company? Do they have multiple offices in different states?
A I don't know.
Q And you see these references that we talked about earlier where he's referring to the ethisphere and the world's most ethical companies.
Those awards relate to CPAY itself or to TSYS; is that correct?
A Yes.
Q And the substance of this e-mail -- first, let me back up.
Would you agree that this is an authentic business record of CPAY?
A Yes.
Q Would you agree with me that again

Mr. Korthals is talking with you about the budget, how much it cost per day to run a dialer?

A No.

Q At the very beginning of the e-mail, he says, "Well we budget 400-500 per day for 16+ dialing days a month" --

A Oh, yeah, on the top. I was looking at the bottom.

Q Do you see that?

A Yes.

Q He's referring to the cost of running a dialer each day, correct?

A Yes.

Q And down below he's asking for a $2,500 advance, correct?

A Yes.

Q And did CPAY provide that advance?

A Well, just to back up, he asked for that advance, and I asked for clarification, and then he responded, yeah, and I'm sure we did advance him the money.

Q Okay. Next exhibit.

THE REPORTER: Number 12.

(Exhibit 12 was marked for identification by the court reporter.)

BY MR. MCCUE:
Q I'm showing you an e-mail between Mr. Korthals and Paul Dobson from June 3rd of 2015. Take a second to look through that.
A Okay.
Q Who is Mr. Dobson?
A He's a sales director.
Q Okay. And I know you're not a party to this e-mail, but I just wanted to get your understanding of this.
When he says, "Had a blast with you. That CPAY throw down at Omnia was epic," what do you think he's referring to?
A Referring to a party we hosted at a lounge in Las Vegas.
Q Okay. Would that have been part of the President's team conference?
A Yes.
Q And there's a reference to an attachment here called "Central Payment Presentation." It looks like a PowerPoint.
Do you know what that is?
A I don't.
Q Okay. He says -- Mr. Dobson says, "I attached the bank stack that I use for some presentations."

Do you have any idea what that means?
A No.
Q Okay. Next exhibit.
THE REPORTER: Exhibit 13.
(Exhibit 13 was marked for identification by the court reporter.)
BY MR. MCCUE:
Q Let me know when you're ready to talk about Exhibit 13.
A Yes, ready.
Q Okay. Mr. Hyman, I'm showing you what has been marked as Exhibit 13. It looks like an e-mail from Mr. Korthals to you dated June 8th, 2015. The attachments talk about new script, June 8th, 2015.
Is this an authentic business record of CPAY?
A Yes.
Q And attached to it is a script with the Bates 46539. Do you see that?
A Yes.
Q Okay. Earlier we talked about you having a conversation with Mr. Korthals where, just summarizing, he was talking to others at the President's team meeting about how he was using prerecorded telemarketing, and you had inquired about the script.
Do you recall that?

A Yes.
Q Does this refresh your memory or do you think this is the e-mail that Mr. Korthals sent to you with his prerecorded script that he was using?
A Most likely this is the -- yeah, yes.
Q And he says in the e-mail, "We have been using the same one for close to one year now (minor variations)."
Do you see that?
A No, I don't. Where is that?
Q Just on the second sentence.
A Okay, yes. "Minor variations," he says.
Q Right. And he says -- at the closing, he says, "I think it plays well with the type of marketing we see in the world today and how others are sort of marketing as well." And then the script itself, if you could turn to the second page.
A Mh-hm.
Q Is this your understanding of one of the scripts for the prerecorded messages that Mr. Korthals was using?
A I'm sorry. What was your question?
Q My question was almost kind of stating the obvious, but is this the -- is it your understanding that this script that was attached to this e-mail was

the script that Mr. Korthals was using in the prerecorded message that he was playing?
A Yes.
Q Okay. And is there any reference to CPAY Wisconsin in this script being an independent dealer for CPAY?
A No, and there's no reference to Central Payment either, which I think goes back to my point that I still to this day question how much of his new business he acquired went directly to Central Payment.
Q Okay. Would you agree with me that a consumer who got a prerecorded phone call with this script would have no way to know who was calling them?
A Yes.
Q So to find out who would be calling them, what would they do?
A They would do what Heidarpour did.
Q Which is press 1?
A Right.
Q Which you call baiting?
A No, that's not what I call baiting. What I call baiting is using a business phone and tying it to a residence, leaving it out there in the Web for the world to see, and you chronically and professionally litigate against those people calling that business that

Heidarpour says is a residence.

Q Okay. Do you know that you're just factually completely wrong? Do you know that?

MR. GRISTINA: Objection. Argumentative. Is that a question?

BY MR. MCCUE:

Q Are you saying that Mr. Heidarpour put his residential phone number on the Internet saying it was a business that was run by Mr. Heidarpour?

A To the best of my knowledge, the number that Korthals called in this instance, in Heidarpour's case only, is a number that is referenced and/or associated to a business, to the best of my knowledge.

But I will say I'm not -- I don't want to factually argue the case because I don't have enough information, and most of that conversation is with our -- with my counsel, and I think that's --

Q I understand, and I'll move on.

A Okay.

Q Next exhibit.

THE REPORTER: 14.

(Exhibit 14 was marked for identification by the court reporter.)

THE WITNESS: Okay.

BY MR. MCCUE:
Q I'm almost done with this chronology. I appreciate your hanging in there.
A Okay.
Q The next e-mail, June 24th, 2015, from Mr. Korthals to you, is this an authentic business record of CPAY?
A Yes.
Q Again, this is another e-mail, and Mr. Korthals essentially is talking to you about using a dialer and how he needs more money to run the dialer; is that correct?
A Yes.
Q And he specifically tells you that "the only way I can keep dialing is with this advance."
Do you see that?
A Yes.
Q He talks about a VIP bonus.
Do you know what that means?
A If they hit certain thresholds every month, they get a monthly bonus.
Q Okay. Is that called a VIP bonus?
A Yes.
Q Okay.
THE REPORTER: Number 15.

(Exhibit 15 was marked for identification by the court reporter.)

BY MR. MCCUE:

Q I'll ask you to take a look through all the pages of this e-mail and let me know when you're ready.

A I'm ready.

Q Okay. Do you recall when approximately this lawsuit was filed?

A About a year ago.

Q All right. Yeah, you're right, August 18, 2015.

This is an e-mail from Nick Korthals to you on August 31st, 2015?

A Yes.

Q Let me back up a second. Exhaust your memory, if you can, as to your conversations with Mr. Korthals about this lawsuit. Let's start with right after you got service with the lawsuit.

What did you do?

A Well, let me look at my e-mail.

Q Yeah.

A It looks like -- I mean, if I reference his e-mail to me on August 31st, it looks like we had a conversation on or around August 31st, and I told him of the lawsuit.

Q Okay.
A And he offered to, you know, stop what he was doing. I said, hey, you're running your own business. You do what you want to do. It's not my call. And he sent me an e-mail that you could read there on August 31st.
Q All right. So let's start at the back at Bates 46810. It looks like Nick Korthals is writing to you. He says, "Matt, in regards to everything and in light of recent events" -- and I assume what he's talking about is the lawsuit?
A Yes.
Q He says, "I know you want my office continuing dialing."
Do you see that?
A Yes.
Q Is that referencing -- well, tell me, what is that referencing?
A I don't know what that's referencing. I believe that's referencing a conversation that we had earlier that day.
Q Okay.
A And if you could just reflect on my e-mail just a few hours after that, I think my e-mail to him probably sums up what my conversation was.

Q Okay. So let me just -- it sounds like you had a conversation with him, but right now you don't remember exactly what you said, and you think this --
A No, no, no.
Q I'm just trying to help you. And you think this -- well, let me ask you the question: Do you have a memory of your conversation with him? Because I want to start from there.
A Yes. I said, hey, we got this lawsuit. It's concerning. Keep doing what you're doing, and we'll keep you apprised, and have you ever heard of TCPA, I believe I asked, because I never heard of it myself.
Q Right.
A And I -- from what I recall, I advised him to get counsel and that he should audit what he's doing to make sure he's in full compliance.
Q Right.
A You know, stating kind of the obvious, what any entrepreneur would do, and that's it.
Q But your first reaction was you told him keep doing what you're doing, correct?
A No.
Q I thought you just said that.
A No. I said, hey, you need to hire third-party counsel. I can't have -- I didn't want to hire -- we

were named, I believe -- and this is more of a question.
I think Central Payment was sued, not Korthals, correct?
Q Correct.
A Okay. So I let Korthals know that we will be retaining our own counsel.
Q Right.
A And in respect to what you are doing, you need to hire your own counsel to get -- to make sure you're in compliance with state and federal TCPA laws.
Q Sure.
A And that's it.
Q Okay. Did CPAY tell him to stop using the dialer?
A No.
Q Did CPAY say to him keep dialing, keep doing what you're doing?
A It's -- we don't control his dialer.
Q I understand. I understand. But you didn't take any steps to say to him put the brakes on it until we figure out what this lawsuit is all about?
A I did advise him via the e-mail that you're presenting here -- and I'll read it. My suggestion to him was "Understand the telemarketing rules act and confirm you are abiding by the law. Pretty basic."

"In regards to you dialing or now, ultimately this is and has been your decision. I can't advise on either as I just don't know enough about what you are doing to even begin exploring that decision. It sounds like you are only dialing businesses and you do have an opt out for the customer. This is a good thing, but that is just my opinion."

So -- and this was a few hours after that conversation.

Q I understand, yeah.

A And, you know, it -- if I understood what TCPA was and is and all the rules abiding to it, that I understood exactly -- you know, I peeled back layers of what Korthals was doing, maybe that conversation would be different, but --

Q Okay. But you have your own in-house attorney, right?

A Yes.

Q Did you ever seek advice from counsel in terms of what's the statute and is Korthals violating it? What should we do?

I'm not asking you to tell me what the attorney said, but did you ever consult with counsel?

MR. GRISTINA: About what?

MR. MCCUE: About the lawsuit.

MR. GRISTINA: You're asking the specifics of a conversation with his attorney. He can't answer that, obviously. Whatever advice he asked from an attorney would be privileged, so please rephrase it.

BY MR. MCCUE:

Q That's fine. You didn't tell CPAY [sic] to stop using the dialer, correct?

A I didn't tell CPAY to stop?

Q I'm sorry. You didn't tell Korthals to stop using the dialer, correct?

A It's his business. How can I tell him what to do?

Q I understand. So the answer is no, right?

I understand your defense. I understand.

A No, no, no, it's not just a -- it's a factual -- he's running his own business. I don't tell any of our contractors what they can and what they can't do within their own marketing efforts.

Q Of course. But you would agree with me that it's an issue of law whether or not Central Payment is in fact responsible for actions of people such as CPAY Wisconsin? That's an issue of law?

A Well, that -- I don't know if I agree with that, but regardless of his contractor relation- -- contracting relationship with CPAY --

Q Right.
A -- how he operates his business and what he does with his dialer, I would assume that he's already had expertise to advise him on what he's doing, how he's doing it, making sure he's abiding by state and federal law.
Q Right.
A The fact that he didn't do that previous to this lawsuit is unfortunate. You know, how -- your expert witness -- how many residences did he call?
Q A million.
A Per your witness, per your expert.
Q Call it 800,000.
A 500,000.
Q It's an awful lot of people. Call it 500,000.
A We got one complaint. Korthals got one complaint.
Q What does that mean?
A Well, I -- I guess my -- it doesn't matter.
Q All right. Let me back up to what you did talk about, is that you did say to him, look, go hire a lawyer, do your due diligence, make sure you're compliant, correct? I'm paraphrasing from your --
A Paraphrasing, yes.
Q Yes. Okay. Did you do anything to follow up

to make sure that he did that?

A No, because I don't -- I wasn't sure how much of his business I was actually getting.

Q I understand. Now, you said to him -- you get sued in a class-action lawsuit, right? You tell him -- you don't tell him to stop dialing, correct?

A Correct.

Q You tell him to go hire an attorney and figure out compliance issues, correct?

A No. I said -- what I said was -- my suggestion to him was, you know, these are -- he was -- Nick was asking me questions, and I said, and I quote, "These are questions you should ask an attorney retained by you working for you. I know you asked for $1,800 advance, but this is difficult since this month is an absolute disaster. My suggestion," and then I went on to say, "Understand the telemarketing rules act and confirm you are abiding by the law."

So did I tell him to stop doing what he was doing? It's not my position to, nor would I ever tell someone to stop unless I -- unless there was concrete evidence that he was violating the law, and to this day, I don't -- I don't feel that he was. Regardless of that, it's his enterprise. He could run it as he sees fit. But if Central Payment is involved, then, yeah, I

want to make sure -- if he's violating a federal or state law, something needs to be done.

Q Okay. My follow-up question is did you ever take the next step after you sent this e-mail to see if he in fact followed up on what you had -- common sense had said to him, go get an attorney and figure out your compliance? Did he ever do that?

A Yes, he did.

Q What did he do?

A He told me he hired an attorney.

Q Yeah, okay. I'm talking about compliance.

A Compliance? We might have had conversations on how he is scrubbing the lists. At that time, he was working with this third-party company that he was buying the lists from --

Q Right.

A -- making sure that there's only businesses, and, you know, he kind of shift the blame. If there was any residences, which he assured me there was not, but he said if there was, then he could put some of the responsibility on this third party. I know you have an affidavit from that person saying that that's not true. But I -- there were some conversations. I don't know the exact details.

Q Okay. And that was the full extent of CPAY's

involvement post filing the lawsuit to make sure that Korthals had taken some affirmative steps to make sure his marketing was compliant?

A Yes, but we also retained our own counsel.

Q To defend you.

A Well, not just to defend Central Payment but to understand the entire case in its entirety.

Q Sure.

A And so we've learned a lot post this lawsuit. You know, to say that this is all we did is far from it.

Q No, no. I'm not talking about defense of this lawsuit. I'm talking about Korthals' compliance going forward to make sure that his continued telemarketing complies with the law. Do you understand? I'm not talking about anything your attorneys told you, right?

You agree with me that he continued telemarketing even after the lawsuit was filed, right?

A Yes.

Q And are you aware that he testified at his deposition that he still is using the same data that he got from Brian Ebersole? Are you aware of that?

MR. GRISTINA: I object to the form.

THE WITNESS: I'm not aware.

BY MR. MCCUE:

Q You never saw the affidavit, right?

A What affidavit?
Q Mr. Ebersole's affidavit, the affidavit of the guy that sold the data to him.
A No, I never saw it.
Q And in that affidavit, he says, look, I sell data, but I don't know what people are using it for, and if you're going to be using it for telemarketing, you've got to scrub it against residential databases and DNC databases.
A Yes, and Korthals told me that he was scrubbing the data.
Q He told you that?
A Yes.
Q When did he tell you that?
A Multiple times.
Q Post filing the lawsuit or pre filing the lawsuit?
A I want to say post. To the best of my knowledge, it was post, but it could have been pre. No, I think it was post. It was post, because he -- part of his defense was like, no, I scrub. I spend hours and hours and hours making sure I'm not calling residences.
Q So if you read his deposition, which, if I'm in your position, I would have read it a long time ago, he testified that he is still telemarketing for CPAY and

he's not scrubbing his Do Not Call list.

MR. GRISTINA: That's inaccurate. Okay? I object to the form. That's not what he testified to. Don't try to trick him. That's not what he said.

MR. MCCUE: I'm not trying to trick anybody. Look at the transcript. That's exactly what he said.

MR. GRISTINA: But that's inaccurate, so I object to the form.

MR. MCCUE: That's fine.

BY MR. MCCUE:

Q In this e-mail, Mr. --

MR. GRISTINA: Let's take a break. We've been going an hour and ten minutes.

THE WITNESS: Cool. Sounds good to me.

(Recess taken.)

MR. MCCUE: Back on the record.

BY MR. MCCUE:

Q I have a few more questions about Exhibit 15, Mr. Hyman. One of them is, it looks like in this e-mail that Mr. Korthals was asking you for an advance to pay an attorney; is that correct?

A Yes.

Q And that would be an attorney relating to this lawsuit; is that right?

A Yes. Well, relating to, you know, auditing

whatever he's doing.

Q Okay. And did you or did CPAY in fact advance that money?

A Yes.

Q Just to summarize your prior testimony, it doesn't look like CPAY did anything to follow up or -- let me rephrase.

Did CPAY do anything to follow up to make sure that Mr. Korthals used that money in fact to ensure that his marketing was compliant with the TCPA?

A I think that's, you know, conversations with my counsel, and I think that's confidential, right?

MR. GRISTINA: If you can't -- if to answer the question you would have to divulge something you and I spoke about, then, no, you don't have to do that.

THE WITNESS: Then I can't.

BY MR. MCCUE:

Q Are there any documents that you received from Mr. Korthals that related to this kind of compliance follow-up that CPAY paid $1,800 for?

A Not that I'm aware of, but there might have been, but that would be between counsel.

Q There's nothing between you and Mr. Korthals?

That's what I'm interested in.

A There might have been something between his

counsel and my counsel, but I don't think -- I don't want to report on that.

Q That's okay. We're not going to go into that. Okay. We're done with the chronology.

A Okay.

Q Thank God. At any time over the years, did CPAY take any disciplinary action against Mr. Korthals for any reason whatsoever?

A No.

Q Okay. What are the different options that CPAY has under its contract to sanction or reprimand dealers that are engaged in inappropriate conduct?

A What's your question again? I'm sorry.

Q My question is general. I'm asking for your understanding under the contract, the form contract between CPAY and an ISO or an ISA.

A Okay.

Q What are the different options that CPAY has when a dealer is acting inappropriately?

A Are you referencing what options do we have contractually or what do we do in general?

Q In general.

A Okay. In general, we have a system in place. If there's any complaint lodged against an independent contractor, it triggers an e-mail to HR, the sales

manager, and the executive of that ISO, ISA.
Q Okay. What about on a much bigger level in terms of terminating a dealer or holding back money against a dealer? What are the options that CPAY has, both contractually and then kind of real practice?
A If there's -- so, contractually, if there's any, you know, malicious activity, you know, any fraudulent or misreps, not doing business in a professional way, we -- we would have a contractual right to terminate the independent contractor contractually basically whenever we want.
Q Right.
A In respects to withholding funds via, you know, the residual income, it's a rarity unless there's fraud.
Q Okay. Would you agree with me that under the contract, the form contract, that CPAY is allowing ISOs such as Mr. Korthals to hold themselves out to the public as representing CPAY?
A Under the contract, yes.
Q Okay. Could Central Payment essentially withdraw that right for an ISO to continue to use the Central Payment trade name in their marketing?
A I don't know.
Q Have you ever done that?

A I'm sure we have in the past where we terminate a relationship due to maybe unethical type of businesses that they're either soliciting to, or, you know, there's a whole slew of different reasons why we might terminate a relationship.
Q Okay. Would you agree with me that in general the trade name Central Payment is well-recognized in your industry as kind of a leading -- a leading company in the industry?
A No, I would not agree with that.
Q Okay. I thought you testified earlier that merchants recognize Central Payment and they know what Central Payment is. No?
A No.
Q How big is Central Payment? Are they a small company, a big company?
A Relatively small.
Q Okay. Do you agree that there's more name recognition among merchants about Central Payment than there is about Korthals Enterprises, LLC?
A No. Unfortunately, businesses don't know who Central Payment is, so whether Korthals is out there marketing as Korthals, LLC, or Central Payment, he wouldn't --
Q Okay. We heard testimony yesterday about the

agent portal. I just wanted to hear directly from you.
What is the agent portal, and what's on it?
A It's a place for our contractors to log in and view their income. So every month we report -- so if -- Korthals, for an example, he sends us a contract. We pay him $200, hypothetically, for that contract, and then we pay him an ongoing revenue split of 60 percent.
And so every month in the agent portal we give them an updated residual report. They could view all their accounts, how much money they're making on each account. It's a place where they could view cash deposits. They could see merchant activity. They could issue trouble tickets. They could join -- they could listen to live conference calls and video feed and, you know, sales and marketing type of material.
Q Okay. Let's talk about the sales and marketing materials.
What types of sales and marketing materials are on the website -- on the portal?
I should be more specific.
A I don't know.
Q Do you know who does?
A Because it's a -- our agent portal has a wealth of -- yeah, I just don't know.
Q Okay. I'll show you a few documents that we

marked yesterday in Mr. Chan's deposition, 8, 9, and 10. I'll ask you just to look at those and let me know when you're ready to talk about them.
A Okay.
Q Do you recognize those documents?
A No.
Q You have no idea where they came from?
A No. Could you --
Q Your attorneys produced them, and no one has been able to tell me what they are.
A This is from an ISO, JPMorgan. So this is back in -- and we never even went live with JPMorgan. So this is in 2005. I'm assuming that someone within our -- one of our sales directors might have put this together, but we never went live.
This is nowhere in our system, in our agent portal. It might be -- it might be somewhere in our servers, but we haven't been a registered -- we were never actually a registered ISO of JPMorgan Chase Bank. We never went live with them. We changed it to -- we did a deal with Wells Fargo in January of 2006. So, yeah, these are just -- this is probably from 2005, and they were never distributed.
Q All right. When you talk about sales and marketing materials on the portal, what are you

referring to?
A So sales and marketing. So we do what we call CPAY Live, and it's a video of two of our sales managers, and they give out breaking news, industry updates. There's a lot of talk on EMV, these little card chips. So anything that's new and breaking that's relevant to our partners, to our independent contractors that are out there, you know, educating merchants, we try to give them the latest in relevancy of that information.
Q Okay. Is there anything on the portal about sales techniques?
A I don't know.
Q When is the last time you saw the portal? I mean, how fresh is your information?
A I do -- I have logged onto the portal to view residual income for an agent, but the last time I have gone through -- that's really my brother Zach who manages the agent portal, so it's kind of -- it's not foreign to me. I just don't spend a lot of time on it. But, you know, we could explore that at a later date.
Q All right. Aside from these documents, does Central Payment recommend to ISOs how to market?
A No.
Q Do they have anything -- any recommendations

or training about telemarketing?
A About telemarketing?
Q Yeah.
A No.
Q Okay.
A I know there's a document somewhere, but, no, we don't talk about telemarketing.
Q So some of these documents here that you're looking at, 8, 9, and 10 from the Chan deposition, refer to -- recommend use of an auto dialer, correct?
A Oh, yeah, "Keys to Telemarketing," this is the one I -- yeah, I -- I have never seen this before, and this has never been sent out or distributed.
Q The agent portal is a password-protected system; is that correct?
A Yes.
Q Okay.
A Can we take a one-minute break?
Q Sure.
(Recess taken.)
BY MR. MCCUE:
Q I take it from your answers that Central Payment has never been sued before for any violation of telemarketing law?
A Not that I'm aware of, no.

Q Are you aware of any other ISOs besides Mr. Korthals that uses telemarketing to promote CPAY's goods and services?
A No.
MR. GRISTINA: When you say "telemarketing" there, are you talking about the auto dialer?
BY MR. MCCUE:
Q I'm talking about any type of marketing by phone.
A Oh, by phone. Let me think about that. No. I do know of independent contractors that will set appointments via phone for one of their employees to go out and solicit merchant services.
Q Okay.
A So I do know of other people, not with a dialer, like Korthals had, but where they might have an appointment setter, they call them, not a telemarketer, and they'll call and say, "Hey, Matt, he's going to be in your area. Do you mind if he stops by at 1:30 to discuss merchant services?"
Q Is that the first point of contact?
A Yes.
Q So that's telemarketing, right?
A Well, they're not selling anything over the phone. I'm just saying telemarketing is --

Q But the purpose of the call is to sell something, right?
A No.
Q Oh, come on. They're saying I'm going to be in the area, let's meet, right, because I want to try to sell you something, right?
A Well, no, no, no. Sure, but they're -- that's not -- in other words, they have -- I'll give you an example, and I don't know who it is, but I know of an independent office that has like two appointment setters, and they set appointments for these folks. So the appointment setter is really not selling anything. They're selling an appointment.
Q Okay. When the person calls and says, "I want to set an appointment," what do they say it's for?
A For merchant services.
Q Right, to sell merchant services.
A But they're not selling them merchant services.
Q Because they don't use the word "I want to sell you merchant services" on the first phone call, that somehow differentiates it?
A No, they're --
Q That's the purpose of the call, right, is to set up a meeting to --

A They set up a meeting.
Q Right, but that's a telemarketing call.
Are you telling me it's not?
MR. GRISTINA: I object to the form.
THE WITNESS: I mean, if you --
BY MR. MCCUE:
Q It's a cold call, right? A cold call. Someone is calling somebody up and saying --
A Can we Google the definition of "telemarketing" so we're all on the same page?
Q Oh, God, this is ridiculous.
MR. GRISTINA: Objection.
THE WITNESS: I just don't --
BY MR. MCCUE:
Q We had this discussion two hours ago.
A Yeah, and you said -- you defined telemarketing as either a system calling outbound to sell merchant services and/or someone closing --
Q All right. I'm not going to argue with you.
What's the name of this company that does this appointment stuff, appointment calls?
A I have no idea.
Q Okay. Have you ever gotten telemarketing complaints about anybody?
A No.

Q And do I have to rephrase "telemarketing complaints"? Are we on the same page? A complaint that Central Payment gets about I got a call from someone selling Central Payment, and I don't want to be called.

MR. GRISTINA: The problem is is that -- and I'm not trying to interfere, but we're in a lawsuit based on an auto-dialing case. So then you're talking about telemarketing and different ways that could be done, so it's confusing me, and I'm sitting here just --

MR. MCCUE: I hear you, but it's not confusing. I mean, this lawsuit is about one part of the statute.

BY MR. MCCUE:

Q Telemarketing is a very broad term.

You're selling using the phone, right?

A In my opinion, someone that's setting appointments for someone to go sell them something is not telemarketing.

Q All right. Well, the telemarketing law might disagree with you.

A Well, then, maybe I'm wrong.

Q But it's important just so we're on the same page, and it sounds like we are now, so I don't want to debate with you.

A Okay.

Q But just to go back to my question --

MR. GRISTINA: And my purpose in saying that was only to make sure that he understands -- when you're asking the question, that he can understand the question and then give you a fair answer, so that later on you might say, well, I asked you about this, and he's thinking telemarketing is something different than you do. That's the reason why I wanted to clarify.

BY MR. MCCUE:

Q All right. Has CPAY ever received any complaints from any consumer about receiving unwanted telemarketing calls?

A To the best of my knowledge, no.

Q Does CPAY have its own internal Do Not Call list? Do you know what that is?

A Our own internal Do Not Call list?

Q I could explain it if you don't.

A Central Payment, our corporate office, we don't do any, in any variation, telemarketing.

Q Okay. Do you agree with me that you are reliant upon ISOs and ISAs to market for you?

A Yes.

Q Okay.

A I will say, because I think it's important that you know that, that -- I would say 95 percent of

the business that is sent in to Central Payment on paper is done face-to-face.

Q Right.

A Yeah, it's not -- businesses are not too apt to switch their processing over the phone. What Korthals was trying to do or attempted to do or was doing was very -- is kind of an unorthodox way of doing business.

Q Why don't we take a five-minute break. I think I'm done with -- off the record.

(Recess taken.)

MR. MCCUE: Let's go back on the record.

Would you mark this as the next exhibit.

THE REPORTER: Exhibit 16.

(Exhibit 16 was marked for identification by the court reporter.)

BY MR. MCCUE:

Q Mr. Hyman, I'm just going to show you what's been marked as Exhibit 16, which is a Year 4 Business Plan for Central Payment Co., LLC, dated November 3rd, 2015. It begins at Bates 40, and it ends at Bates 73.

And I really just want to authenticate the document as a business record, so if you could just take a look through it and let me know when you're ready.

A I'm ready.

Q Okay. Are you familiar with this document?
A Yes.
Q And what is it?
A It's our business plan for CPAY.
Q As it says on page 1.
A You know, we use it to -- primarily for financial restraints and limitations that we have with our independent contractors.
Q Okay.
A So if you reference like, for an example, page Number 10, it kind of gives some basic guidelines, and if we go outside of those guidelines, then we have what we call a board meeting.
Q Would you agree with me that this is an authentic business record of CPAY?
A Yes.
Q All right. I am done with your individual deposition. Unless your attorneys have questions for you, then we will proceed to your corporate depo.
MR. GRISTINA: No questions. The only thing I would say with regard to the 30(b)(6) is that we maintain our objections as put in our response to the notice of deposition.
MR. MCCUE: Understood. So we're going to do a separate transcript for the corporate depo, all right,

so we'll kind of start fresh.

THE WITNESS: Okay.

(TIME NOTED: 11:54 a.m.)

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 25, 2016

Mona Russo

MONA M. RUSSO

CSR No. 8771

Veritext Legal Solutions
1 North Franklin Street - Suite 3000
Chicago, Illinois 60606
Phone: 312-442-9087

August, 25 2016

To: Thomas F. Gristina

Case Name: Heidarpour, Fred, etc., et al. v. Central Payment Co., LLC

Veritext Reference Number: 2366825

Witness: Matthew Hyman Deposition Date: 8/16/2016

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature at the bottom of the sheet notarized and forward errata sheet back to us at the address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 2366825
CASE NAME: Heidarpour, Fred, etc. v. Central Payment Co., LLC
DATE OF DEPOSITION: 8/16/2016
WITNESS' NAME: Matthew Hyman

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

________________ ___________________________
Date Matthew Hyman

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 2366825
CASE NAME: Heidarpour, Fred, etc. v. Central Payment Co., LLC
DATE OF DEPOSITION: 8/16/2016
WITNESS' NAME: Matthew Hyman

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ _________________________
Date Matthew Hyman

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;

They have listed all of their corrections in the appended Errata Sheet;

They signed the foregoing Sworn Statement; and

Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 2366825

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

_______________ ________________________

Date Matthew Hyman

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

________________________________

Notary Public

________________________________

Commission Expiration Date