IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

FRED HEIDARPOUR, individually    *
and on behalf of a class of all persons    *
and entities similarly situated,    *
   *
     Plaintiff,    *
   *
v.    *    Case No: 4:15-cv-139 (CDL)
   *
CENTRAL PAYMENT CO., LLC,    *
   *
     Defendant.    *

**PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANT'S STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED
AND AFFIRMATIVE STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE ARE  GENUINE ISSUES TO BE TRIED**

Plaintiff Fred Heidarpour, by counsel and pursuant to Fed. R. Civ. P. 56 and Local Rule

56, submits the following Consolidated Response to Defendant's Statement of Material Facts as

to which there is no Genuine Issue to be Tried and Affirmative Statement of Material Facts as to

Which There are Genuine Issues to Be Tried in support of his Opposition to Defendant's Motion

for Summary Judgment.   Pursuant to Local Rule 56, Plaintiff responds to the numbered

paragraphs in Defendant's Statement of Material Facts below.

**I.**     **The Complaint**

1.     Plaintiff Fred Heidarpour filed this putative class action on August 18, 2015,

alleging that CPay violated the Telephone Consumer Protection Act ("TCPA") by making nine

telemarketing calls to his residential telephone line ("Number"), via pre-recorded message

without his prior express written consent.[1]  [Pltf's Compl., ECF No. 1, at ¶¶2 & 16]  The TCPA

prohibits "initiat[ing] any telephone call to any residential telephone line using an artificial or

prerecorded voice to deliver a message without the prior express consent of the called party,

unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a

debt owed to or guaranteed by the United States, or is exempted by rule or order by the" FCC.[2]

47 U.S.C. § 227(b)(1)(B).

      **Plaintiff's Response:**  Undisputed.

      2.     Plaintiff further alleges that CPay made similar calls to other residential telephone

numbers of putative class members and seeks certification of the following class:

> [a]ll persons within the United States whom Defendant, directly or through their
> agents, initiated a telephone call with a pre-recorded message to a residential line
> within four years before this Complaint was filed through the date of class
> certification.

[Pltf's Compl., ECF No. 1, at ¶22]

      **Plaintiff's Response:**  Disputed.   In his Motion for Class Certification (ECF 40 at 22,

Plaintiff seeks certification of the following class:

> All persons in the United States to whom (1) between December 2, 2014 and
> October 30, 2015 (2) Central Payment WI made telephone calls (3) using a
> pre-recorded message (4) to residential telephone numbers.

      3.     Plaintiff's Complaint is devoid of specific allegations demonstrating that his

Number is residential.[3]

---

[1] The calls were allegedly made on February 24, 25, March 5, 12, 26, April 16, May 21, July 1 and August 13, 2015.

[2] The TCPA creates a private right of action "to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater."  47 U.S.C. § 227(b)(3)(B).  Plaintiff has not alleged any actual monetary loss.

[3] No doubt, this is because, ***the TCPA does not define the term "residential."***  *Bank v. Independence Energy Group, LLC*, No. 12-CV-1369(JG)(VMS), 2014 WL 4954618, at *2 (E.D.N.Y. Oct. 2, 2014)("neither the [TCPA] statute nor the enacting regulations provide a

**Plaintiff's Response:**   Disputed.   Plaintiff notes that the although the adequacy of Plaintiff's allegations in his Complaint are not properly at issue in considering a motion for summary judgment, and is set forth below Plaintiff's phone in his Scottsdale residence is indisputably a residential phone, Paragraph 2 of Plaintiff's Complaint in fact states: "Mr. Heidarpour alleges that Defendant Central Payment Co., LLC ("Central Payment" or "Defendant") violated the TCPA by telemarketing **to his residential telephone line** via pre-recorded message without his prior express written consent." ECF. 1 (emphasis added.). Plaintiff further responds that Defendant's editorial commentary in footnote 3 as to why Plaintiff did not allege that he phone is residential (he in fact did) is because the statute does define residential is mistaken.  As Plaintiff has argued in previous filings with the Court (ECF. 22, 6-9) the plain distinction between residential and business telephones is embedded not only in the TCPA, but in federal telecommunications law. The Federal Communications Commission has enacted regulations pursuant to the Communications Act of 1934, as amended, 47 U.S.C. 222, requiring telecommunications carriers to maintain subscriber lists of residential and business subscribers. A "residential subscriber" is "a subscriber to telephone exchange service that is not a business subscriber." 47 C.F.R. § 64.2305(d). A "[b]usiness subscriber refers to a subscriber to telephone exchange service for businesses." 47 C.F.R. § 64.2305(b).  Furthermore, courts have recognized that limited use of a residential line for business calls does not transform the line into a business phone.

definition for the phrase, and the plain language of the statute is not helpful in arriving at a definition").  Nevertheless, as demonstrated by this motion, "if the subscriber holds out such a telephone number to the general public as a business line, the line should not be considered 'residential' for the purposes of the TCPA -- even if it is registered as 'residential' with the telephone company." *Id.* at *3.

In addition, in his deposition Plaintiff flatly states that the telephone number on which he bases his lawsuit is his "residential number in Scottsdale, Arizona." Fred Heidarpour Dep. 43: 22-24. ECF 37.

4.      Plaintiff's Complaint alleges no actual damages and demands statutory damages only.  [Pltf's Compl., ECF No. 1, at Relief Sought]  Plaintiff is not seeking any relief beyond what is alleged in the Complaint.  [Fred Heidarpour Depo., ECF No. 37, at 175:20-24]

**Plaintiff's Response:** Disputed.   Plaintiff notes that the although the adequacy of Plaintiff's allegations in his Complaint are not properly at issue in considering a motion for summary judgment, and is set forth below, contrary to Defendant's assertion, Plaintiff's Complaint states in Paragraph 1 that he seeks brings the action to stop "the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs.,* LLC, 132 S.Ct. 740, 745 (2012)." Dkt. 1.  Responding further, in his deposition, Plaintiff testified at length about the annoyance, inconvenience and frustration that he suffers as a result of unsolicited telemarketing—all received in spite of the fact **that** he obtained an unlisted phone number for his Scottsdale and that, as with all of his telephone numbers, he placed the Scottsdale residential number on the National Do Not Call Registry.   Fred Heidarpour Dep. ECF 37: 53:7-1 (describing calls in this case as "outrageous" and continuing even after he asked them to stop.); 72:3—74:5 (explaining why he has an unpublished number, his frustration with calls, and saying the telemarketer in this case was the worst among the telemarketers who call him.); 104:4—105:14. (testifying that he files TCPA lawsuits to stop abusive telemarketing directed at himself and others.)

5.      Plaintiff has not suffered any financial damages in this case.  [*Id.* at 119.22-.25] His telephone bill was not affected by the calls he allegedly received from CPay.  [*Id.* at 120.8-

.16]  He does not know of any calls he missed as a result of the calls.  [*Id.* at 120.25-121.2]
Plaintiff's Complaint, again, alleges no actual damages and demands statutory damages only.

      **Plaintiff's Response:**  Disputed.  As an initial matter, the assertion that Plaintiff did not
suffer financial damages is immaterial as the TCPA does not require financial damages in order
to support a claim, as this Court has held in this case. ECF 10, Order Denying Motion to Stay at
3-4, noting that the Eleventh Circuit did not require economic harm for a TCPA plaintiff suing
over a junk fax, and holding this instruction would also apply to telemarketing cases arising
under the TCPA.   Responding further Plaintiff's counsel lodged an objection to the question of
whether Plaintiff suffered financial damages as the question called for a legal conclusion from
Plaintiff' a lay witness.

## II.     <u>CPay</u>[4]

      6.      CPay is a Delaware company with its principal place of business in San Rafael,
California.  [Hyman Affidavit, ECF No. 16-5, at ¶3]  It operates a Direct Merchant Acquiring
business selling, marketing and providing services to Merchants enabling Merchants to accept
Electronic Payments from their customers and constituents (such services being defined as
"Electronic Payment Acceptance Services").  [*Id.* at ¶4]  Companies like CPay in the Electronic
Payment industry are often referred to as Independent Sales Organizations or ISOs.   [*Id.*]
Merchants include retailers, other businesses, government entities, non-profit organizations,
educational institutions and other entities and organizations desiring to accept Electronic
Payments.  [*Id.*]  Electronic Payments include payments made by credit cards, debit cards,

---

[4] As will also be discussed further below, CPay did not make the calls alleged in the Complaint.
Even if Plaintiff could prove that calls were made in violation of the TCPA, such calls could only
have been made by an independent contractor, Korthals, LLC, for whose actions CPay is not
responsible or liable.

prepaid cards, ACH and other forms of payment where payment funds are transferred from payer to receiver by electronic means.  [*Id.*]

**Plaintiff's Response:**  Undisputed, although Plaintiff observes that none of these facts can properly be considered material.  As to the conclusory statements set forth in footnote 4 asserting that Defendant did not place the calls and is not liable for Korthals, LLC, Plaintiff does dispute those allegations and responds to specific assertions in numbered paragraphs below. Responding briefly, it not necessary for Defendant to have physically placed the calls for vicarious liability to attach, and in this case all of the elements for a finding of vicarious liability are readily satisfied. TCPA liability is not limited to the entity that places an illegal call. An entity is equally culpable for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services.

7.     CPay sells Direct Merchant Acquiring through non-exclusive Independent Sales Agents ("ISAs"), which are 1099 Sales Agents that contract with CPay to be an authorized ISA of CPay.  [*Id.* at ¶5]  CPay owns the Merchant contract and relationship.  [*Id.*]   Use of non-exclusive ISAs is a foundational component of CPay's business strategy and important to CPay's long term success.  [*Id.* at ¶6]  CPay recognizes that, at all times, an arm's length relationship must be maintained.  [*Id.*]  As a result, CPay adheres to the following practices and ISA policies to ensure the proper independent contractor relationship is maintained:

- The ISAs work outside CPay's physical locations.

- The ISAs' agreements with CPay specifies that each ISA is non-exclusive and can work for other Independent Sales Organizations.

- All ISAs work their own schedules.

- Commissions to ISAs are not paid on a set schedule.

- ISAs can work "full" or "part time" as one could in their own business.  There is no traditional manager/subordinate relationship between CPay and the ISAs.  In fact, ISAs are considered and treated like CPay customers.

- ISAs are not given any instructions on which merchants to solicit for services.

- ISAs cannot bind CPay.

- Each ISA has a written individual ISA agreement.

- ISAs have no access to any type of benefits.

- ISAs are not disciplined for any unsatisfactory performance.

- ISAs are paid via a 1099 and are responsible for their own taxes.

- ISAs are not assigned to merchants or geographic work areas.

- ISAs are not required to complete any training.  Any training that is provided is limited to product and industry knowledge.

[*Id.*]

**Plaintiff's Response:**  Plaintiff does not dispute the allegations in the first three sentences of paragraph 7, although they are not material to a resolution of Defendant's liability in this action.  As is set forth herein, Plaintiff disputes Defendant's assertions "CPay recognizes that, at all times, an arm's length relationship must be maintained." Plaintiff further disputes that even if Defendant actually followed the practices set forth in bullet points, that its relationship with its telemarketing agent Central Payment WI can fairly be characterized as "arms-length." Plaintiff does not dispute the first four bullet points, but states that those facts are not material to Defendant's vicarious liability in this action.  Whether an ISA is part-time or full time has no bearing on Defendant's potential vicarious liability, and as is set forth below, rather than not giving Central Payment WI instructions, Defendant was intimately involved in his business, and indeed was a major source of financing to make the calling possible.  The remaining bullet points are either not material to Defendant's liability, and in the case of two assertions actually support

7

imposition of liability, as Defendant admits that it does not discipline its agents (including for illegal telemarketing of which it was aware) and does not require its agents with any training

Responding further, Plaintiff states that the reality of Defendant's relationship with the Central Payment WI was so close that Defendant funded Central Payment WI's purchase of an autodialer. The owner and sole shareholder of Central Payment WI, Nick Korthals, began working with Central Payment in 2009 as a National Sales Agent. As early as 2009, the documents that Central Payment has produced in this case show that he was engaging in telemarketing with the support of Central Payment, with the funding, oversight and instruction of Central Payment. Central Payment's own notes from Mr. Korthal's agent files state:

- Is using an awesome lead system, should be killing it but has to work most these over the phone.[5]
- Is rolling…doing a lot of telemarketing to write busienss (sic).[6]
- He is doing some crazy telemarketing – interesting stuff ****Kris*** find out his source of leads.[7]
- Had a long talk about canning his telemarketers.[8]
- He sent in some invoices for leads…we'll see if we can pay.[9]
- Is so fucking resistant to different sales techniques and getting help from us…frustrating.[10]
- Talked about the dialer.[11]
- Talked for a while…have now loaned him 22K.[12]

The notes referenced are attached as <u>Exhibit</u> 1.

In 2013, shortly after his release from prison for lying to a federal investigator (a fact of which Central Payment was aware), Mr. Korthals presented Central Payment with a business plan for opening an office that was dedicated to generating new business for Central Payment,

---

[5] CPAY111
[6] *Id.*
[7] CPAY112
[8] CPAY121.
[9] CPAY131.
[10] CPAY133.
[11] CPAY139.
[12] CPAY142.

which he would call Central Payment WI. As Mr. Korthals stated in his deposition, the only difference in this new agreement with Central Payment was that his office shared in revenues.[13] The development of the new office was funded by Central Payment and their website was made using materials from Central Payment's own website. As Mr. Korthals wrote on February 10, 2014 to Central Payment:

> Let me know what you think of my web site I made it 100 from scratch my self and use materials off Cpays site for info etc I think it turned out amazing Anyhow sorry to bother you on a Sunday but if i invested 15 20k into some one to open an office I would like updates once in a while myself.

*See* Exhibit 2, CPAY636.

Central Payment gave Central Payment WI a dedicated $40,000 loan to open its call center to get ready to begin making pre-recorded message calls. *See* Exhibit 3, CPAY1-4. In fact, Mr. Korthals testified that Central Payment WI could not have opened without the funding from Central Payment. *Korthals Deposition* 84:23-25 (ECF 40-4) . Central Payment was willing to loan Central Payment WI the money in exchange for its business that resulted from that telemarketing.  Hyman Deposition at 42:3—43:1 (ECF 45).

This partnership was entered into with complete transparency as to the automated telemarketing that was going to occur. As Central Payment testified, "So the only knowledge I had of how he was going to solicit businesses was that he was going to use a dialer….He did tell me that he was planning on doing that." Hyman Deposition at 46:2-4, 6-7 (ECF 45). Central Payment WI also wrote to Central Payment in early 2014 prior to the business opening:

---

[13]*See Korthals Deposition* 44:19-22 ("could you explain to me what -- how it was slightly different? A: The revenue share agreement was different for my company's revenue.") ECF 40-4, *Korthals Dep.* 158:2—159:4.

> At this time we should fund the dialer for about 3 people that's what I have so far as I bring more Ill just send you requests Also we should purchase data so i can start compiling Campaigns to run

*See* <u>Exhibit 4,</u> CPAY654. Central Payment WI then hired more telemarketing representatives to field responses to pre-recorded message calls using subsequent loans they obtained from Central Payment. *Korthals Deposition* 52:23-25 (ECF 40-4).

The contract between the parties includes the following prove Central Payment WI should be held vicariously liable, which highlight the strict control Central Payment maintained over Central Payment WI:

- o "CPAY appoints Representative…as a marketing and sales representative of CPAY for the purpose of soliciting prospective merchants."
- o "it shall be the responsibility of the Representative to provide each such prospective merchant with all applicable materials and information…for merchant approval"
- o "Representative shall not knowingly solicit any merchant which does not meet CPAY's credit criteria"
- o "It shall be the responsibility of the Representative to conduct a physical inspection of the business premises of each prospective merchant solicited…including a detailed description of the type of business engaged in by the prospective merchant."
- o "CPAY shall approve, subject to such limitations as it may choose to impose, or disprove the application of each applicant to become an Approved Merchant"
- o During the term of this Agreement, Representative is authorized to display the names and/or trademark of CPAY on…solicitation materials, subject, however to CPAY's approval on the form and content of that display."
- o "Because of certain non-solicitation agreements, Representative will not knowingly solicit merchants who process card transaction s with CreditPayment solutions."

*See* <u>Exhibit 5,</u> CPAY73-98. After the sale is completed, Central Payment ships the merchant the equipment and services the account. Central Payment WI is only compensated when they secure customers that sign up for the Central Payment service. *See Deposition of Nicholas Korthals ("Korthals Deposition")* at 52:23-25 (ECF 40-4).

Defendant's reliance on a contractual characterization of Central Payment WI as an "independent contractor" is insufficient to entitle to summary judgment as a matter of law: "how the parties to any given relationship label it is not dispositive" because "[w]hether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship and the application of the law of agency to those facts."  Restatement (Third) of Agency § 1.02, cmt. a. A disclaimer of an agency relationship in a contract is therefore "not dispositive of the issue of whether such a relationship was created." *Shamblin v. Obama for Am.*, No. 8:13-CV-2428-T-33TBM, 2015 WL 1754628, at *7 (M.D. Fla. Apr. 17, 2015); *see also U.S. v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1017 (C.D. Ill. 2014) (rejecting Dish's argument that its "retailers" were independent contractors despite contract provision when other provisions and evidence showed Dish's control over them). *Highline Capital Corp. v. Adhoot*, Nos. 06-cv-2023, 06-cv-2024, 2008 WL 486019, at *8 (D. Colo. Feb. 20, 2008) ("even in cases in which the alleged principals and agents *themselves* disclaim the existence of an agency relationship, courts routinely find such disclaimers only weakly probative of whether such relationships in fact exist"); *Am. Home Mort. Corp. v. First Am. Title,* No. 07-1257, 2007 WL 3349320, at *5 (D.N.J. Nov. 9, 2007) ("If courts routinely recognized disclaimers of agency, parties could conduct themselves as principal and agent without legal ramifications that accompany that special relationship.")

The use of Central Payment's name and trademarks were commonplace for Central Payment WI in its telemarketing as it explained to Central Payment that "everyone knows we are Cpay or Cpay WI". *See* <u>Exhibit 6,</u> CPAY7077. This script used by Central Payment WI was a group effort, as Central Payment regularly worked with Central Payment WI on their telemarketing script:

Q What type of script training would Mr. Neuhaus be involved with?

A I would assume that has to do with a closing script, so when that merchant presses 1 on the dialer, that -- Aaron is saying that he is going to support Nick in training his new employees on educating them what Central Payment is about, who we are, the history, and basic objectives.

Hyman Deposition at 101:10-17 (ECF 45).

From the inception of the business, the collaboration of Central Payment WI and Central Payment has been clear and embraced by both parties. As Central Payment exclaimed near the time of the Central Payment WI's opening, "you are now a partner of CPAY and I'm excited about our launch this week". *See* Exhibit 7, CPAY720-721. The companies are so intertwined that Central Payment grants Central Payment WI access to their computer systems and proprietary information through a computer portal maintained by Central Payment.

Central Payment prides itself on the fact that Central Payment WI represented it to the public:

Well, he's representing Central Payment, so why he just didn't say Central Payment, that's, you know -- because he's really -- he's representing Central Payment in this relationship.

…

Q Just so I'm clear, so you're saying it's actually a requirement that when ISOs or ISAs go out and market, that they market -- that they represent that they are CPAY?
A Yes.

…

Q Is this an appropriate script for him to use when he's talking to a merchant by saying, "Our company is Central Payment"?
A If this merchant -- a hundred percent"

Hyman Deposition at 47-8:24-2; 51:10-14; 75:21-24 (ECF 45).

In fact, the script utilized by Central Payment WI touted its "joint venture with TSYS (which is actually true only of Defendant and falsely stated that Central Payment WI is A+ rated with the Better Business Bureau and had received numerous awards, which had actually been received by Defendant itself:

> ***Our Company is Central Payment.*** We are a joint venture with TSYS. We are currently the largest processor in the world. We are A+ rated with the Better Business Bureau; we have received awards for being the most Ethical Company in the world which no other processor in the world has ever done! We currently do business in 85 countries

*See* ECF 46-6, and Korthals Dep. 133:12-25 (ECF 40-4).

Use of trademarks is a factor cited by the FCC and courts as supporting the imposition of vicarious liability. *DISH Network*, 28 FCC Rcd. at 6593 and *Mey v. Monitronics Int'l, Inc.*, 959 F. Supp. 2d 927, 934 (N.D. W. Va. 2013) (holding that a party may be held vicariously liable due to, among other things, terms of contracts that allow telemarketers to hold themselves out as authorized dealers of the party whose goods are being marketed.) Lastly, even after being sued for illegal telemarketing on its behalf in this lawsuit on August 31, 2015, Matthew Hyman advised Mr. Korthals of the lawsuit, buy Defendant allowed Central Payment WI to continue telemarketing on its behalf. Hyman Dep. 115:13-15 ("Q: Okay. Did CPAY tell him to stop using the dialer? A: No." (ECF 45) see also *Hyman Deposition* at 24:7-19; 118:20—121:18 (ECF 45) and *Korthals Deposition* at 72:24—73:13 (ECF 40-4).

8. CPay has an established process whereby it recruits, trains (again, only as to product and industry knowledge), supports and compensates its ISAs. [*Id.* at ¶7] Emphasis on the independent contractor relationship permeates this process.

- Recruiting: CPay posts ISA opportunities on career websites such as Career Builder, Monster.com. In addition, CPay utilizes various social media outlets

including Facebook, LinkedIn and Twitter to advertise opportunities to individuals who are seeking independent career opportunities.

- Recruiters: CPay employs recruiters work the applications submitted for the 1099 Sales Agents.  Submitted applications are sorted and assigned to a recruiter. Recruiters attempt to call applicants up to 2 times.  After initial conversation with a Recruiter, the applicant either decides to move forward on the spot and are scheduled to attend the "Sales Agent Conference call" or they can call back to be scheduled.

- Training:  Central Station an internally developed computer platform providing a one-stop-shop for a wide array of training materials, such as webinars, tutorials, databases of sales and training materials, and other training information which registered ISAs can access at their discretion and option.  This "self-help," "all you can eat" training model relies on the ISA to be proactive and self-motivated to train themselves.

- ISA Support:  Support for the ISAs is one of CPay's top priorities.  CPay hosts live conference calls, hosts on-site training events in various cities around the US, and offers sales support to ISAs such as statement analysis and responding to merchant inquiries.  Each active ISA is called multiple times throughout the week by a CPay Sales Director.  CPay frequently updates the Central Station portal, including monthly videos, conference calls, reporting, etc.

- Compensation:  CPay offers a competitive, performance based compensation program to ISAs, balancing up-front payments with long-term financial reward. Payout is based on a percentage of net processing revenue.

- Sales Directors Function:  W-2 Sales Directors are responsible for training, motivating and managing the ISA.

- Sales Assistants Function:  W-2 Sales Assistants provide support to the ISAs by completing merchant pricing proposals, performing merchant statement analysis, answering sales agent inquiries, etc.

- W-2 Direct Sales Agents:  CPay does not employ any W-2 Salary based Sales Agents.

- Lead Sources: CPay does not currently provide or intend to provide any referrals or leads to its ISAs.

- Self-Enrollment:  CPay does not offer merchants the ability to self-enroll.

[*Id.*]

14

**Plaintiff's Response:**  Disputed.  Plaintiff submit that rather than supporting the notion offered by Defendant that "the independent contractor relationship permeates the process" Defendant's training and support of its ISA's underscores that Defendant can and should be held vicariously liable for the conduct of its ISA's in general, and more importantly, of Central Payment WI in particular. As is set forth in detail in response to Statement 7, Defendant was fully aware of, supported and indeed financed the pre-recorded telemarketing conducted on its behalf by Central Payment WI.

9.     The Central Payment brand is an important component of CPay's marketing and communication strategy.  [*Id.* at ¶8]  It is incorporated into the look and feel in all realms of communication to team members and "customers" ("customers" including both merchants and ISAs).  [*Id.*]  Since the formation of the company in 2005, CPay has built a considerable amount of brand equity in the ISA community.  [*Id.*]

**Plaintiff's Response:**  Undisputed.  Plaintiff further states that as is set forth in Plaintiff's Response to Statement 7, Defendant's high level of involvement with and approval of Central Payment WI's illegal telemarketing raises genuine issues of material fact which preclude a grant of summary judgment in favor of Defendant as to its vicarious liability.

10.     Once an ISA has signed an ISA Agreement, CPay permits the ISA to use the "Central Payment" brand on business cards and authorizes the ISA to hold him/herself out as an "Independent Agent" of CPay.  [*Id.*, ¶9]  CPay does not permit the ISA to hold themselves out as an employee or as having authority to bind CPay in any manner.  [*Id.*]  Business Cards provided by CPay to ISAs will clearly identify the ISA as being an independent sales agent.  [*Id.*]

**Plaintiff's Response**:  Disputed.  As is set forth in detail in response to Statement 7, Defendant was aware of and supported Central Payment WI in identifying itself as Defendant itself. Hyman Deposition at 47:20—49:9; 75:19—76:12 (ECF 45).

11.     As set forth above, CPay supports, but has no control over, its ISAs.  CPay does not intend to, and does not, have any control over the manner and means of its ISAs' operations or marketing techniques.  [*Id.*, ¶10]  One of CPay's primary competitive advantages and differentiators is ISA recruiting.  [*Id.*, ¶11]  CPay maintains a culture that is based on the principle that, again, the ISA is a customer. [*Id.*]  CPay provides industry leading support for its ISAs.  [*Id.*]

**Plaintiff's Response:**  Disputed. As is set forth in detail in response to Statement 7, rather than having "no control" over its ISAs' marketing, in the case of Central Payment WI in particular, Defendant exercised extensive control over Central Payment WI's marketing, was aware of its use of pre-recorded telemarketing, and indeed financed that telemarketing.  Whether Defendant provides "industry leading support of its ISAs is immaterial to Defendant's liability in this action.

### III.   Korthals, LLC

12.     Korthals, LLC is a Wisconsin Limited Liability Company that was organized in 2012 or 2013.   [Nicholas Korthals Depo. at 34.18-35.5][14]   Nicholas Korthals is the sole shareholder in Korthals, LLC.  [*Id.* at 36.12-36.15]

**Plaintiff's Response:**   Undisputed, although Plaintiff further avers that with the knowledge and support of Defendant, Korthals, LLC held itself out as variously Central Payment

---

[14] This deposition and all others cited herein that have not been filed already will be filed concurrently with this summary judgment motion.

itself, or Central Payment of Wisconsin. Hyman Deposition at Hyman Deposition at 47:20—49:9; 75:19—76:12 (ECF 45).

13.     At all relevant times, Korthals, LLC was an ISA of CPay.  [*Id.* at 35.18-35.21] Korthals, LLC did business as CPAY WI.  [*Id.* at 37.3-37.8].

**Plaintiff's Response:** As to the first sentence, undisputed.  As to the second sentence, Plaintiff states that with the knowledge and support of Defendant, Korthals, LLC held itself out as variously Central Payment itself, or Central Payment of Wisconsin. Hyman Deposition at 47:20—49:9; 75:19—76:12 (ECF 45).

14.     There is no evidence whatsoever that the disputed calls were placed by CPay. The call logs upon which Plaintiff purports to rely showing the calls were produced by Korthals, LLC.

**Plaintiff's Response**:  Undisputed, although these statements are not material to resolving Defendant's liability in this action. TCPA liability is not limited to the entity that places an illegal call. An entity is equally culpable for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services.

15.     Korthals, LLC has not been named in this lawsuit.

**Plaintiff's Response**:  Undisputed, although this statement is not material to resolving Defendant's liability in this action.

16.     The relationship between Korthals, LLC and CPay was governed by a Representative Agreement dated December 29, 2009.  [Matt Hyman Depo. at 33.22-34.10; Aaron Neuhaus Depo., Exhibit 1]

**Plaintiff's Response:**  Undisputed, although the parties course of conduct as described in Plaintiff's response to Statement 7 raises genuine disputed issues of material fact as to Plaintiff's

vicarious liability in spite of contractual disclaimer language. The terms of the contract are immaterial to Defendant's liability in the matter as  how the parties to any given relationship label it is not dispositive because whether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship and the application of the law of agency to those facts. A disclaimer of an agency relationship in a contract is therefore not dispositive of the issue of whether such a relationship was created.  As is set forth more fully in response to Statement 7, Defendant's course of conduct with Central Payment WI is more than sufficient to raise a disputed issues of fact as to Defendant's vicarious liability to support denial of Defendant's motion for summary judgment.

17.     The Representative Agreement provided, in part:

(a)     "Central Payment Corp. (CPC) is a registered Independent Sales Organization (ISO) with  VISA, U.S.A. and a registered Member Service Provider (MSP) with MasterCard, International, and maintains contractual agreements with MasterCard, VISA U.S.A. and Member Banks (hereinafter "Banks"), whereby CPC solicits prospective merchants to apply to "Banks" for Merchant Agreements, and provides various and sundry merchant account services to Banks…." [Neuhaus Depo., Exhibit 1]

(b)     "CPC desires to retain Representative as an independent contractor and non-exclusive sales representative to assist CPC soliciting prospective merchants to apply to "Banks" for Merchant Agreements and Representative desires to render such assistance to CPC in accordance with the terms and conditions of this Agreement." [*Id.* at ¶1]

(c)     "CPC and Representative acknowledge and agree that Representative's relationship with CPC is solely that of an independent contractor and nothing herein contained shall be construed to constitute CPC and Representative as partners, joint venturers, co-owners, or otherwise as participants in a joint or common undertaking." [*Id.*]

(d)     "As a Representative, it is understood and agreed that Representative is not entitled to participate in any group medical plans, pension plans, bonus, stock, or similar benefits that CPC provides to its employees.  It is further understood and agreed that Representative is responsible for paying (and that CPC has no responsibility to withhold on Representative's behalf) any and all required state and federal taxes, including, but not limited to FICA (Social Security),

unemployment insurance, federal or state income taxes, disability insurance and workers' compensation insurance." [*Id.*]

(e)      "Representative may employ such personnel as it deems necessary to complete performance.  CPC may not direct such employees…" [*Id.*]

**Plaintiff's Response:**  Undisputed that Defendant has correctly quoted portions of the Representative Agreement, but states that the terms of the contract are immaterial to Defendant's liability in the matter as how the parties to any given relationship label it is not dispositive because whether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship and the application of the law of agency to those facts. A disclaimer of an agency relationship in a contract is therefore not dispositive of the issue of whether such a relationship was created.  As is set forth more fully in response to Statement 7, Defendant's course of conduct with Central Payment WI is more than sufficient to raise a disputed issues of fact as to Defendant's vicarious liability to support denial of Defendant's motion for summary judgment.

18.      The sole shareholder of Korthals, LLC described the relationship of CPay and Korthals, LLC as follows:

THE WITNESS:  Yes, I had said that my viewpoint was that our relationship was a 1099 relationship.

MR. PARONICH:

Q.   And when you say your viewpoint is that the relationship was a 1099 relationship, what do you mean by that?

A.   That I am my own business owner and make my own decisions, operate under my own influence, that sort of thing.

[Korthals Depo. at 8.16-8.25]

**Plaintiff's Response:** Undisputed that Defendant has correctly cited a portion of Mr. Korthals deposition testimony, but Plaintiff disputes that this testimony us sufficient to eliminate the existence of disputed genuine issues of material fact sufficient to preclude the entry of summary judgment in favor of Defendant as set forth in detail in Plaintiff's Response to Statement 7.

19.   The independent contractor relationship between CPay and Korthals, LLC was not exclusive.  [*Id.* at 88.5-88.23]  With respect to certain cash advance transactions or merchants who do not qualify under CPay's internal standards, Korthals, LLC places those merchants with other vendors.  [*Id.*]

**Plaintiff's Response:**  Disputed and immaterial.  Mr. Korthals actually testified that the relationship was not exclusive for some portion of 2012 (before Mr. Korthals began telemarketing via robo-call), with respect to some higher risk accounts, but that otherwise in promoting "merchant services" the relationship has been exclusive.  Korthals Dep. at 87:25—88:11 (ECF 40-4).  Mr. Korthals further testified that the pre-recorded advertising was performed exclusively for Defendant.  Q:  I see.  So for the prerecorded message system that we've been discussing, the messages that you would use for payment processing, was that limited to Central Payment?  A:  It was. Korthals Dep. at 88:24—89:3 (ECF 40-4).  .

20.   At the start of its business relationship with CPay, Korthals, LLC used mostly door to door marketing.  [*Id.* at 11.4-11.9]   Korthals, LLC later moved to pay-per-click advertising over the internet.  [*Id.* at 20.7-20.18]  Korthals, LLC also had a website, which it designed and maintained on its own without any assistance from CPay.  [*Id.* at 37.22-38.12]

**Plaintiff's Response:** Undisputed that Mr. Korthals so testified, but Mr. Korthals non-telemarketing, non-robo call marketing is immaterial to resolution of Defendant's liability in this

action as he testified that the rebo-calling was limited to Central Payment. Korthals Dep. at 88:24—89:3 (ECF 40-4).  .

21.    At some point in the Spring of 2014, Korthals, LLC decided to begin telemarketing to generate business.  [*Id.* at 113.4-16]  Korthals, LLC purchased a list of what it believed to be business numbers from Sales Data Pro, a California based business that offers data and contact center technology solutions to businesses.  [Hyman Depo., Exhibit 1, Ebersole Affidavit, ¶¶1 & 7]  Korthals, LLC then began using an autodialer to attempt to call those businesses.  [Korthals Depo. at 73.20-74.6]  Korthals made calls on the list of numbers provides by Sales Data Pro from approximately April, 2014 until March, 2016.  [*Id.* at 74.7-74.14]

**Plaintiff's Response:**  Undisputed, although Plaintiff adds that Mr. Ebersole's Affidavit (ECF22-2) also states Sales Data Pro explicitly wants its customers that the customer is responsible for compliance with telemarketing law.  Mr. Ebersole attests that:

- SDP offers data and contact center technology to businesses, selling its data over the internet. (¶¶ 1-2)
- SPP explicitly warns its customers that, if the data is used for telemarketing, the customer is responsible to ensure compliance with telemarketing law. (¶ 4)
- SDP requires that customers agree to the terms of the SDP Privacy Policy, including warranting that the customer has access to the Do Not Call Registry and understands that it may not call Do Not Call registrants. (¶¶ 5-6)
- SDP sold Central Payment data from its business database, but notes that the data was from a "variety of sources" and that SDP "therefore, cannot and does not guarantee the accuracy of data sold to its customers." (¶¶ 7-8)
- Mr. Ebersole notes that phone numbers are frequently reassigned from businesses to residential lines, which is why he notes that it is important for SDP customers who purchase data for telemarketing to "take the required steps to ensure compliance with all telemarketing law." (¶ 9)
- In response to a subpoena from Plaintiff, SDP produced the list of 11,032,736 phone numbers that it sold to Central Payment WI. (¶¶ 10-11)
- Mr. Ebersole attested that SDP also produced the contact information that matches this list of phone numbers, as it currently exists in the SDP database.  The contact data, however, is constantly updated.  Accordingly, the contact data associated with the list of numbers sold to Central Payment WI may not exactly match the contact data associated with the numbers when sold to Central Payment, WI.  (¶ 12)

- SDP is not in possession of any document evidencing anyone's "pripr express written consent" to receive pre-recorded telemarketing calls from Central Payment WI. (¶ 13)
- However, the information in the SDP records matches Mr. Heidarpour's home telephone number to a business called DNC Pool Perfectors, a company owned by Debbie Armando.  SDP's records do not match the number to Mr. Heidarpour, his residential address, or to any business owned by Fred Heidarpour. (¶¶ 15-17)
- SDP is not in possession of any records evidencing anyone's "prior express written consent" to receive pre-recorded telemarketing calls from Central payment WI. (¶ 13)

22.    CPay was aware that Korthals, LLC was using an autodialer with a pre-recorded message to generate leads.  [Hyman Depo. at 117.9-117.12 (ECF 45)]  CPay never directed Korthals, LLC with regard to its autodialing.  [*Id.* at 117.9-117.12]  The managing director of CPay testified:  "No, no, it's not just a – it's a factual – he's running his own business.  I don't tell any of our contractors what they can and what they can't do within their own marketing efforts."  [*Id.* at 117.15-117.18]

**Plaintiff's Response**:  Undisputed that Defendant was aware of Mr. Korthals use of an autodialer (and notes that this fact supports rather than precludes the imposition of vicarious liability), and that Defendant correctly quoted a portion of Mr. Hyman's deposition testimony. Plaintiff disputes that Defendant "never directed Korthals with regard to its autodialing" as he testified that he wrote an email to Mr. Korthals discussing his autodialing, and purporting to suggest that it was wholly Mr. Korthals decision and his responsibility. Mr. Hyman did concede that once he was sued, he consulted with an attorney to determine whether the TCPA was being violated—even though he had knowledge prior to that that Mr. Korthals was, in fact, violating the TCPA—but did not tell Mr. Korthals to stop autodialing prerecorded messages, even though Mr. Korthals offered to stop. Hyman Dep. 112:15—113:6 (ECF 45).  Defendant's failure to exercise its authority to stop the illegal telemarketing on its behalf supports the imposition of vicarious liability against Defendant.

IV.   **Plaintiff And His Businesses And The Number**

   A.   *Plaintiff And His Businesses*

23.   Plaintiff is 56-years-old. [Fred Heidarpour Depo., at 11.3-.4 (ECF 37)  He holds a bachelor's degree in industrial engineering from Central State University and a masters and Ph.D. in health care administration from Pacific Western University.  [*Id.* at 12.21-13.11]  He has been married to Farideh Heidarpour since 1981.  [*Id.* at 15-24-.25]  They have two children, Andrew and Ali.  Ali is an IT manager, and Andrew graduated from Pheonix School of Law in 2014.  [*Id.* at 17.16-19.14]  Both children live in the Washington, D.C. area.

   **Plaintiff's Response:**  Undisputed, but immaterial.

24.   After law school, Andrew helped start Legal Advocacy for Victims, which is a company that files TCPA claims.  [Andrew Heidarpour Depo. at 15.7-22.20 (ECF 44)]  He left the company, but still has an ownership interest.  [*Id.*]  While there, he assisted his father with TCPA claims, although he claims he does not know how many he assisted with or how many TCPA claims his father has filed.  [*Id.*].

   **Plaintiff's Response:**  Undisputed but immaterial, with the limited exception that Plaintiff disputes that Andrew Heidarpour testified that he handled his father's claims while at Legal Advocacy for Victims.  Mr. Heidarpour actually was asked "did Legal Advocacy for Victims handled claims for Fred Heidarpour, and he answered "I think they handled a couple." Andrew Heidarpour Dep. 19:22—20:2 (ECF 44).

25.   According to Plaintiff's interrogatory responses, "[s]igned under the pains and penalties of perjury" on January 12, 2016, Plaintiff's residential address is 38560 N. 101 Street,

Scottsdale, Arizona, 85262 ("Scottsdale House").[15]   [Pltf's Int. Resp., ECF No. 16-1, at Answer No. 1 & p. 18]

    **Plaintiff's Response:** Undisputed as this is the residential home at which he received the calls in question in this case, and this statement is immaterial as the TCPA does not require that a call be received at a "primary" residence in order to qualify for TCPA protection.   Plaintiff strongly disputes the commentary in footnote 15 that his interrogatory answers were "riddled with material omissions."

    26.    When asked where he lived, however, Plaintiff testified that he lives in, and splits time between, California, Arizona and Washington, D.C.   [Fred Heidarpour Depo., ECF No. 37, at 23.14-25.11; 25.22-26.08]   When in California, Plaintiff stays at 465 Miner Road, Orinda, California ("Orinda House").   [*Id.* at 269-.11]   He stays with his son Ali in Washington, D.C. [*Id.* at 26.12-.23]   In 2015, when the alleged calls were made, he also spent a lot of time in Dallas and Oklahoma.   [*Id.* at 25.12-.21]   In fact, Plaintiff has an Oklahoma Driver's License, has never gotten an Arizona license and still registers his cars in Oklahoma.   [*Id.* at 17.16-19.14; 33.23-34.16; 158.23-.25]   He still uses an Oklahoma house located at 756 Legacy Drive, Edmond, Oklahoma ("Edmond House"), which he claims to rent out, as a primary mailing address and the address for his Driver's License.   [*Id.* at 17.16-19.14; 24.3-.18; 27.9-.13; 33.5-34.16; 158.23-160.3]

    **Plaintiff's Response:** Undisputed, but these statements are immaterial as the TCPA does not require that a call be received at a "primary" residence in order to qualify for TCPA protection.   Moreover, Mr. Heidarpour testified he considers his Scottsdale his primary residence

---

[15] As pointed out in CPay's February 18, 2016 Motion to compel and related filings [ECF Nos. 16, 17 & 26], Plaintiff's interrogatory responses were riddled with material omissions.   These omissions will also be addressed further in opposition to Plaintiff's impending motion for class certification.

and that he has an Arizona identification card listing his Scottdale address. Fred Heidarpour Dep. 33:18-19 and 34:12—19 (ECF 40-1).

27.     Plaintiff's wife also testified that she lives in the same "many" places Plaintiff mentioned.  [Farideh Heidarpour Depo., ECF No. 39, at 6.11-7.20]  She said she did not "have a clue which one is" her primary residence.  [*Id.*]

**Plaintiff's Response:** Undisputed, but these statements are immaterial as the TCPA does not require that a call be received at a "primary" residence in order to qualify for TCPA protection.

28.     The Scottsdale House is not in Plaintiff's name, but rather, since it was purchased in 2012, has been owned by the Fred Ramezan Heidarpour Revocable Trust ("Trust").  [Fred Heidarpour Depo., ECF No. 37, at 27.23-29.1]  The Trust also owns the Orinda House and the Edmond House.  [*Id.* at 29.2-.15]  Again, Plaintiff currently rents the Edmond House.  He has also rented the Orinda House in the past, including up until July or August, 2015.  [*Id.* at 41.4-.10]  The Trust also owns a property in Dallas, Texas.  [*Id.* at 31.8-.16]

**Plaintiff's Response:** Undisputed, but these statements are immaterial as the TCPA does not require that a call be received at a "primary" residence in order to qualify for TCPA protection, and Plaintiff's ownership of the Scottsdale house via a trust vehicle as well as rental other properties is wholly irrelevant and immaterial.   The residential phone in question is registered in Mr. Heidarpour's name as a "Home phone."  ECF 36-7.  MR. Heidarpour also said he considers his Scottsdale home his primary residence. Fred Heidarpour Dep. 33:18-19 (ECF 40-1).

29.     Plaintiff also controls a family limited partnership -- Heidarpour Family Limited Partnership I -- that owns "many investment properties," to include one in Pheonix, Arizona, one

in McLean, Virginia, four in Oakland, California, and one in Emeryville, California.   [*Id.* at 29.16-31.7]   Plaintiff and his wife manage these rental properties without assistance from a management company.   [*Id* .at 32.22-33.7]   When people call or have problems with his rental properties, they call Plaintiff on the cellular number, 510-385-7447.   [*Id.* at 36.16-.22]   Plaintiff says this is the "only cell phone that" he uses "to give to all my [his] tenants and everybody."   [*Id.* at 36.23-37.2]   That number is registered to Abante Rooter and Plumbing, Inc. ("Abante"), a California plumbing business Plaintiff owns and runs with his family.[16]   [*Id.* at 81.18-82.3]

**Plaintiff's Response:**  Undisputed, but immaterial, as is the number of cases filed by Mr. Heidarpour or Abante Rooter and Plumbing, Inc.

30.     Heidarpour Family Limited Partnership I was formed in Oklahoma and its address is listed as the Edmond House.  [*Id.* at 37.14-38.3]

---

[16] On behalf of Abante, Plaintiff has also filed at least seven TCPA class action cases for calls allegedly placed to him on Abante's cellular numbers.  The cases are captioned:

(1)     *Abante Rooter And Plumbing, Inc. v. New York Life Insurance Company* (United States District Court for the Southern District of New York; Case 1:16-cv-3588-AKH; filed May 13, 2016);

(2)     *Abante Rooter And Plumbing, Inc. v. Direct Energy, LP, et al.* (United States District Court for the Northern District of California; Case 3:16-cv-1162-EDL; filed March 9, 2016);

(3)     *Abante Rooter And Plumbing, Inc. v. Alarm.com, Incorporated, et al.* (United States District Court for the Northern District of California; Case 4:15-cv-6314-YGR; filed December 30, 2015);

(4)     *Abante Rooter And Plumbing, Inc. v. OH Insurance Agency, et al.* (United States District Court for the Northern District of Illinois; Case 1:15-cv-9025-AKH; filed October 13, 2015);

(5)     *Abante Rooter And Plumbing, Inc. v. Birch Communications* (United States District Court for the Northern District of Georgia; Case 1:15-cv-3562-AT; filed October 7, 2015);

(6)     *Abante Rooter And Plumbing, Inc. v. Pivotal Payments, Inc., et al.* (United States District Court for the Northern District of California; Case 3:16-cv-5486-JCS; filed September 26, 2015); and

(7)     *Abante Rooter And Plumbing, Inc. v. Pmax Commercial Insurance Services, Inc., et al.* (United States District Court for the Northern District of Illinois; Case 1:15-cv-7722; filed September 1, 2015).

**Plaintiff's Response:** Undisputed, but immaterial.

31.     Plaintiff also controls Heidarpour Family Limited Partnership II, which he uses to trades stocks. [*Id.* at 152.17-157.2]  The "Entity Address" for this partnership as listed with the Oklahoma Secretary of State is the Scottsdale House. [*Id.*at 340.18-342.13; Exhibit 19]  He also controls Heidarpour Companies, Inc., which he says owns the Trust and Heidarpour Family Limited Partnerships I and II. [*Id.*]

**Plaintiff's Response:** Undisputed with the exception that Mr. Heidarpour testified that his attorney may have put the Scottsdale address for mailing, but that it is an Oklahoma entity which files its taxes in Oklahoma. Fred Heidarpour Dep. at 155:16-25 (ECF 40-1).  Moreover, the statement is immaterial.

32.     Plaintiff claims he has been the owner and President of Abante, located at 4 Admiral Drive, B-339, Emeryville, California, 94608, for the last 10 years.[17]  [Pltf's Int. Resp., ECF No. 16-1, at Answers Nos. 1 & 5]

**Plaintiff's Response:** Undisputed, but immaterial.  The record is clear that the calls to Mr. Heidarpour resulted from the misuse of faulty data that was not scrubbed agains the National Do Not Call database, not his company's use of credit card processing (offered by entities other than Defendant).

33.     Unit B-339, Admiral Drive -- Abante's headquarters -- is a residential apartment. [Ali Heidarpour Depo. at 20.17-21.12]  Ali Heidarpour, who works for Abante as the "IT guy"

---

[17] Abante has accepted credit card payments since Plaintiff acquired the business in 2003.  [*Id.* at 112.6-.21]  Plaintiff agrees that credit card payments are critical to Abante's business and that getting a good deal on credit card transaction services is important.  [*Id.* at 115.2-.11]  He is familiar with and understands credit card processing in the business setting.  [*Id.* at 118.16-.19] Plaintiff also admits to changing the company that provided Abante credit card services one time around 2013.  [*Id.* at 116.19-117.16]

lived there around 2004, 2005.  [*Id.* at 18.7-.12; 21.13-.19]  When he lived there, there was no sign saying "Abante Rooter" to indicate that Abante received mail there.  [*Id.*]

**Plaintiff's Response:**  Undisputed, but immaterial.

34.    Ali Heidarpour also testified that when Plaintiff was in Scottsdale, he observed Plaintiff managing Abante from the Scottsdale House.  [*Id.* at 22.22-23.16]

**Plaintiff's Response:**    Disputed, and Plaintiff further states that the statement is immaterial.  What Ali Heidarpour testified was that the company is located in California, but that his father is the manager. Ali Heidarpour Dep. 23:7-22 (ECF 43). Fred Heidarpour testified that he receives calls from customers seeking plumbing services on his cell phone and not on the Scottsdale residential phone, and that Abante Rooter does not have customers in Arizona. Fred Heidarpour Dep. at 76:14-16 (ECF 40-1).

35.    The only other business Plaintiff admits to being an officer, director, agent or employee of or otherwise maintaining an ownership interest in within the past 10 years is A.B.C. Billing, Inc., 3225 Turtle Creek, Boulevard, No. 601, Dallas, Texas, 75215.[18]  [Pltf's Int. Resp., ECF No. 16-1, at Answer No. 5]

**Plaintiff's Response:**  Undisputed, but immaterial

36.    When asked to identify "any civil actions" in which he has been a party, Plaintiff admitted to being involved in only three other cases, all of which are TCPA class cases in which Abante is the plaintiff.[19]  [*Id.* at Answer No. 3]

---

[18] This answer was also inaccurate and failed to disclose Plaintiff's real estate holding entities and his assistance to his wife in her medical practice business.  [*See* Plaintiff's First Motion to Compel, ECF No. 16; Fred Heidarpour Depo., ECF No. 37, at 329.24-333.1]

[19] Plaintiff's Interrogatory responses were singed on January 12, 2016.  Plaintiff only disclosed the two class cases pending in the Northern District of Illinois and the one pending in the Northern District of Georgia.  He failed to disclose the two then pending class cases in California

**Plaintiff's Response:**  Undisputed, but immaterial, and Plaintiff notes that his counsel lodged an objection to  identifying any non-class TCPA cases, and although Defendant filed an initial motion to compel, it did not obtain and order requiring disclosure of individual cases..

37.    Later, only after being confronted on deposition and having his material interrogatory response omissions exposed in CPay's Motion to Compel, Plaintiff admitted to making other TCPA demands and filing other TCPA lawsuits based on the Number, but claims he cannot recall how many because there are too many to recall.  [Fred Heidarpour Depo., ECF No. 37, at 68.13-69.9; 98.10-.15]  He admits to filing four TCPA cases in Arizona and one in California in his own name.  [*Id.* at 96.18-97.7]  He has also filed other TCPA lawsuits on behalf of Abante, but he could not recall how many.  [*Id.* at 96.15-.17]  However, again at least seven can be located on Pacer.  Plaintiff admits to having many lawyers in different states that help him with TCPA claims.  [*Id.* at 100.20-101.6]

**Plaintiff's Response:**  Undisputed, but immaterial.   Indeed courts recognize that experience in enforcing a statute *supports* class certification.

38.    Plaintiff could not recall how much he has received in payments on TCPA claims, but admitted he pays taxes on these payments.  [*Id.* at 98.16-100.5]

**Plaintiff's Response:**  Undisputed, but immaterial.

39.    Plaintiff has not requested a new telephone number.  [*Id.* at 72.3-73.11]

**Plaintiff's Response:**  Undisputed, but immaterial.

40.    He also testified as follows:

Q.  Is it true that you are on a mission to stop telemarketing calls?

---

and never supplemented his interrogatory responses to include the two additional cases filed after he served his responses.

A.  If you want to call it mission, call it mission, but what – what I'm – trying to tell you is what else me as a consumer can do, what else can I do.

Q.  Do you think it's your duty to try to stop telemarketing calls?

A.  Not – for myself yes.  At least I want to stop them.

Q.  And you think it's your duty to try to do that on behalf of others?

A.  If I can help them because I know that – again, when I think about my godparents, I said, you know, how many people can I if I can stop them.

[*Id.* at 378.18-379.6]

**Plaintiff's Response:**  Undisputed, but immaterial.

**B.**    *The Number*

41.    The disputed Number is (480) 595-5903.  [Pltf's Int. Resp., ECF No. 16-1, at Answer No. 6]  While Plaintiff claims his Number "is used as a residential telephone line, as reflected in [his] residential phone bill," he admits he is "unaware" if his Number is "registered as a residence."  [*Id.* at Answers Nos. 7 & 10]

**Plaintiff's Response:**  Disputed, but immaterial.  Mr. Heidarpour's interrogatory answer was to whether the phone number had "ever" been registered as residential.  Mr. Heidarpour testified flatly that his number is a residential land line that his plugged into the wall in his Scottsdale kitchen, and phone bills reflect that it is a residential phone. Fred Heidarpour Dep. at 55:24—56:6 (ECF 40-1) and ECF 37-6.

42.    The Number is listed with the Arizona Secretary of State in the Trade Name Registration for DNA Pool Perfectors showing a business address of 36715 N. 24th St., Phoenix, Arizona, 85086.  [*See* Trade Name Application, Exhibit 2 hereto]  The Number is also held out

to the public as associated with DNA Pool Perfectors on at least 23 different web links.[20]   The
Number is also still listed in the Cave Springs, Arizona, telephone directory as associated with
DNA Pool Perfectors.  [*See* Amarando Declaration, ECF No. 26-3 at ¶5 & Exhibits B, C & D]

**Plaintiff's Response:**  Undisputed, but immaterial.  In point of fact, the number currently
belongs to Fred Heidarpour, is registered in the National Do Not Call Registry, and the phone
bills reflect that it is a residential phone. Fred Heidarpour Dep.  Fred Heidarpour Dep. at 37421-
22 (ECF 40-1) and Fred Heidarpour Phone Bills, ECF 37-6. As is set forth fully in Plaintiff's
Response to Statement 21, had Defendant's agent followed the warnings from Mr. Ebersole
about the limitations of the data it was being sold, Mr. Heidarpour and others on the Do Not Call
Resgitry would not have received illegal pre-recorded calls.

43.     Plaintiff identified CenturyLink and Cox Communications as telephone service
providers for the Number.  [Pltf's Int. Resp., ECF No. 16-1, at Answer No. 10]

**Plaintiff's Response:**  Undisputed, but immaterial.

44.     Plaintiff initially provided only one telephone bill showing how the Number has
been used, and this bill only shows outgoing long distance calls.  Of these calls, however, 20
appear to have been made to businesses.[21]

**Plaintiff's Response:**  Undisputed, but immaterial, as courts have recognized that limited
use of a residential line for business calls does not transform the line into a business phone. (*See
also* Plaintiff's Response to Statement 3)

---

[20] *See* Internet Sites list attached as Exhibit A to previously filed [ECF No. 16-3] Affidavit of
Tyler Cashbaugh Regarding Internet Sites.

[21] *See* CenturyLink Phone log attached as Exhibit B to previously filed [ECF No. 16-4] Affidavit
of Tyler Cashbaugh Regarding CenturyLink Phone Record.

45.     Plaintiff claims the Number is registered to the Scottsdale House.   [Fred Heidarpour Depo., ECF No. 37, at 46.24-47.2]   But, when Plaintiff is not at the Scottsdale House, all calls made to the Number are forwarded to another cellular number, (510) 459-6147, registered to and paid for by Plaintiff's plumbing business, Abante.   [*Id.* at 47.12-49.12]   In addition, this cellular number is registered to the same AT&T business cellular account as numerous other Abante cellular numbers, including (510) 385-7447, which is, again, the number Plaintiff claims to use for his property business.   [*Id.* at 54.17-55.7; AT&T Mobility Wireless Statement Cover Sheet for bill cycle, March 20-April 19, 2015, Exhibit 1 hereto]   Invoices for the account are addressed to "Abante Rooter & Plumbing, Attn. Fred Heidarpour, 38560 N 101st St., Scottsdale, AZ  85262-3097."  [*Id.*]

**Plaintiff's Response**:  Undisputed with the exception that Mr. Heidarpour testified that when he is not at the Scottsdale house he does not forward the calls from his residential phone "one hundred percent of the time." Fred Heidarpour Dep. 53:2-6 (ECF 40-1).  Mr. Heidarpour further testified that he pays for the Scottsdale residential phone out of his personal checking account. *Id. at 15-24.*   However, whether the call was forwarded to a cell phone does not alter the fact that the calls were placed to his residential phone, and as such this statement is immaterial to Defendant's liability in this action.

46.     ***In summary, calls to the Number are regularly forwarded to a business cellular number which is registered to Abante at the Scottsdale House and paid for by Abante.***  In fact, to determine what telemarketers have called the Number, Plaintiff admits that he does not even look at telephone bills for the Number -- he goes online to the Abante AT&T Mobility account and looks at telephone calls that have been forwarded to Abante's cellular number.  [Fred Heidarpour Depo., ECF No. 37, at 49.13-53.6]  Plaintiff admits that sometimes, but not 100% of

32

the time, he actually receives telemarketer calls to the Number on Abante's cellular telephone. [*Id.* at 52.24-53.6]

**Plaintiff's Response**: Undisputed with the exception that Defendant mischarterizes Mr. Heidarpour as saying he solely looks at his cell phone bill to confirm who called him as he and Mrs. Heidarpour testified that they have and had access to online bills from their residential telephone carriers. Farideh Heidarpour Dep. 16:24—17:12. (ECF 35-3). Mr. Heidarpour further testified that he pays for the Scottsdale residential phone out of his personal checking account. *Id. at 15-24.* However, whether the call was forwarded to a cell phone does not alter the fact that the calls were placed to his residential phone, and as such this statement is immaterial to Defendant's liability in this action.

47. When asked if he ever represented to anyone that the Number was a cellular number, Plaintiff's response was, "I don't recall." [*Id.* at 54.11-.15] As shown below, Plaintiff was apparently claiming not to recall doing so in the Arizona small claims cases he also failed to disclose in his interrogatory responses.

**Plaintiff's Response:** Disputed and immaterial. As to Plaintiff's interrogatory response about his litigation history, Mr. Heidarpour objected and stated he would only provide information about his class action participation, and Defendant did not move to compel as to individual cases, of which it was already aware due to an extensive investigator's report it obtained, so Mr. Heidarpour did not failed to disclose anything.

Defendant makes much of errors in pro se filings by Mr. Heidarpour in Arizona Small Claims Court regarding illegal pre-recorded calls to Mr. Heidarpour's Scottsdale residence. Under the TCPA, an unsolicited pre-recorded phone call offering goods or services is illegal whether made to a cell phone or a cell phone. *Compare* 47 U.S.C. § 227(b)(1)(A)(iii) with 47

U.S.C. § 227(b)(1)(B).  The small claims court filings were simply an error, and Plaintiff corrected them in motions for reconsideration.   See Dkt. 37-9 (third to last page, "a pre-recorded call to my residential telephone was received on March 16, 2015") and Dkt. 37-10, the final two pages.  ("Statement of facts:  A per-recorded (sic) call to my residential telephone was revived (sic) on Feb. 17, 2015.") As Defendant rightly states, a phone cannot be both a cell phone and a residential landline.  Here, the phone in question is indisputably a residential landline, making the corrected errors in small claims court filings irrelevant and immaterial to this action.

48.     Plaintiff does not know whether he has call waiting on the Number, and testified that the main reason he got a landline for the Scottsdale house was so that his sons could reach him in case of emergency when he could not be reached on his cellular telephone.  [*Id.* at 121.4-.23]

**Plaintiff's Response:**   Undisputed, although Mr. Heidarpour noted that his Arizona property does not have perfect cell coverage, which was an additional reason for wanting the landline which came as part of a television, internet and phone bundle.   Mr. Heidarpour additionally testified that he did not take a home office tax deduction for his Scottsdale residential line. Fred Heidarpour, Dep. 238:10-18 (ECF 40-1). These statements are in any event immaterial.

49.     However, his son Ali testified that he does not even know the Number and that he did not even know the Scottsdale House had a landline until July 2016, when his child wanted to play with the handset.  [Ali Heidarpour Depo. at 14.13-16.18]   He had not even noticed a landline during any prior visits to the Scottsdale House.  [*Id.*]

**Plaintiff's Response:**  Undisputed, but immaterial.

50.     Plaintiff's other son, Andrew, does not know the Number either.  [Andrew
Heidarpour Depo. at 42.21-43.20; 47.4-.7; 49.15-50.3]  He does not know the landline number
for the Scottsdale House and has never tried to call a number he believed was a landline number
for the Scottsdale House.  [*Id.*]  Nor does he know where the landline telephones are located in
the Scottsdale House.  [*Id.*]  When he tries to reach his parents when he knows they are at the
Scottsdale House he calls their cellular numbers.  [*Id.*]

**Plaintiff's Response:**  Undisputed, but immaterial

51.     Consistent with her sons, Plaintiff's wife did not could not even recall the last
four digits of the Number.  [Farideh Heidarpour Depo., ECF No. 39, at 8.3-.8]  She admitted she
did not use the Number very often.  [*Id.*]

**Plaintiff's Response:**  Undisputed, but immaterial

52.     Plaintiff's stated reason for obtaining the Number is also refuted by the fact that
when asked what he used the Number for, Plaintiff replied:

> A.  Mostly I use when I want to fax out.  What happened is – well, I have some
> customers that, when I get an invoice for my business – for Abante, I can say, like
> 90 percent of my customers, I can send them invoices through the e-mail or text
> or whatever.  Some of them that are very, very old fashioned, I need to fax it to
> them.
>
>         What I do is when I – when I have those invoices that I need to fax them, I
> turn on the fax machine, fax it, and turn it off.

[*Id.* at 59.15-.24]

**Plaintiff's Response:**  Disputed.  What Fred Heidarpour testified is that once or
twice every two week period, "maximum" he would fax an invoice if the customer did
not receive invoices via email.  Mr. Heidarpour testified further that it was his personal
fax machine, and he never makes business calls from his Scottsdale residential line.  Fred
Heidarpour Dep. 60:19—62:14.

53.    *Plaintiff regularly uses the Number to fax Abante invoices.*  [*Id.* at 357.20-373.4]  According to Plaintiff, every couple of weeks, he would send a series of faxes to Abante customers from the Number.  [*Id.* at 368.13-.17]

**Plaintiff's Response:**  Disputed.  What Fred Heidarpour testified is that once or twice every two week period when he was in Scottsdale, "maximum" he would fax an invoice if the customer did not receive invoices via email. Mr. Heidarpour testified further that it was his personal fax machine, and he never makes business calls from his Scottsdale residential line. Fred Heidarpour Dep. 60:19—62:14 (ECF 40-1).

54.    Abante is also listed on several internet web advertisements as associated with the address for the Scottsdale House.  [*Id.* at 335.19-338.24; Exhibit 17]

**Plaintiff's Response:**  Disputed Mr. Heidarpour testified that neither he nor Abante created any such listing, and that it was instead done without his authorization by Yellow Pages, who Abante had retained to create a webpage, and as Mr. Heidarpour described Yellow Pages "goofed up" as his plumbing business is located solely in California, and in fact Yellow Pages had created a number not even assigned to him to which Yellow Pages said "we assigned it to ourselves to see how many calls you get.,  Fred Heidarpour Dep. 336:3--338:25.  Mr. Heidarpour had no reason to promote Abante Plumbing in Arizona as all of his plumbers are in the San Francisco area, and perhaps more importantly for purposes of resolving Defendant's summary judgment motion, Defendant did not call Mr. Heidarpour due to any listing on the web but rather because Defendant's agent relied on data it had been explicitly warned to check for TCPA compliance.

## V.    The Calls

55.    Plaintiff admits that some of the calls alleged in the Complaint that he claims he received from CPay were received on the Abante cellular telephone after the calls were forwarded from the Number.  [*Id.* at 53.7-54.10]

**Plaintiff's Response:**  Disputed in the limited sense that calls were received on his residential line and forwarding is irrelevant and immaterial to Defendant's liability in this action.

56.    Plaintiff thinks that the calls alleged in his Complaint could have lasted five or ten minutes.  [*Id.* at 122.10-.23]  He admits that during the calls, he wanted to convey that he was interested in credit card processing services so that the caller would send him more information about their company.  [*Id.* at 122.24-124.14]  He also asked the caller to send him an email.  [*Id.*]

**Plaintiff's Response:**  Undisputed and immaterial.  All the Heidarpours did was make sure to learn the identity of the telemarketer calling them illegally to enforce their rights under the TCPA, since telemarketers making illegal calls obfuscate their identity. This is a tactic that courts have recognized as appropriate.

57.    Independent contractor Korthals, LLC[22] was given enough information by Plaintiff and his wife to begin a merchant processing application ("Merchant Application")  in the name of Abante [*Id.* at 191.5-200.19; 346.23-347.23; Exhibit 3]  Mrs. Heidarpour claims that the application is fake.  [Farideh Heidarpour Depo., ECF No. 39 at 42.15-45.15]  But, the Merchant Application includes the name of Abante's bank (Bank of America), the name of Abante's accountant (David Devoto) and Abante's cellular telephone number [Fred Heidarpour Depo., ECF No. 37, at 163.4-.21; 191.5-200.19; 346.23-347.23; Exhibit 3 ], which are things

---

[22] CPay did not make the disputed calls.  As addressed above, CPay sells Direct Merchant Acquiring through non-exclusive Independent Sales Agents ("ISAs"), which are 1099 Sales Agents that contract with CPay to be an authorized ISA of CPay.  Korthals, LLC is one of these ISAs.

Korthals, LLC could not have known without being told by Plaintiff and/or his wife.  Plaintiff denies ever seeing the Merchant Application or discussing Abante, but when asked if he provided the name "Bank of America," he said, "I don't know."  [*Id.*]

**Plaintiff's Response**:  Disputed and immaterial.  Any information given to Central Payment WI in the course of trying to discovery the identity of both the caller and entities whose services are being promoted by illegal telemarketing is irrelevant to whether the calling was in fact illegal and whether Defendant can be held liable for the calling.  Moreover, as conceded by Defendant, both Mr. Heidarpour and Mrs. Heidarpour denied filling out any such application— making the assertion that the fact is "not disputed" untenable on its face.  Mr. Heidarpour testified that the "accountant" listed had not worked for Abante since 2013.  Rather than suggesting the information could only have come from the Heidarpours, this outdated information suggests an after the fact attempt to locate information about the Heidaropours to make it appear that Plaintiff was doing business with Defendant. Fred Heidarpour Dep. 162:23— 164:5.  (ECF 40-1)

58.    The Merchant Application is dated March 26, 2015, the same day as one of the calls alleged in the Complaint.  [Fred Heidarpour Depo., ECF No. 37, at 208.7-209.16]

**Plaintiff's Response:**  Undisputed that the date on the purported , but immaterial, and Plaintiff objects that the document has not been authenticated as a business record and is therefore inadmissible.

59.    When asked if he lied to telemarketers to obtain information about them, Plaintiff responded, "[w]hatever it takes to get information from them, we do that."  [*Id.* at 208.7-210.11] Plaintiff also admits that he does not tell the telemarketers that he is trying to gather information to file a TCPA claim, nor does he tell them to stop calling until he gathers enough information.

[*Id.* at 131.13-133.16; 177.19-178.15]  He could not recall during which of the calls alleged in the Complaint he told the caller to stop calling.  [*Id.* at 176.9-177.16]

**Plaintiff's Response:**  Undisputed and immaterial.  All the Heidarpours did was make sure to learn the identity of the telemarketer calling them illegally to enforce their rights under the TCPA, since telemarketers making illegal calls obfuscate their identity. This is a tactic that courts have recognized as appropriate. Plaintiff further notes that by having registered his telephone number on the National Do Not Call list, as a matter of law he had made clear he did not want to receive the calls in question.

60.     Plaintiff's wife also admits to lying to Korthals, LLC and other telemarketers to elicit enough information to identify them for a lawsuit.  [Farideh Heidarpour Depo., ECF No. 39, at 29.4-36.9]

**Plaintiff's Response:**  Undisputed and immaterial.  All the Heidarpours did was make sure to learn the identity of the telemarketer calling them illegally to enforce their rights under the TCPA, since telemarketers making illegal calls obfuscate their identity. This is a tactic that courts have recognized as appropriate. Plaintiff further notes that by having registered his telephone number on the National Do Not Call list, as a matter of law he had made clear he did not want to receive the calls in question.

61.     For example, CPay obtained a recording of two of the calls from Korthals, LLC. During one call, Plaintiff's wife indicated that she had a plumbing business that uses a credit card and that she was interested in learning more about credit card processing services.  [Fred Heidarpour Depo., ECF No. 37, at 201.14-208.6; Farideh Heidarpour Depo., ECF No. 39, at 29.4-36.9]  She also indicated she was writing down the pricing information.  [*Id.*]  She then asks that an email be sent to Plaintiff because he was the one who was going to make the decision.

[*Id.*]  She also provided the cellular number, (510) 385-7447 (an Abante number), to the caller.

[*Id.*]  She also admitted that during a recorded conversation with Korthals, LLC, she pretended to be writing down information about credit card processing services and to sounding like she was interested in the services to gain more information.  [Farideh Heidarpour Depo., ECF No. 39, at 29.4-36.9]  She also testified:

> Q.  Do you often tell stories to telemarketers that aren't true to try to get information from them?
>
> A.  Sometimes.
>
> Q.  Why do you do that?
>
> A.  To get information.

[*Id.* at 35.24-36.6]

**Plaintiff's Response:**  Undisputed and immaterial.  All the Heidarpours did was make sure to learn the identity of the telemarketer calling them illegally to enforce their rights under the TCPA, since telemarketers making illegal calls obfuscate their identity. This is a tactic that courts have recognized as appropriate. Plaintiff further notes that by having registered his telephone number on the National Do Not Call list, as a matter of law he had made clear he did not want to receive the calls in question.

62.    On August 14, 2012, Plaintiff's wife was plead guilty to federal Health Care Fraud in connection with her management of A.B.C. Billing.  [*See* Plea Agreement and Judgment, Exhibits 2 and 3 hereto]  She served nine months in jail and was fined $1.8 million. [Fred Heidarpour Depo, ECF No. 37, at 89.14-91.2; Farideh Heidarpour Depo., ECF No. 39 at 20.8-20.21]  She has opened a special bank account to pay the fine back because the order says that she is to pay 10 percent of her gross income or $1,000 a month, whichever is greater.  [Fred

Heidarpour Depo, ECF No. 37, at 89.14-91.2]  Since getting out of prison, Plaintiff's wife has

worked for and been paid by Abante.  [Farideh Heidarpour Depo., ECF No. 39 at 21.3-.16]

      **Plaintiff's Response:**  Undisputed, immaterial and a wholly inappropriate attack on

Plaintiff's character by innuendo.

      63.    Plaintiff also admits that he does not recall who received each of the calls in the

Complaint – he thinks he received some of them and his wife received some of them.  [Fred

Heidarpour Depo., ECF No. 37, at 124.15-.22; 172.12-.20]  His wife did not know either.

[Farideh Heidarpour Depo., ECF No. 39 at 26.3-.16]

      **Plaintiff's Response:**  Undisputed and immaterial, particularly as there is no dispute in

this case that the calls occurred—indeed some were recorded by Central Payment WI.

      64.    When Plaintiff or his wife receive calls from telemarketers on the Number, he and

his wife write down the telemarketers' names and number in a booklet and also keep the

information in an Excel spreadsheet.  [Fred Heidarpour Depo., ECF No. 37, at 126.13-130.25;

178.18-182.20]  The portion of the spreadsheet that has been produced in this case indicates that

Plaintiff or his wife -- it is impossible to tell which -- did not tell Korthals, LLC to stop calling

him until the eighth call.  [*Id.* at 181.2-.7]  The spreadsheet also indicates that Plaintiff or his

wife obtained the names of the callers and their telephone numbers so he could call them back.

[*Id.* at 188.10-189.22]

      **Plaintiff's Response:**  Undisputed and immaterial.

      65.    Plaintiff asked Korthals, LLC to email him information after two of the calls he

received.  [*Id.* at 220.24-224.10]  He did this to assist him to prepare his demand and claim

against CPay.  [*Id.*]

      **Plaintiff's Response:**  Undisputed and immaterial.

66.     The second call is between Korthals, LLC and Plaintiff.  The recording is short, but Plaintiff stated that he was probably calling Korthals, LLC back after he was called on his cellular phone.  In the recording Plaintiff asks "how can I help you?"  [*Id.* at 201.18-212.17]

**Plaintiff's Response:**  Undisputed and immaterial.

## VI.     **The Arizona Lawsuits**

67.     On September 30, 2015 (***just six weeks after the instant matter***), Plaintiff filed four TCPA cases in Arizona small claims court, allegedly based on autodialed calls to the Number.[23]  [*Id.* at 241.16-301.18; Exhibits 8, 9, 10 & 11]  The complaints were filed expressly for alleged violations of TCPA provision 42 U.S.C. 227(b)(1)(A)(iii), which prohibits calls to:

> any telephone number assigned to ***a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call***, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

[*Id.* at Exhibits 8, 9, 10 & 11]

**Plaintiff's Response:**  Disputed and immaterial.

Defendant makes much of errors in pro se filings by Mr. Heidarpour in Arizona Small Claims Court regarding illegal pre-recorded calls to Mr. Heidarpour's Scottsdale residence. Under the TCPA, an unsolicited pre-recorded phone call offering goods or services is illegal whether made to a cell phone or a cell phone.  *Compare* 47 U.S.C. § 227(b)(1)(A)(iii) with 47 U.S.C. § 227(b)(1)(B).  The small claims court filings were simply an error, and Plaintiff corrected them in motions for reconsideration.   See Dkt. 37-9 (, third to last page, "a pre-recorded call to my residential telephone was received on March 16, 2015") and Dkt. 37-10, the final two pages.  ("Statement of facts:  A per-recorded (sic) call to my residential telephone was

---

[23]  Again, the Arizona small claims cases were not disclosed by Plaintiff in his interrogatory responses.  Amazingly, he claimed that he did not think they were "relevant" and that they were public records in any event.  [*Id.* at 317-20-323.10]

revived (sic) on Feb. 17, 2015.") As Defendant rightly states, a phone cannot be both a cell phone and a residential landline.  Here, the phone in question is indisputably a residential landline, making the corrected errors in small claims court filings irrelevant and immaterial to this action.

68.    With the assistance of his son, Andrew Heidarpour, Plaintiff also acknowledged sending three demand letters (two dated August 24, 2015 and one dated August 26, 2015) in three of the lawsuits (those against Freedom Auto Glass, Arizona Energy Pros and Mortgage Pro USA LLC) where he made the demand in the name of **Abante** using the Number.  [*Id.* at 241.16-301.18; Exhibits 8, 9 & 10 at "Demand Letter – Violation OF The TCPA"]

**Plaintiff's Response:**  Disputed and immaterial.

Defendant makes much of errors in pro se filings by Mr. Heidarpour in Arizona Small Claims Court regarding illegal pre-recorded calls to Mr. Heidarpour's Scottsdale residence. Under the TCPA, an unsolicited pre-recorded phone call offering goods or services is illegal whether made to a cell phone or a cell phone.  *Compare* 47 U.S.C. § 227(b)(1)(A)(iii) with 47 U.S.C. § 227(b)(1)(B).  The small claims court filings were simply an error, and Plaintiff corrected them in motions for reconsideration.   See Dkt. 37-9 (, third to last page, "a pre-recorded call to my residential telephone was received on March 16, 2015") and Dkt. 37-10, the final two pages.  ("Statement of facts:  A per-recorded (sic) call to my residential telephone was revived (sic) on Feb. 17, 2015.") As Defendant rightly states, a phone cannot be both a cell phone and a residential landline.  Here, the phone in question is indisputably a residential landline, the calls indisputably happened, making the corrected errors in small claims court filings irrelevant and immaterial to this action.

69.     The demand letters cover calls in February, March and May 2015 *(the same months as calls alleged in the instant matter)* and reference the Number as Abante's **cellular** number, **not a residential landline**.  [*Id.* at 241.16-301.18; Exhibits 8, 9 & 10]  In addition, the telephone records filed in two of the Arizona cases (those against Arizona Energy Pros and Mortgage Pro USA LLC) show the calls actually being received on Abante's cellular number, (510) 459-6147.  [*Id.* at Exhibits 9 & 10]  It is also undisputed that in one of the lawsuits (that against Freedom Auto Glass), Plaintiff settled on November 30, 2015 for $500 by entering a Settlement Agreement and General Release on November 15, 2015 *(three months after filing the instant matter)* that specifically states that "Plaintiff alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") to Plaintiff's **cellular** telephone line on May 15, 2015."  [*Id.* at Exhibit 8 at "Settlement Agreement and General Release"]

**Plaintiff's Response:**  Disputed and immaterial.

Defendant makes much of errors in pro se filings by Mr. Heidarpour in Arizona Small Claims Court regarding illegal pre-recorded calls to Mr. Heidarpour's Scottsdale residence. Under the TCPA, an unsolicited pre-recorded phone call offering goods or services is illegal whether made to a cell phone or a cell phone. *Compare* 47 U.S.C. § 227(b)(1)(A)(iii) with 47 U.S.C. § 227(b)(1)(B).  The small claims court filings were simply an error, and Plaintiff corrected them in motions for reconsideration.   See Dkt. 37-9 (, third to last page, "a pre-recorded call to my residential telephone was received on March 16, 2015") and Dkt. 37-10, the final two pages. ("Statement of facts:  A per-recorded (sic) call to my residential telephone was revived (sic) on Feb. 17, 2015.") As Defendant rightly states, a phone cannot be both a cell phone and a residential landline.  Here, the phone in question is indisputably a residential

landline, the calls indisputably happened, making the corrected errors in small claims court filings irrelevant and immaterial to this action.

70.    Plaintiff therefore took the position *(contemporaneously with the instant matter)* under oath three separate times in Arizona courts that the Number is a business cellular telephone line.  Of course, here he claims the Number is a residential landline.  It cannot be both.[24]   [Andrew Heidarpour Depo. at 139.22-140.8 ("Q.   A telephone line can't be both a residential landline and a business cell phone; correct?  A.  Correct.")]

    **Plaintiff's Response:**  Disputed and immaterial.

    Defendant makes much of errors in pro se filings by Mr. Heidarpour in Arizona Small Claims Court regarding illegal pre-recorded calls to Mr. Heidarpour's Scottsdale residence. Under the TCPA, an unsolicited pre-recorded phone call offering goods or services is illegal whether made to a cell phone or a cell phone.  *Compare* 47 U.S.C. § 227(b)(1)(A)(iii) with 47 U.S.C. § 227(b)(1)(B).   The small claims court filings were simply an error, and Plaintiff corrected them in motions for reconsideration.   See Dkt. 37-9 (, third to last page, "a pre-recorded call to my residential telephone was received on March 16, 2015") and Dkt. 37-10, the final two pages.  ("Statement of facts:  A per-recorded (sic) call to my residential telephone was revived (sic) on Feb. 17, 2015.") As Defendant rightly states, a phone cannot be both a cell phone and a residential landline.   Here, the phone in question is indisputably a residential

---

[24] CPay acknowledges that the small claims court complaints also baldly reference "47 USC 227 b(i)B."  There is no such provision.  47 U.S.C. § 227(b)(1)(B) prohibits artificial or prerecorded calls to residential telephone lines.  Any effort by Plaintiff to claim that this was simply a typo is dispelled by (1) the clear language of the demand letters which alleged cellular violations to Abante's cellular telephone, not residential landline violations; (2) the telephone bills included purportedly showing calls to Abante's cellular number; and (3) the Settlement Agreement referencing the calls as a cellular.

landline, the calls indisputably happened, making the corrected errors in small claims court filings irrelevant and immaterial to this action.

71.     Plaintiff also appears to have tried to change his story two months after filing these three Arizona lawsuits.  On November 25, 2015 (in the Arizona Energy Pros lawsuit) and December 9, 2015 (in the Mortgage Pro USA LLC lawsuit), Plaintiff filed motions for reconsideration because both lawsuits had been dismissed on November 3, 2015.  [*Id.* at Exhibits 9 & 10]  Those motions for the first time took the position that the alleged calls had been placed to a residential landline.  Similarly, On November 25, 2015 (in the Freedom Auto Glass lawsuit), Plaintiff took the position for the first time that the calls were placed to his residential landline.  [*Id.* at Exhibit 8 at "Disclosure Statement"]  Again, however, just five day later, Plaintiff settled this case with an agreement expressly describing the calls has having been made to a cellular telephone. [*Id.* at Exhibit 8 at "Settlement Agreement and General Release"][25]

**Plaintiff's Response:**  Disputed and immaterial.  As to Plaintiff's interrogatory response about his litigation history, Mr. Heidarpour objected and stated he would only provide information about his class action participation, and Defendant did not move to compel as to individual cases, of which it was already aware due to an extensive investigator's report it obtained, so Mr. Heidarpour did not failed to disclose anything.

Defendant makes much of errors in pro se filings by Mr. Heidarpour in Arizona Small Claims Court regarding illegal pre-recorded calls to Mr. Heidarpour's Scottsdale residence.  Under the TCPA, an unsolicited pre-recorded phone call offering goods or services is illegal whether made to a cell phone or a cell phone.  *Compare* 47 U.S.C. § 227(b)(1)(A)(iii) with 47

---

[25] It is clear that Plaintiff began to claim the Number was a residential landline in the Arizona lawsuits only after he lost in two of the suits on November 3, 2015.  At best for Plaintiff, he was trying to have it two ways by claiming that the Number was both a business cellular number and a residential landline.  Again, it cannot be both.

U.S.C. § 227(b)(1)(B).   The small claims court filings were simply an error, and Plaintiff corrected them in motions for reconsideration.   See Dkt. 37-9 (third to last page, "a pre-recorded call to my residential telephone was received on March 16, 2015") and Dkt. 37-10, the final two pages.  ("Statement of facts:  A per-recorded (sic) call to my residential telephone was revived (sic) on Feb. 17, 2015.") As Defendant rightly states, a phone cannot be both a cell phone and a residential landline.  Here, the phone in question is indisputably a residential landline, the calls indisputably happened, making the corrected errors in small claims court filings irrelevant and immaterial to this action.  Moreover, the TCPA calls for an award of $500 per call, regardless of whether the call was to a cell phone or a residence, making the distinction immaterial for a settlement.

This 6th day of November, 2016.


Respectfully Submitted by Plaintiff Fred Heidarpour,
By Counsel

*/s/Anthony I. Paronich*
Anthony I. Paronich
Edward A. Broderick
Broderick Law, P.C.
99 High St., Suite 304
Boston, MA  02110
(617) 738-7080
ted@broderick-law.com

Matthew P. McCue
The Law Office of Matthew P. McCue
1 South Avenue, Suite 3
Natick, Massachusetts 01760
(508) 655-1415
(508) 319-3077 *facsimile*
mmccue@massattorneys.net

Steven H. Koval
Attorney for Plaintiff
Georgia Bar No. 428905
THE KOVAL FIRM, LLC
3575 Piedmont Road
15 Piedmont Center, Suite 120
Atlanta, GA  30305
Telephone:  (404) 513-6651
Facsimile: (404) 549-4654
Steve@KovalFirm.com


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served via the Court's

electronic filing system on all counsel of record:


This 6th day of November, 2016.

/s/ *Anthony I. Paronich*
Counsel for Plaintiff